# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

THE NATIONAL ASSOCIATION OF )
BOARDS OF PHARMACY, )
)
    Plaintiff, )
)
v. )    CIVIL ACTION NO.: 3:07-CV-84 (CDL)
)
THE BOARD OF REGENTS OF THE )
UNIVERSITY SYSTEM OF GEORGIA, )
*et. al.*, )
)
    Defendants. )
_____ )

## PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

J. Rodgers Lunsford III
Georgia Bar No.: 461200
Kerri A. Hochgesang
Georgia Bar No.: 358448
Devin H. Gordon
Georgia Bar No.: 141256
Todd D. Williams
Georgia Bar No. 142379

Attorneys for Plaintiff National Association
of Boards of Pharmacy

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................... 2

III. ARGUMENT AND CITATION OF AUTHORITIES ......................... 2

    A.   Defendants' Rule 21 objection is without merit .................................... 2

    B.   Warren and Cobb are not entitled to immunity for their copyright infringement .......................................................................... 2

        1.   Sovereign immunity does not apply to NABP's copyright infringement claims against Warren and Cobb who are sued in their personal capacities ..................... 2

        2.   Qualified immunity does not shield Warren and Cobb from the consequences of their knowing infringement of NABP's secure exam questions ..................... 5

    C.   The Official Capacity Defendants are not entitled to immunity from prospective injunctive relief for copyright infringement ................................................................................... 8

        1.   The infringement in this case was "continuing" until enjoined .......................................................................... 9

        2.   The alleged availability of state-law remedies is irrelevant ......................................................................... 13

        3.   The Official Capacity Defendants have a "nexus" to the infringing activity ............................................................. 14

    D.   The Board is not entitled to immunity from NABP's copyright infringement claims ................................................. 18

        1.   The CRCA is constitutional under Section 5 of the Fourteenth Amendment under *Georgia* ................................ 19

            (i)   The previous *City of Boerne/Florida Prepaid* "facial" § 5 approach .................................. 21

i

(ii)     The current *Georgia* "as-applied"  §  5
         approach ................................................................ 22

         (a)      Background ................................................ 23

         (b)      *Georgia* ................................................... 25

(iii)    This is a Step Two case because the Board
         has deprived NABP of property without due
         process of law ...................................................... 30

         (a)      Deprivation................................................ 31

         (b)      Property...................................................... 31

         (c)      Without due process of law.......................... 32

(iv)     Each of the Board's counterarguments is
         flawed .................................................................. 37

         (a)      The  "Recital  Argument"  ignores
                  extensive precedent to the contrary................ 37

         (b)      The    "Footnote    18    Argument"
                  focuses on the wrong case, and there
                  is nothing in *Georgia* to suggest that
                  its three-step framework should be
                  applied only to Title II ................................ 40

         (c)      The "Leapfrog Argument" misreads
                  *Georgia* ..................................................... 42

         (d)      The "Silent Overruling Argument"
                  misreads *Florida Prepaid* ............................. 44

(v)      Even if this is a Step Three case, the CRCA
         is still "appropriate"  § 5  legislation  under
         the "congruence and proportionality" test.................. 46

         (a)      *Rodriguez* ................................................. 47

         (b)      *Chavez* ..................................................... 47

         (c)      Analyzing *Rodriguez* and *Chavez* ................. 49

2.   The CRCA is a proper exercise of Congress's Article I copyright power under *Katz* ....................... 59

    (i)   The *Katz* Decision ................................... 61

        (a)   The need for uniformity ................................. 62

        (b)   The Framers' actions ..................................... 63

    (ii)   Applying the reasoning of *Katz* to the copyright context ............................................ 64

        (a)   The need for uniformity ................................. 64

        (b)   The Framers' actions ..................................... 66

    (iii)   The CRCA is valid under *Katz* ..................... 66

3.   Under *Baum Research, inter alia,* the Board's immunity was contractually waived in 1995 ......................... 68

    (i)   *Board of Trustees SABIS International School v. Montgomery* ............................... 69

    (ii)   *Baum Research & Development Company v. University of Massachusetts at Lowell* ...................................... 70

    (iii)   Tying *SABIS* and *Baum Research* together ............................... 72

    (iv)   Applying *SABIS* and *Baum Research* to the instant case ........................................................ 74

E.   Warren, Cobb, and the Board are not entitled to immunity for their misappropriation of trade secrets or breach of contract .......................................... 80

  1.   Trade Secret Misappropriation ............................. 80

  2.   Breach of Contract ....................................... 81

IV.   CONCLUSION ............................................... 82

# TABLE OF AUTHORITIES

Page

## CASES

*Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988) .............................................79

*Alden v. Maine*, 527 U.S. 706, 712, 119 S. Ct. 2240, 2246 (1999) ........................................60, 61

*Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 931-32 (S.D.N.Y. 1996) .............................................................................................................................78

*Anderson v. State Univ. of N.Y.*, 107 F.Supp.2d 158, 161 (N.D.N.Y. 2000) ................................39

*Aptheker v. Sec. of State*, 378 U.S. 500, 84 S. Ct. 1659 (1964) ....................................................28

*Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 439 (S.D.N.Y. 1996) .............................................................................................................................79

*Arpaia v. Anheuser-Busch Cos.*, 55 F. Supp.2d 151, 162 (W.D.N.Y. 1999)...............................78

*Ass'n of Am. Med. Colls. v. Mikaelian*, 571 F. Supp. 144 (E.D. Pa. 1983) ...................................5

*Asunto v. Shoup*, 132 F. Supp.2d 445, 452 (E.D. La. 2000)..........................................................79

*Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 105 S. Ct. 3142 (1985) ..........................51-53

*Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 126 S. Ct. 961 (2006) ..................................................................................................................................28

*Barcena v. Dep't of Off-Street Parking of Miami*, 492 F. Supp.2d 1343, 1350 (S.D. Fla. 2007) ..............................................................................................................36

*Baum Research & Dev. Co. v. Univ. of Mass. at Lowell,* No. 1:02-cv-674, 2006 WL 461224 (W.D. Mich. Feb. 24, 2006), aff'd, --- F.3d ---, 2007 WL 2937300 (Fed. Cir. Oct. 10, *2007)*.................................................. 1, 68-76, 80

*Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S. Ct. 955 (2001) ...................................................................................................................23, 29, 49

*Bd. of Trustees SABIS Int'l Sch. v. Montgomery*, 205 F. Supp.2d 835 (S.D. Ohio 2002) .................................................................................................................68-77, 80

*Belch v. Bd. of Regents of Univ. Sys. of Ga.*, 27 F. Supp.2d 1341, 1347-38 (M.D. Ga. 1998) .................................................................................................................38

iv

*Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs.,* No. 06-00737, 2006 WL 1530177 (N.D. Cal. June 5, 2006) , *aff'd,* -- F.3d -- , No. 2006-1515, 2007 WL 3071687 (Fed. Cir. Oct. 23, 2007) ........................................67

*Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 554-55 (3d Cir. 2007) ........................................................................30, 41, 44, 46

*Brignoli v. Balch Hardy & Scheinman, Inc.,* 645 F. Supp. 1201, 1205 (S.D.N.Y. 1986)........................................................................79

*Broadrick v. Oklahoma,* 413 U.S. 601, 93 S. Ct. 2908 (1973) ........................28

*Brown v. Ga. Dep't of Revenue,* 881 F.2d 1018, 1022-23 (11th Cir. 1989)........11

*BV Eng'g v. Univ. of Cal., Los Angeles,* 657 F. Supp. 1246 (C.D. Cal. 1987) ........................................................................51

*Cable/Home Communication Corp. v. Network Prods., Inc.,* 902 F.2d 829, 851 (11th Cir. 1990) ........................................................................31

*Camp v. Coweta County,* 280 Ga. 199, 203-204(3), 625 S.E.2d 759 (2006) ........................81

*Cardinal Indus. v. Anderson Parrish Ass'n,* No. 83-1038-Civ-T-13, 1986 WL 32732 (M.D. Fla. May 7, 1986) ........................................................................51

*Cent. Va. Cmty. Coll. v. Katz,* 546 U.S. 356, 126 S. Ct. 990 (2006) ........................ passim

*Chavez v. Arte Publico Press,* 59 F.3d 539, 547 (5th Cir. 1995), 517 U.S. 1184, 116 S. Ct. 1667 (1996) ........................................................................8

*Chavez v. Arte Publico Press,* 204 F.3d 601 (5th Cir. 2000)..............................passim

*Chesler Perlmutter Prods., Inc. v. Fireworks Entm't, Inc.,* 177 F. Supp.2d 1050, 1059 (C.D. Cal. 2001)........................................................................79

*Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624, 630-31 (7th Cir. 2003) ........................................................................7

*Chisolm v. Georgia,* 2 Dall. 419 (1793)........................................................................63

*City of Boerne v. Flores,* 521 U.S. 507, 117 S. Ct. 2157 (1997) ....................21, 25, 28, 43, 47, 49

*Coll. Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 671, 119 S. Ct. 2219, 2223-24 (1999) ........................47, 49

*Crawford v. Davis,* 109 F.3d 1281, 1283 (8th Cir. 1997) ........................38

*Cummings v. Ga. Dept. of Juvenile Justice*, __ S.E.2d __, 2007 WL 4124884 at *3 (Ga. Nov. 21, 2007) ..................................................................81

*Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 367, 372-73 (2d Cir. 2005) ...........................................................................................8, 17

*Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662 (1986) ...........................31

*De Romero v. Inst. of Puerto Rican Culture*, 466 F. Supp.2d 410 (D.P.R. 2006) ...........................................................................................22, 39

*Duckworth v. Franzen*, 780 F.2d 645, 650-651 (7th Cir. 1985) ....................4

*Edelman v. Jordan*, 415 U.S. 651, 664-65, 94 S. Ct. 1347, 1356-57 (1974) ....................4, 13, 17

*Educ. Testing Serv. v. Simon*, 95 F. Supp.2d 1081 (C.D. Cal. 1999) ............5

*Educ. Testing Servs. v. Katzman*, 793 F.2d 533 (3d Cir. 1986) ...................5

*EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S. Ct. 1054, 1064 n. 18 (1983) ...................................................................................................38

*Eldred v. Ashcroft*, 537 U.S. 186, 213, 123 S. Ct. 769, 785 (2003) ..............63

*Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908) ........................... passim

*Fetner v. City of Roanoke*, 813 F.2d 1183, 1185 (11th Cir. 1987) ...............36

*Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982)..................12

*Firoozye v. Earthlink Network*, 153 F. Supp.2d 1115, 1126 (N.D. Cal. 2001) ......................................................................................................79

*Fitzpatrick v. Bitzer*, 427 U.S. 445, 452-56, 96 S. Ct. 2666, 2669-71 (1976) .................................................................................................20, 60

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642-45, 119 S. Ct. 2199, 2208-10 (1999) ........................... passim

*Franks v. Ky. Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998) ............38

*Frew v. Hawkins*, 540 U.S. 431, 437, 124 S. Ct. 899, 903 (2004) ..................8

*Fullilove v. Klutznick*, 448 U.S. 448, 476, 100 S. Ct. 2758, 2773 (1980) .....38

*Gonzales v. Carhart*, 127 S. Ct. 1610, 1638 (2007) ...................................28

vi

*Grizzle v. Okla. Dept. of Veterans Affairs*, No. CIV-06-210, 2006 WL
3227880 at *4 n.2 (E.D. Okla. Nov. 2, 2006) ................................................42

*Guttman v. Khalsa*, 446 F.3d 1027, 1035-36 (10th Cir. 2006) ....................30, 44, 46

*Hafer v. Melo*, 502 U.S. 21, 31, 112 S. Ct. 358, 365 (1991) ............................................3

*Hairston v. N.C. Agric. & Tech. State Univ.*, No. 1:04-CV-1203, 2005 WL
2136923 (M.D.N.C. Aug. 5, 2005) ................................................9, 10, 22, 46

*Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) ...............................5

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) ......................5

*Hight v. Burden*, 180 Ga. App. 716, 717, 350 S.E.2d 471, 473 (Ga. Ct.
App. 1986) ................................................................................32

*Howard v. Sterchi*, 725 F. Supp. 1572, 1579 (N.D. Ga. 1989)......................................79

*Hudson & Goodwin v. Patten*, 1 Root 133 (Conn. 1789) ............................................65

*Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194 (1984) ................................. 32, 44-46

*Hundertmark v. Fla. Dept. of Transp.*, 205 F.3d 1272, 1275, 1275 n.2
(11th Cir. 2000) ................................................................................39

*Hutto v. Finney*, 437 U.S. 678, 98 S. Ct. 2565 (1978)......................................................9

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 117 S. Ct. 2028 (1997)....................13, 14

*Int'l Bus. Machs. Corp. v. Evans,* 265 Ga. 215, 216-217, 453 S.E.2d 706,
708-709 (1995)................................................................................81

*James v. Allen*, 1 Dall. 188 (C.P. Phila. Cty. 1786) ............................................62, 63

*Jehnsen v. N.Y. Martin Luther King Jr. Inst. for Nonviolence*, 13 F.
Supp.2d 306, 311 (N.D.N.Y. 1998) ................................................22, 40

*Johnson v. Univ. of Va.*, 606 F. Supp. 321 (W.D. Va. 1985) ......................................51

*Katzenbach v. Morgan*, 384 U.S. 641, 658, 86 S. Ct. 1717 (1966) ............................58

*Kersavage v. Univ. of Tennessee*, 731 F. Supp. 1327, 1330 (E.D. Tenn.
1989) ................................................................................3, 5

*Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S. Ct. 631 (2000) ........................42, 49

*King v. Comfort Living, Inc.*, 287 Ga. App. 337, 651 S.E.2d 484 (2007) .......................................82

*Klingler v. Dir., Dept. of Revenue, Mo.*, 455 F.3d 888, 894 (8th Cir. 2006) ...................30, 44, 46

*Lane v. First Nat'l Bank of Boston*, 687 F. Supp. 11, 15 (D. Mass. 1988) ......................... 3, 24-26

*Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 122 S. Ct. 1640 (2002) .................................................................................................................. 68-72, 76, 80

*Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) ...............................................2

*Lennon v. Seaman*, 63 F. Supp.2d 428, 438 (S.D.N.Y. 1999) .........................................79

*Leroy v. Great W. United Corp.*, 443 U.S. 173, 178, 99 S. Ct. 2710, 2714 (1979) ......................................................................................................................13

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36, 102 S. Ct. 1148, 1158 (1982) ..............................................................................................33, 34, 44, 45

*Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986) ..............................................7

*Maher v. Roe*, 432 U.S. 464, 468 n. 4, 97 S. Ct. 2376, 2380 n. 4 (1977) .....................................13

*McLellan v. Miss. Power & Light Co.*, 526 F.2d 870, 873 (5th Cir. 1976), *modified on other grounds*, 545 F.2d 919 (5th Cir. 1976).....................................................2

*Mehus v. Emporia State Univ.*, 295 F.Supp.2d 1258, 1265 (D. Kan. 2004) .................................39

*Messick v. Leavins*, 811 F.2d 1439, 42-43 (11th Cir. 1987) .........................................36

*Mihalek Corp. v. Michigan*, 595 F. Supp. 903 (E.D. Mich. 1984) ..............................................51

*Millar v. Hall*, 1 Dall. 229 (Pa. 1788) ..........................................................62, 63

*Mills Music, Inc. v. Arizona*, 591 F.2d 1278 (9th Cir. 1979) ..........................................51

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25, 103 S. Ct. 927, 942 (1983).............................................................................................73

*Munford v. MacLellan*, 682 F. Supp. 521, 521 (N.D. Ga. 1988).....................................2

*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 n.6 (8th Cir. 1993)......................................................................................................78

*Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies, Inc.*, 458 F. Supp.2d 252 (E.D. Pa. 2006) ........................................................................................5

*Nat'l Conference of Bar Exam'rs v. Saccuzzo*, No. 03CV0737BTM, 2003
WL 21467772 (S.D. Cal. June 10, 2003) ............................................................5, 6

*Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 123 S. Ct.
1972 (2003) ...................................................................................... 49, 58-59

*Papasan v. Allain,* 478 U.S. 265, 282 n. 14, 106 S. Ct. 2932, 2943 n.14
(1986)...............................................................................................................17

*Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908 (1981) .......................32, 33, 37, 44, 45

*Pennington Seed Inc. v. Produce Exch. No. 299,* 457 F.3d 1334 (Fed. Cir.
2006) .........................................................................................................17, 18

*Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 19-20, 109 S. Ct. 2273, 2284
(1989)...........................................................................................................40, 60

*Rainey v. Wayne State Univ.*, 26 F. Supp.2d 973, 976 (E.D. Mich. 1998) ....................22

*Richard Anderson Photography v. Radford Univ.*, 633 F. Supp. 1154
(W.D. Va. 1986) ...........................................................................................3, 4, 51

*Rodriguez v. Tex. Comm'n on the Arts*, 199 F.3d 279 (5th Cir. 2000) ...........21, 22, 46, 47, 49, 59

*Rosaly v. Ignacio*, 593 F.2d 145, 147 n. 3 (1st Cir. 1979)...........................................13

*Roth v. Pritikin*, 710 F.2d 934, 939 (2d Cir. 1983) .....................................................31

*Sabri v. United States*, 541 U.S. 600, 608, 124 S. Ct. 1941, 1948 (2004) ........................27, 28, 42

*Salerno v. City Univ. of N.Y.*, 191 F. Supp.2d 352, 356 (S.D.N.Y. 2001) .....................22

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66, 116 S. Ct. 1114, 1128
(1996) .......................................................................................................40, 60, 61

*Short Line R.R. Co. v. Dept. of Revenue Or.*, 139 F.3d 1259, 1266 (9th Cir.
1998) ................................................................................................................38

*Stenberg v. Carhart*, 530 U.S. 914, 120 S. Ct. 2597 (2000) ....................................28, 29

*Stotter v. Univ. of Tex. at San Antonio*, -- F.3d --, 2007 WL 4171112 *6 (5th Cir. 2007)............46

*Teamsters Local 515 v. Roadbuilders, Inc. of Tenn.,* 249 Ga. 418, 421, 291
S.E.2d 698, 701 (Ga. 1982)...............................................................................13

*Telecomm Tech. Servs., Inc. v. Siemens Rolm Communications, Inc.,* 66 F. Supp.2d 1306, 1326 (N.D. Ga. 1998) .......................................................................77

*Tennessee v. Lane,* 541 U.S. 509, 124 S. Ct. 1978 (2004) .................23, 24, 25, 40, 41, 42, 43, 49

*Titan Sports Inc. v. Turner Broad. Sys., Inc.,* 981 F. Supp. 65, 72 n.2 (D. Conn. 1997).....................................................................................................78

*Toeller v. Wis. Dept. of Corr.,* 461 F.3d 871, 876 (7th Cir. 2006) ................................................61

*Toledo v. Sanchez,* 454 F.3d 24, 34 (1st Cir. 2006) ............................................30, 44, 46

*Torah Soft Ltd. v. Drosnin,* 224 F. Supp.2d 704, 717 (S.D.N.Y. 2002) ........................................79

*Trenton v. Infinity Broad. Corp.,* 865 F. Supp. 1416, 1429 (C.D. Cal. 1994) ...............................................................................................................79

*Tribue v. Hough,* No. 304-CV-286, 2006 WL 42163 *9 (N.D. Fla. Jan. 6, 2006) ...............................................................................................................36

*Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1169 (7th Cir. 1997) ........................................58

*Union Pac. R.R. Co. v. Utah,* 198 F.3d 1201, 1203-04 (10th Cir. 1999) ........................................39

*United States v. Georgia,* 546 U.S. 151, 126 S. Ct. 877 (2006) ........................................... passim

*United States v. Moghadam,* 175 F.3d 1269, 1275 n.10 (11th Cir. 1999) ........................................39

*United States v. Raines,* 362 U.S. 17, 20-22, 80 S. Ct. 519, 522-23 (1960) ................................27

*United States Fire Ins. Co. v. Nat'l Gypsum Co.,* 101 F.3d 813, 816 (2d Cir. 1996) ...............................................................................................72, 73

*Ussery v. La. ex rel. La. Dept. of Health & Hosps.,* 150 F.3d 431, 436 (5th Cir. 1998) ...............................................................................................38

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 645, 122 S. Ct. 1753, 1760 (2002)..................................................................................8

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Univ.,* 489 U.S. 468, 477, 109 S. Ct. 1248, 1255 (1989)..................................................................74

*Wihtol v. Crow,* 309 F.2d 777 (8th Cir. 1962) .......................................................51

*Williams v. Ga. Dept. of Human Res.,* 272 Ga. 624, 625, 532 S.E.2d 401 (2000).....................................................................................................81

x

*Wilson v. Beebe*, 770 F.2d 578, 588 (6th Cir. 1985) ...................................................4

*Woelffer v. Happy States of Am., Inc.*, 626 F. Supp. 499 (N.D. Ill. 1985) .................51

*Wolff v. Inst. of Elec. & Elecs. Eng'rs, Inc.*, 768 F. Supp. 66, 69 (S.D.N.Y. 1991) ........................................................................................................................78

*Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S. Ct. 421, 424 (1948) ........................................................................................................................38

*Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 457-58 (6th Cir. 2001) .....................78

*Wright v. Newsome,* 795 F.2d 964, 967 (11th Cir. 1986) ............................................35

*Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990) .....................30, 33-35, 44-46

## CONSTITUTIONS, STATUTES, LEGISLATIVE HISTORY, RULES

1 Stat. 318 § 7 (1793) ..................................................................................................66

17 U.S.C. § 106 ...........................................................................................................77

17 U.S.C. § 301 ..........................................................................32, 55, 68, 76, 80, 82

17 U.S.C. §§ 501(a) and 511 (Copyright Remedy Clarification Act) ................. passim

28 U.S.C. § 1338 ...............................................................................................55, 68, 76

28 U.S.C. § 1367 ..........................................................................................................81

GA. CONST. art. I, § II, par. IX .....................................................................................82

O.C.G.A. § 28-5-80..................................................................................................32, 34

O.C.G.A. § 50-21-26 ...................................................................................................81

FED. R. CIV. P. 15 .....................................................................................................2, 11

FED. R. CIV. P. 21 ..........................................................................................................2

FED. R. CIV. P. 25(d)(1) ..............................................................................................17

U.S. CONST. amend XIV § 1 .......................................................................................20

U.S. CONST. amend XIV § 5 .......................................................................................20

*Copyright Liability of States and the Eleventh Amendment* 7-9 (1988) .......................39

*Copyright Remedy Clarification Act: Hearings on H.R. 1131 Before the
House Subcomm. on Courts, Intellectual Prop., and the Admin. of Justice
of the Comm. on the Judiciary*, 101st Cong. (1989) ............................................................ passim

H.R. REP. NO. 101-282(I) at 8 (1989) ...........................................................................52

S. REP. NO. 101-305 (1989) ...........................................................................................52

**SUPPLEMENTAL AUTHORITIES**

61B AM. JUR. 2d Pleading § 897 (2007).........................................................................12

1 ALEXANDER LINDEY & MICHAEL LANDAU, 1 LINDEY ON ENTM'T,
PUBL'G & THE ARTS § 1:87 (3d ed.) .............................................................................67

James F. Caputo, *Copy-Katz: Sovereign Immunity, The Intellectual
Property Clause, and Central Virginia Community College v. Katz*, 95
GEO. L.J. 1911, 1935 (August 2007) .............................................................................67

Irah Donner, *The Copyright Clause of the U.S. Constitution: Why did the
Framers Include it with Unanimous Approval*, 36 AM J. LEGAL HIST. 361,
370-72 (July 1992) .........................................................................................................65

Edward A. Hartnett, *Modest Hope for a Modest Roberts Court: Deference,
Facial Challenges, and the Comparative Competence of Courts*, 59 SMU
L. REV. 1735, 1751-52 (2006) .......................................................................................27

L. Ray Patterson & Craig Joyce, *Copyright in 1791: An Essay*, 52 EMORY
L.J. 909, 933 (Spring 2003) ......................................................................................64, 65

Gillian E. Metzger, *Facial Challenges and Federalism*, 105 COLUM. L.
REV. 873, 932 (2005) .................................................................................................27, 41

MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT ......................53, 56

RESTATEMENT (SECOND) OF CONTRACTS § 73 cmt. b (1981)......................................79

THE FEDERALIST NO. 43, at 279 (James Madison) (Mod. Lib. ed., 1941) ...................65

Edward C. Walterscheid, *To Promote the Progress of Science and Useful
Arts: The Anatomy of a Congressional Power*, 43 IDEA 1, n. 328 (2002) ...................66

## I.      INTRODUCTION

Defendants have knowingly and repeatedly infringed NABP's copyrighted pharmacist licensure exam questions.  In doing so, they seriously compromised the integrity of NABP's pharmacist licensure exam and the integrity of pharmacist licensure in this and numerous other states.  When called to task for their misconduct, they did not deny it, but instead collectively invoked a perceived sovereign immunity shield.  But Defendants' desired jurisdictional shield is not as pervasive nor collective as they wish it to be.  There can be no legitimate dispute that this Court has had jurisdiction over: 1) NABP's copyright infringement claims against Warren and Cobb in their personal capacities; 2) NABP's breach of contract claim against Warren under 28 U.S.C. § 1367; and 3) NABP's claim against the Official Capacity Defendants for prospective injunctive relief for copyright infringement under the rule of *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908).  Nor should there be any question that this Court has had jurisdiction over NABP's claim against the "Board," as an entity, for the monetary damages suffered as a result of the Defendants' copyright infringement.  The Board's arguments to the contrary ignore several recent shifts in sovereign immunity jurisprudence.  Specifically, under a trio of 2006 cases – *United States v. Georgia*, 546 U.S. 151, 126 S. Ct. 877 (2006); *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 126 S. Ct. 990 (2006); and *Baum Research & Dev. Co. v. Univ. of Mass. at Lowell*, No. 1:02-cv-674, 2006 WL 461224 (W.D. Mich. Feb. 24, 2006), *aff'd*, --- F.3d ---, 2007 WL 2937300 (Fed. Cir. Oct. 10, 2007) – the Board is not entitled to immunity for its infringement of NABP's copyrights because: 1) Congress validly abrogated such immunity in passing the CRCA; and 2) the Board, after it was caught infringing NABP's copyrights in 1995, waived such immunity when it signed an agreement in which it promised not to do so again.

## II.    STATEMENT OF FACTS

NABP incorporates herein all factual averments contained in its Restated and Amended Verified Complaint.   Because Defendants confirmed in their Motions to Dismiss that the sovereign immunity challenges addressed herein are "facial," as opposed to "factual," all such averments from NABP's Restated and Amended Verified Complaint are taken as true.   *E.g.*, *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

## III.    ARGUMENT AND CITATION OF AUTHORITY

### A.    Defendants' Rule 21 objection is without merit.

Before addressing Defendants' substantive arguments, NABP first addresses Defendants' procedural objection that under FED. R. CIV. P. 21 NABP was required to obtain leave of this Court before amending its complaint to add parties.   (Board Brief at 42.)   NABP added the parties in question when it amended its complaint under FED. R. CIV. P. 15(a).   The addition of a party through an amendment under Rule 15 prior to responsive pleadings is a matter of right in this circuit for which no motion or leave is required.   *E.g.*, *Munford v. MacLellan*, 682 F. Supp. 521, 521 (N.D. Ga. 1988); *see also* *McLellan v. Miss. Power & Light Co.*, 526 F.2d 870, 873 (5th Cir. 1976), *modified on other grounds*, 545 F.2d 919 (5th Cir. 1976).

### B.    Warren and Cobb are not entitled to immunity for their copyright infringement.

### 1.    Sovereign immunity does not apply to NABP's copyright infringement claims against Warren and Cobb who are sued in their personal capacities.

Warren and Cobb are named as defendants individually; each is being sued in his personal capacity.   In such capacities, any monetary judgment against them for their copyright infringement would not be paid by the State, but instead would be paid by *them*, out of their *personal* assets.   The Supreme Court has made clear that "[i]nsofar as [a plaintiff] seek[s] damages against [an individual defendant] personally, the Eleventh Amendment does not restrict

2

[a plaintiff's] ability to sue in federal court." *Hafer v. Melo*, 502 U.S. 21, 31, 112 S. Ct. 358, 365 (1991). This rule has been repeatedly applied against employees of state universities who, like Warren and Cobb, infringed intellectual property rights. *See, e.g., Richard Anderson Photography v. Brown*, 852 F.2d 114, 122 (4th Cir. 1988); *Kersavage v. Univ. of Tenn.*, 731 F. Supp. 1327, 1330 (E.D. Tenn. 1989); *Lane v. First Nat'l Bank of Boston*, 687 F. Supp. 11, 15 (D. Mass. 1988).

Thus, the test for distinguishing personal capacity from official capacity suits is not whether state employees are sued for actions taken in the course of their state employment, as Defendants suggest. Rather, the test is whether the relief sought would operate against the State. A state employee who is sued in his personal capacity for a violation of federal law is frequently being sued for conduct undertaken within the official scope of his state employment. But "[t]he mere fact that [an employee's] conduct was undertaken in the course of her state employment does not . . . relieve her of individual liability, even if her employer could not be sued for it." *Richard Anderson Photography*, 852 F.2d at 122; *accord Hafer*, 502 U.S. at 26, 112 S. Ct. at 362 ("[T]he phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, ***not*** the capacity in which the officer inflicts the alleged injury.") (Emphasis added.) In *Hafer*, the defendant was a State Auditor General sued personally for monetary relief for dismissing eighteen employees allegedly because of their political affiliation. There was no question that the firing fell within the scope of her employment, and she thus moved to dismiss under, *inter alia*, the Eleventh Amendment. But the Supreme Court held, ***without dissent***, that sovereign immunity did not bar the suit, because the Auditor General was sued in her ***personal capacity***. 502 U.S. at 31, 112 S. Ct. at 365. Thus, to the extent that Warren and Cobb suggest that if their infringement was undertaken in the course of their state

3

employment, then they enjoy sovereign immunity, they are simply mistaken.[1]  (Cobb Brief at 2; Board Brief at 12.)

Curiously, Warren and Cobb both appear to understand this point, as both *correctly* note that the test for distinguishing personal capacity suits from official capacity suits is not whether the wrong was perpetrated in the scope of the defendant's state employment, but whether the relief sought would operate against the State.  But neither Warren nor Cobb *applies* this test.  For example, both cite *Edelman* (Warren Brief at 3 n.1; Cobb Brief at 12-13 n.2), in which the Supreme Court held that a suit to compel a state official to release withheld welfare benefits (which benefits could not be paid out of the official's *personal* assets) sought relief from the State.  *Edelman v. Jordan*, 415 U.S. 651, 664-65, 94 S. Ct. 1347, 1356-57 (1974).  But because both private and public actors can pay damages from their *own pockets* for their copyright infringement, a suit against a state university professor for copyright infringement is not the same.  *E.g.*, *Richard Anderson Photography*, 852 F.2d at 122 ("Brown could obviously pay a judgment for money damages independently of her status as a state official, and without any consequence to the state's fisc.").  Instead of acknowledging this result, or including any analysis on this point, Warren and Cobb instead focus on the wholly irrelevant question (at least as to them) of whether the CRCA is constitutional.  (Warren Brief at 4-16; Cobb Brief at 4-10.)  Such analysis is relevant only to whether the *Board's* sovereign immunity was abrogated.  It has

---

[1] Further, while Defendants do not raise the issue, it is equally well established that the amenability of state officials sued in their personal capacities to damage judgments does not evaporate if the State has agreed to indemnify the individuals.  Courts have consistently held that a state's voluntary decision to indemnify such defendants does not transform the nature of the underlying claim, or permit the defendants to escape personal liability. *See, e.g.*, *Duckworth v. Franzen*, 780 F.2d 645, 650-651 (7th Cir. 1985) ("[T]he purpose of the Eleventh Amendment is only to protect the state against involuntary liability.  If the State chooses to pick up the tab for its errant officers, its liability for their torts is voluntary."); *Wilson v. Beebe*, 770 F.2d 578, 588 (6th Cir. 1985) ("State cannot clothe [state officer] with [Eleventh Amendment] immunity by voluntarily agreeing to pay any judgment rendered against him.").

nothing to do with Warren and Cobb, who, as individuals sued in their ***personal capacity***, enjoy no sovereign immunity to begin with.

## 2.      Qualified immunity does not shield Warren and Cobb from the consequences of their knowing infringement of NABP's secure exam questions.

Warren and Cobb also assert that "qualified immunity" should apply to their copyright infringement.  It does not, for the immunity is just what it says – qualified, not absolute – and it applies only when a defendant can establish that their conduct did not violate "clearly established" law.  *See, e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages ***insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.***") (emphasis added); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  Both Warren and Cobb correctly cite this test, but again, neither applies it.  (Warren Brief at 16; Cobb Brief at 15-16.)

Applying this test, courts have consistently found that when public officials' infringements violated "clearly established" patent or copyright law, such officials could be held liable for damages. *Kersavage*, 731 F. Supp. at 1330; *Lane*, 687 F. Supp. at 16-18.  Further, the conclusion that Warren and Cobb's infringement of NABP's secure exam questions violated "clearly established" law follows ineluctably from two propositions of copyright law, long established by the federal courts.  First, copying and distributing secure exam questions constitutes copyright infringement.[2]  Second, the defense of fair use has no applicability in this

---

[2] *See, e.g.*, *Educ. Testing Servs. v. Katzman*, 793 F.2d 533 (3d Cir. 1986) (finding copyright infringement for illicit copying and use of secure examination questions); *Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies, Inc.*, 458 F. Supp.2d 252 (E.D. Pa. 2006) (same); *Nat'l Conference of Bar Exam'rs v. Saccuzzo*, No. 03CV0737BTM, 2003 WL 21467772 (S.D. Cal. June 10, 2003) (same); *Educ. Testing Serv. v. Simon*, 95 F. Supp.2d 1081 (C.D. Cal. 1999) (same); *Ass'n of Am. Med. Colls. v. Mikaelian*, 571 F. Supp. 144 (E.D. Pa. 1983) (same).

Case 3:07-cv-00084-CDL   Document 121   Filed 01/04/08   Page 19 of 52

context, because the unique nature of secure tests means that any use thereof is destructive, and

renders the test worthless. *E.g.*, *Katzman*, 793 F.2d at 543; *Ass'n of Am. Med. Colls.*, 571 F.

Supp. at 152. Congress has recognized the intrinsically unfair nature of copying and using

secure exam questions, and has explicitly stated that such use is not "fair use." As the *Sacuzzo*

court noted:

> Congress has likewise indicated that the fair use doctrine is not intended to shield
> the unauthorized disclosure or use of secure, standardized test questions. For
> example, in amending the "fair use" provision of the Copyright Act in 1991,
> Congress noted the importance of rigorous copyright protection for secure tests.
> The Senate Report on that amendment stated that the bill was "not intended to
> reduce the protection of secure tests, the utility of which is especially vulnerable
> to unauthorized disclosure." Similarly, in a statement on the Senate floor, Senator
> Grassley stressed that it was not Congress' intention to "weaken the very strong
> protection that the courts have given to an important type of copyrighted work-
> secure tests such as the ACT, SAT, LSAT, and MCAT." Senator Grassley went
> on to quote the testimony of Ralph Oman, then Register of Copyrights, who
> explained that: Secure tests are particularly vulnerable to having their utility
> obliterated by unauthorized disclosure. The courts have, accordingly, been
> particularly solicitous in protecting these works. Indeed, so far as we are aware,
> the courts have *never* upheld a fair use claim advanced by any private entity with
> regard to copying of secure tests or test questions.
>
> In amending another section of the Copyright Act in 2001, Congress again made a
> point to note the protection that Copyright laws afford to secure tests: *The
> Committee is aware and deeply concerned about the phenomenon of school
> officials who are entrusted with copies of secure test forms solely for use in
> actual test administrations and using those forms for a completely unauthorized
> purpose, namely helping students to study the very questions they will be asked
> on the real test.* The Committee does not in any way intend to change current law
> with respect to application of the Copyright Act or to undermine or lessen in any
> way the protection afforded to secure tests under the Copyright Act.

*Saccuzzo*, 2003 WL 21467772 at *8-*9 (citations omitted; emphasis added). And as Judge

Posner of the Seventh Circuit recognized:

> So if Schmidt can publish six tests, other dissenters can each publish six other
> tests, and in no time all 44 will be published. The board will never be able to use
> the same question twice, and after a few years of Schmidtian tactics there will be
> such difficulty in inventing new questions without restructuring the curriculum

that the board will have to abandon standardized testing.   Which is Schmidt's goal.

If ever a "floodgates" argument had persuasive force, therefore, it is in this case. . . . If Schmidt wins this case, it is goodbye to standardized tests in the Chicago public school system; Schmidt, his allies, and the federal courts will have wrested control of educational policy from the Chicago public school authorities.

*Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 630-31 (7th Cir. 2003) (finding no fair use for infringement of secure exam questions).

In the face of such unanimous, explicit, and contrary authority, it is incomprehensible for Warren and Cobb to argue that it was not "clearly established" that their conduct constituted copyright infringement, or that their conduct was fair use.  Cobb attempts to circumvent this conclusion by arguing that because the constitutionality of the CRCA may be in question, his copyright infringement did not violate "clearly established" law.  (Cobb Brief at 16.)  This misses the point.  As noted above, the CRCA has nothing to do with Warren and Cobb, both of whom are sued in their personal capacities. But even if it did, the question is not whether Cobb's *immunity* was clearly established; the question is whether *the law Cobb violated* – here copyright protection for secure exam questions – was clearly established.  In this case it was.

Warren doesn't even argue this point.  This is understandable – it would be disingenuous for Warren to assert that he did not realize he was violating the copyright laws, as he was caught committing *the very same infringement* in 1995, and signed an agreement promising not to do it again.  (Amended and Restated Verified Complaint ¶ 18 and Ex. A.)  Thus, he can hardly claim that he did not know that repetition of his 1995 misconduct would violate copyright law.  The Supreme Court has made clear that qualified immunity does not protect "those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986).  Thus, this is not a case such as *Chavez*, where Warren could argue that there was some ambiguity as to

7

whether what he was doing violated a clearly established right.  *Chavez v. Arte Publico Press*, 59

F.3d 539, 547 (5th Cir. 1995), *vacated on other grounds*, 517 U.S. 1184, 116 S. Ct. 1667 (1996).

It clearly did, and he knew it.

**C.    The Official Capacity Defendants are not entitled to immunity from prospective injunctive relief for copyright infringement.**

Turning from Warren and Cobb to the Official Capacity Defendants, for almost a

century, under *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908), courts have consistently held

that sovereign immunity does not preclude suits for prospective injunctive relief against state

officials sued in their official capacity for violations of federal law.  *E.g., Frew v. Hawkins*, 540

U.S. 431, 437, 124 S. Ct. 899, 903 (2004).  To determine whether *Young* applies, a court "need

only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective."  *E.g., Verizon Md., Inc. v.*

*Public Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S. Ct. 1753, 1760 (2002).  So long as a

plaintiff's complaint pleads these elements, and pleads that the official sued has some connection

to the continuing violation of federal law at issue, then *Young* applies and the state official enjoys

no immunity.  S*ee, e.g., Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 367, 372-73

(2d Cir. 2005).  Such an inquiry is one of ***pleading***, and does not include an analysis of the merits

of the claim.  *E.g., Verizon*, 535 U.S. at 646, 122 S. Ct. at 1761 ("An *allegation* of ongoing

violation of federal law is ordinarily sufficient.") (Citations omitted; emphasis in original.)  Thus,

because NABP in its Amended Complaint has alleged that the "Official Capacity Defendants"[3]

---

[3] Paul Brooks, Alan Wolfgang, George Francisco, Svein Oie, Eldridge W. McMillan, Donald M. Leebern, Jr., Hugh A. Carter, Jr., J. Timothy Shelnut, Michael J. Coles, William H. Cleveland, Wanda Yancey Rodwell, James R. Jolly, Patrick S. Pittard, Julie Ewing Hunt, W. Mansfield Jennings, Jr., Allan Vigil, Doreen Stiles Poitevint, Richard L. Tucker, Willis J. Potts, Robert F. Hatcher, A. Felton Jenkins, Benjamin J. Tarbutton, James A. Bishop, and Kenneth R. Bernard, Jr.

had a connection to the ongoing infringement at issue, and has asked for prospective injunctive relief therefor,[4] sovereign immunity does not apply to them.

Defendants seek to avoid a century of precedent on this point with multiple counterarguments. Some can be summarily addressed. First, NABP has never alleged that *Young* applies to anyone other than the Official Capacity Defendants. Thus, the Board's assertion that *Young* does not apply to it, and Cobb's assertion that *Young* does not apply to him, are both true but irrelevant. (Board Brief at 31-32; Cobb Brief at 17-18.) Likewise, NABP has never alleged that *Young* applies to any violations of state law. The Official Capacity Defendants' statement to that effect is likewise true but irrelevant. (Board Brief at 32-33.) The three additional arguments proffered by the Official Capacity Defendants as to why *Young* should not apply: 1) the "continuing harm" argument; 2) the "state-law remedies" argument; and 3) the "nexus" argument – are addressed below.

**1.      The infringement in this case was "continuing" until enjoined.**

In their attempt to skirt *Young*, the Official Capacity Defendants first argue that *Young* cannot apply because the harm suffered by NABP is not "continuing." (Board Brief at 33-38.) This argument contains two components – first, that NABP has not sufficiently pled that the infringement is continuing, and second, that NABP's pleadings, even if sufficient on their face, are not factually supported. (Board Brief at 34-35; Board Brief at 35-38.) On the first argument, in *Hairston v. N.C. Agric. & Tech. State Univ.*, No. 1:04CV1203, 2005 WL 2136923 (M.D.N.C. Aug. 5, 2005) – a case relied on by the Board in its brief – the court summarily rejected a claim that the harm complained of was not sufficiently "continuing" to support an injunction under *Young. Hairston*, 2005 WL 2136923 at *8. The Court's discussion is cited here in full:

---

[4] NABP also seeks attorneys' fees under *Hutto v. Finney*, 437 U.S. 678, 98 S. Ct. 2565 (1978).

> Defendants argue, therefore, the complaint on its face does not allege an ongoing
> violation of Plaintiff's copyright. This court does not agree. In addition to the
> allegations in Paragraph 14, the amended complaint clearly also alleges that "[o]n
> numerous occasions after 2000 and, upon information and belief, *to date*,
> Defendants have infringed . . . the above-mentioned copyright by reproducing and
> copying the photograph in print publications sponsored by the University,
> including but not limited to, football programs"; that "[t]he unauthorized and
> infringing *use* by Defendants *will, unless enjoined, cause* irreparable harm,
> damage and injury to Plaintiff"; that "Defendants have unlawfully and wrongfully
> derived, *and will continue to derive*, income and profits from the infringing acts";
> and that Plaintiff "has notified Defendant of the acts *which constitute* copyright
> infringement, and Defendants *have continued to infringe* the copyright."
> Amended Compl. ¶¶ 25, 26, 27, 29 (emphases added). Thus, the court finds that
> Plaintiff sufficiently alleges an ongoing violation of federal copyright law by
> Defendants.

*Id.* The Official Capacity Defendants *concede* that ¶¶ 33 and 35 of NABP's Amended and

Restated Verified Complaint allege a "continuing" harm in the same way that the pleadings in

*Hairston* alleged a continuing harm. (Board Brief at 35.) But the Official Capacity Defendants

then attempt to claim that NABP's Amended and Restated Verified Complaint does not aver

specific facts supporting such allegations. (*Id.*) This is simply not true. NABP's Amended and

Restated Verified Complaint ¶¶ 19-23 outline *specific facts* supporting the allegation that the

infringement in this case was continuing when NABP filed this lawsuit on August 3, 2007.

The Official Capacity Defendants attempt to avoid his conclusion by noting that *after*

this lawsuit was filed, and *after* they were enjoined by this Court on August 3, 2007, their

infringing activities have purportedly ceased. The Official Capacity Defendants rely on

numerous new facts, including Interrogatory Responses and "testimony" from their counsel, in

support of this assertion. (Board Brief at 35 n.10; Board Brief at 36.) All of these facts are not

properly before the Court. NABP and the Defendants went through rounds of briefing regarding

discovery in October, and the discovery dispute between the parties was ultimately resolved *only*

when the Defendants *represented to this Court* that they would mount a "facial," as opposed to a

"factual," challenge on the sovereign immunity issue.  Under such a "facial" challenge, the Official Capacity Defendants cannot rely on facts other than those included in NABP's Restated and Amended Verified Complaint.  Yet, as NABP anticipated,[5] the Official Capacity Defendants have reneged on their representation to this Court and have attempted to slip new facts into the record.  This they cannot do.

But even if this Court accepts all of the Official Capacity Defendants' new facts as true, they are irrelevant, because they all concern events that took place *after* this lawsuit was filed, and *after* Defendants were temporarily enjoined by this Court on August 3, 2007.[6]  Thus, to

---

[5] As NABP argued back on October 25th:

> The problem is that NABP has no way of knowing whether the Board will indeed, when the time comes, mount a "facial" attack on the sovereign immunity issue, or will instead rely on declarations in support of its ultimate motion that NABP will need to rebut.  This uncertainty – and the fact that the ball is in the Board's court on this issue – partly informed NABP's request at the August 21st hearing that the Court allow discovery on the immunity question, and partly informed the Discovery Requests at issue. . . .
>
> The Board cannot have it both ways.  On the one hand, the Board claims that it intends to launch a "facial" attack on subject matter jurisdiction, alleviating any need for discovery or development of a factual record for the Court's consideration.  On the other, the Board wants to retain its ability to place facts in the record in support of its ultimate Motion to Dismiss, regardless of whether or not those facts have been previously disclosed to NABP.  Thus, the Discovery Requests are vital to protect NABP from ambush when the jurisdictional issues are eventually briefed for the Court.  The Board must be required to take a position and proceed accordingly.  Allowing the Board to "flip-flop" its positions as needed to ward off NABP's legitimate attempts to conduct discovery will result in prejudice and could have an adverse impact on the Court's final analysis of the jurisdictional issues of this case.

(NABP's Reply to the Board's Response to NABP's Motion to Compel, Docket No. 95, at 3-4.)

[6] It is erroneous for the Official Capacity Defendants to suggest that the critical date is not the date this suit was filed (August 3rd) but the date that NABP amended its complaint (October 25th).  (Board Brief at 35.)  NABP's Restated and Amended Verified Complaint relates back to the date of filing of the original complaint under FED. R. CIV. P. 15(c).  *Brown v. Ga. Dept. of Revenue*, 881 F.2d 1018, 1022-23 (11th Cir. 1989) (holding that relation back was proper where a plaintiff amended his complaint to add individual members of the State Personnel Board in their official capacities under *Young*, since service on the Board had provided sufficient notice to the individual Board members, and since no prejudice resulted from the amendment because the Board was already a party to the suit).  Further, because NABP's

(continued...)

claim that the factual record in this case supports the conclusion that Defendants "voluntarily" ceased their infringing conduct is not credible. In 1995, the Board and Warren agreed to cease their infringing conduct only after suit was threatened by NABP. (Amended and Restated Verified Complaint ¶ 18 and Ex. A.) Having entered into an agreement in which they promised to cease their infringing activities, they then flagrantly violated that agreement. (*Id.* at ¶¶ 19-23, 25-29.) There is no reason to believe they would not still be infringing today had NABP not brought this suit and obtained injunctive relief. In fact, on the very day they were enjoined, they were offering to sell infringing material for a review course that was scheduled to be taught by Warren and Cobb beginning on August 8, 2007. (*Id.* at ¶ 22.) Only when faced with the risk of contempt for violating this Court's temporary restraining order did their infringing conduct cease. Thus, the factual record is not one of "voluntary" cessation, but of continuing infringement followed by compliance only after judicial intervention.[7]

Further, as a matter of law, NABP knows of no authority, and the Official Capacity Defendants cite none, for the novel theory that a defendant caught on multiple occasions committing copyright infringement may, by complying with a temporary restraining order or preliminary injunction, obviate the "continuing" nature of the harm, and hence the need for permanent injunctive relief. Preliminary relief protects a plaintiff's rights *pendente lite* until a

---

(continued...)

Restated and Amended Verified Complaint relates back, the verification thereof also relates back to the date of the original verification. *See* 61B AM. JUR. 2d Pleading § 897 (2007).

[7] Defendants half-heartedly attempt to circumvent this logic by arguing that their cessation was voluntary, rather than compelled by this Court's temporary injunction, because this Court had no jurisdiction to issue the injunction in the first place. (Board Brief at 36-37.) This of course assumes the conclusion. It is also contrary to established authority. *E.g., Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982) ("A district court possesses inherent powers of equity sufficient to enable it to preserve the status quo until the question of its jurisdiction can be resolved."). And it is substantively erroneous – as NABP shows throughout this brief, this Court enjoys, and has always enjoyed, jurisdiction.

permanent injunction can be entered; such interlocutory relief thus only *precedes* the permanent injunction.    Defendants' novel theory would instead have preliminary injunctions *displace* permanent injunctions – a plaintiff could get one or the other, but not both.   One need look no further than *Edelman* to see that that is not the law.   There, the district court issued a preliminary injunction ordering state officials to cease violating federal statutes, and thereafter issued a permanent injunction that included a retroactive reward of monetary relief.   But the Supreme Court only addressed the retroactive aspect of the permanent injunction.   *Edelman*, 415 U.S. at 669, 94 S. Ct. at 1358.   One cannot find in that opinion, or anywhere else, even a suggestion that an official's compliance with a preliminary injunction moots the need for a permanent injunction.   Analogous arguments – usually that a claim for injunctive relief is moot on appeal where the defendant complied with a lower court's injunction in the interim – have been summarily dismissed.[8]   As these cases and basic logic imply, the rule *cannot be* that once a plaintiff successfully procures preliminary relief, a state official's compliance with such an order *automatically* precludes a court from exercising jurisdiction against the state official because the harm is no longer "continuing" under *Young*.

**2.      The alleged availability of state-law remedies is irrelevant.**

The Official Capacity Defendants next assert that under *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 117 S. Ct. 2028 (1997), relief under *Young* is unavailable where a state provides

---

[8] *See, e.g., Leroy v. Great W. United Corp.*, 443 U.S. 173, 178, 99 S. Ct. 2710, 2714 (1979) (holding that completion of a tender offer under protection of an injunction that restrained state officials from enforcing a takeover law did not moot an action challenging the law); *Maher v. Roe*, 432 U.S. 464, 468 n. 4, 97 S. Ct. 2376, 2380 n. 4 (1977) (holding that adoption of a new welfare regulation to comply with an injunction did not moot an appeal from the injunction where the new regulation appeared to have been adopted only for the purpose of interim compliance with the injunction); *Rosaly v. Ignacio*, 593 F.2d 145, 147 n. 3 (1st Cir. 1979) (holding that restoration of plaintiffs to their original employment positions to comply with an injunction pending appeal did not moot the issues as to injunctive relief); *see also Teamsters Local 515 v. Roadbuilders, Inc. of Tenn.*, 249 Ga. 418, 421, 291 S.E.2d 698, 701 (Ga. 1982) ("Merely because a party has complied with temporary restraining order or interlocutory injunction by ceasing the enjoined activity does not necessarily render the permanent injunctive issues moot.").

an adequate judicial forum for relief.  (Board Brief at 39.)  But that is not the holding of that case. The portion of Justice Kennedy's opinion that outlined that requirement garnered only *one* other vote, and was explicitly rejected by the seven other Justices.  As Justice O'Connor wrote, in an opinion that Justices Scalia and Thomas joined:

> While I therefore agree that the Tribe's suit must be dismissed, I believe that the principal opinion is flawed in several respects.  . . .  [T]he principal opinion reasons that federal courts determining whether to exercise jurisdiction over any suit against a state officer must engage in a case-specific analysis of a number of concerns, including whether a state forum is available to hear the dispute . . . .  This approach unnecessarily recharacterizes and narrows much of our *Young* jurisprudence.  The parties have not briefed whether such a shift in the *Young* doctrine is warranted.  In my view, it is not.

*Coeur d'Alene Tribe*, 521 U.S. at 291, 117 S. Ct. at 2045 (O'Connor, J., concurring).  Despite the Official Capacity Defendants' wish to the contrary, a two-vote opinion that was explicitly rejected by the other seven Justices is not controlling.  Any argument relying thereon must be rejected.

**3.    The Official Capacity Defendants have a "nexus" to the infringing activity.**

Finally, the Official Capacity Defendants argue that NABP has not alleged that they enjoyed a sufficient "nexus" to the infringing activity.  (Board Brief at 39-42.)  Again, this is simply not true.  Rather, NABP has specifically alleged facts showing that both the "Defendant Administrators"[9] and the "Defendant Board Members"[10] all had a "connection" to the infringing activity here.  With respect to the Defendant Administrators, their oversight of the affairs of the University of Georgia ("UGA") College of Pharmacy, includes, but is not limited to:

---

[9] Paul Brooks, Alan Wolfgang, George Francisco, and Svein Oie.

[10] Eldridge W. McMillan, Donald M. Leebern, Jr., Hugh A. Carter, Jr., J. Timothy Shelnut, Michael J. Coles, William H. Cleveland, Wanda Yancey Rodwell, James R. Jolly, Patrick S. Pittard, Julie Ewing Hunt, W. Mansfield Jennings, Jr., Allan Vigil, Doreen Stiles Poitevint, Richard L. Tucker, Willis J. Potts, Robert F. Hatcher, A. Felton Jenkins, Benjamin J. Tarbutton, James A. Bishop, and Kenneth R. Bernard, Jr.

1) Providing and/or authorizing academic credit, extra credit, elective course credit, and other benefits to UGA College of Pharmacy students;

2) Copying, reproducing, publishing, selling and distributing, and/or authorizing the copying, reproduction, publishing, selling and distribution of the documents and other course materials for use in courses and review courses taught at the UGA College of Pharmacy;

3) Reviewing and approving courses, course content, and documents or materials used in courses and review courses taught at, offered by, or sponsored by the UGA College of Pharmacy;

4) Overseeing compliance with contractual agreements between the College of Pharmacy and third parties, and

5) Overseeing compliance by College of Pharmacy professors and employees with applicable laws, policies, procedures, rules, and regulations, including the Copyright law of the United States.

(Amended and Restated Verified Complaint ¶ 6.)  Thus, because:

1) UGA offered and provided academic credit, extra credit, elective course credit, or other benefits to at least three College of Pharmacy students who participated in compiling actual or purported NABP Examination Questions and other study or course materials for NAPLEX review courses taught by Warren (Amended and Restated Verified Complaint ¶ 25);

2) UGA copied, reproduced, published, distributed, and sold documents and other course materials for use in NABPLEX and NAPLEX review courses taught by Warren and Cobb (*Id.* at ¶¶ 22, 23, and 26);

3) In distributing NABP Examination Questions to students across the country Warren utilized his school-owned computer and email account, and created copies of the electronic and hardcopy NAPLEX review course materials for distribution using UGA supplies and machines (*Id.* at ¶ 27); and

4) Since January of 1996 Warren has taught more than forty Review of Pharmacy Courses through the College of Pharmacy's Office of Postgraduate Continuing Education and Outreach, all of which were within the authorized scope of his employment with UGA (*Id.* at ¶ 28)

the Defendant Administrators clearly had a connection to the complained-of infringement.

Similar reasoning confirms the connection of the Defendant Board Members to the complained-of infringement.  The Board is charged with the government, control, and

management of the University System of Georgia and each of its member institutions. The Board implements such control and management through its individual members. At all meetings of the Board, a majority of the members of the Board constitutes a quorum for the transaction of business. The action of a majority of the members of the Board present at any meeting constitutes action by the Board, except as may otherwise be provided by the Board's bylaws. Thus, in their official capacities, each, and all, of the Defendant Board Members are responsible for the operation of the University System of Georgia pursuant to the Constitution of the State of Georgia and the laws enacted thereto. Further, UGA is a member institution within the University System of Georgia, and the UGA College of Pharmacy is a college within UGA. As a result, Defendant Board Members are charged with responsibility for the operation and affairs of the UGA College of Pharmacy. (Amended and Restated Verified Complaint ¶ 4.) Given that the Defendant Board Members enjoy such responsibility over the UGA College of Pharmacy, and given the facts discussed above (regarding the College of Pharmacy's provision of course credit to students for compiling questions, Warren's use of College of Pharmacy computers for compiling and copying questions, *etc.*), the Defendant Board Members clearly had a connection to the complained-of infringement. This connection is ***cemented*** by the fact that when NABP first discovered this copyright infringement scheme in 1995, both Warren ***and the Board*** signed a settlement agreement promising not to engage in such infringement again. (Amended and Restated Verified Complaint ¶ 18 and Ex. A.) Unless the Board is to now argue that its signing of the 1995 Agreement was somehow fraudulent, it is impossible to argue that it has no connection to the resumed infringement scheme. Rather, because the Defendant Board Members have responsibility for overseeing compliance with and adherence to the terms of that

16

agreement, the Board Members' connection to the complained-of activity is manifest. (*Id.* at ¶ 4 and Ex. A.)

Such factual averments clearly meet the "connection" requirement under *Young*, as that requirement has been commonly understood. The Official Capacity Defendants' contrary claim that more specific factual allegations – including allegations of *specific* bad acts by *specific* officials – are required to support an injunction under *Young* (Board Brief at 41), is flatly contradicted by decades of precedent to the contrary, including numerous cases relied on by the Defendants elsewhere, which show that a defendant can be named under *Young* simply by virtue of his official responsibilities.[11]  Further, to require that a plaintiff allege *specific* bad acts by *specific* officials to satisfy *Young* flies in the face of FED. R. CIV. P. 25(d)(1), which provides that "when a public officer is a party to an action in an official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party."  If official capacity jurisdiction under *Young* was indeed predicated on the specific bad acts of a specific official capacity defendant, then FED. R. CIV. P. 25(d)(1) would be rendered a nullity – as soon as a new Attorney General, for example, was named to a suit, the fact that it was only the old Attorney General who had committed the bad acts in question would destroy jurisdiction under *Young*.  To the extent that *Pennington Seed Inc. v. Produce Exch. No. 299*, 457 F.3d 1334 (Fed. Cir. 2006), relied on by the Official Capacity Defendants, is to the contrary, it is simply erroneous. (Board Brief at 44-46.)

---

[11] *See, e.g., Papasan v. Allain*, 478 U.S. 265, 282 n. 14, 106 S. Ct. 2932, 2943 n.14 (1986) (rejecting claim that petitioners had not sued any state officials who could grant the relief requested because the respondent Secretary of State was, by state statute, responsible for general supervision of the administration by the local school officials of the public school land funds in question); *Edelman*, 415 U.S. 651, 94 S. Ct. 1347 (Illinois officials sued under *Young* based on their responsibility for administering federal-state programs of aid to the aged, blind, and disabled); *Dairy Mart*, 411 F.3d at 373 (holding that named officers' "significant responsibilities" overseeing Kentucky's petroleum storage tank environmental clean-up fund created the requisite "connection" to the complained-of conduct).

But even accepting *Pennington Seed's* heightened nexus analysis, in which the Federal Circuit held that a broad duty to direct a University's patent policy did not suffice, it is clear that NABP has alleged more here.  NABP did not name the Official Capacity Defendants simply because of their broad duty to prevent copyright infringement.  Rather, such Defendants were named based, at least in part, on the following *facts*: 1) the UGA Administration approved academic credit, extra credit, elective course credit, or other benefits to at least three College of Pharmacy students who participated in compiling actual or purported NABP Examination Questions; 2) someone at UGA copied, reproduced, published, distributed, and sold documents and other course materials for use in NAPLEX review courses; and 3) *the Board* signed an agreement in 1995 promising that it would not infringe NABP's copyrights in its secure exam questions.  No such facts were present in *Pennington Seed*.

Based on the foregoing: 1) NABP has properly pled ongoing copyright infringement; 2) NABP seeks relief against the Official Capacity Defendants that is properly characterized as prospective; and 3) the Official Capacity Defendants have the requisite connection to the complained-of infringement.  Thus, this Court has jurisdiction over NABP's claim against the Official Capacity Defendants to issue prospective permanent injunctive relief.

**D.     The Board is not entitled to immunity from NABP's copyright infringement claims.**

Moving from the Official Capacity Defendants to the "Board" as an entity, the Board is not entitled to sovereign immunity for its copyright infringement at least in part because Congress confirmed the abrogation of such immunity when it passed the Copyright Remedy Clarification Act ("CRCA") in 1990.[12]  The Board does not dispute that the CRCA explicitly

---

[12] NABP acknowledges that: 1) while the Eleventh Amendment by its express terms precludes federal courts only from exercising diversity jurisdiction, it has since been expanded to cover federal-question cases; and 2) the Board is an arm of the State of Georgia, and thus would share in the State's sovereign

(continued...)

abrogated state sovereign immunity for copyright infringement, but instead claims that the CRCA is unconstitutional.[13]  But under two 2006 Supreme Court cases – *United States v. Georgia*, 546 U.S. 151, 126 S. Ct. 877 (2006) and *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 126 S. Ct. 990 (2006) – it is clear that the CRCA is constitutional under ***both*** Section 5 of the Fourteenth Amendment ***and*** Congress's Article I copyright power.

1.  **The CRCA is constitutional under Section 5 of the Fourteenth Amendment under *Georgia*.**

Whether a federal statute such as the CRCA constitutionally abrogates state sovereign immunity is governed by a two-part inquiry: 1) did Congress unequivocally express its intent to abrogate state sovereign immunity; and 2) did Congress act pursuant to a valid exercise of power in doing so.  The first inquiry is not seriously in dispute here: the language of the CRCA shows that Congress's intent to abrogate states' immunity for copyright infringement could not have been clearer.[14]  Thus, the key question is the second: whether Congress enacted the CRCA

---

(continued...)

immunity, *if* it existed in this case.  (Board Brief at 9-12.)  But sovereign immunity is not absolute.  It can be abrogated by Congress, as was done by the CRCA.

[13] In the alternative, the Board also attempts to argue that even if the CRCA is constitutional it still enjoys immunity from monetary damages for its copyright infringement under the notice provisions of the Georgia Tort Claims Act.  (Board Brief at 27-30.)  But the Board also concedes that the waiver of immunity effected by the GTCA doesn't apply to claims for copyright infringement, which are *federal* claims that must be brought in *federal* court.  (Board Brief at 28 n.8)  It is illogical to argue that the GTCA doesn't apply to copyright claims, but then to turn around and argue that the notice provisions of the GTCA apply to copyright claims.  The Board is correct on the former but not the latter – the GTCA, including its notice provisions, has no bearing on NABP's copyright infringement claims.

[14] The CRCA (17 U.S.C. §§ 501(a) and 511) provides, in relevant part:

> Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity. . . .  Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United

(continued...)

pursuant to a valid exercise of its power.  For more than thirty years the Supreme Court has consistently held that Congress, when legislating under § 5 of the Fourteenth Amendment,[15] has the power to abrogate state sovereign immunity. *E.g.*, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 452-56, 96 S. Ct. 2666, 2669-71 (1976).  Thus, if the CRCA is "appropriate" § 5 legislation, then the abrogation effected by it is constitutional, and the Board does not enjoy immunity for its copyright infringement.

In arguing that the CRCA is not "appropriate" § 5 legislation, the Board relies on an outdated "facial" approach.  Under this old approach to § 5 cases, the Supreme Court would ***begin and end*** its analysis by looking solely at the statute in question, and specifically ask whether the statute's abrogation of sovereign immunity was "congruent and proportional" to the "harm" identified in its legislative history.  But by 2006 the Supreme Court had clearly moved to an "as-applied" approach for § 5 cases. *United States v. Georgia*, 546 U.S. 151, 126 S. Ct. 877 (2006).  This approach looks ***first*** to whether the State conduct at issue rises to the level of a constitutional violation; and ***only if*** the answer to that question is "no," ***then*** looks to whether the statute is "congruent and proportional" to the identified harm.  Thus, under *Georgia*, the CRCA is constitutional if: 1) the Board's infringement is a violation of procedural due process; ***or*** if 2) the CRCA is "congruent and proportional."  As shown herein, because the answer to the first

---

(continued...)

> States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or nongovernmental entity, for a violation of any of the exclusive rights of a copyright owner . . .  [R]emedies (including remedies both at law and in equity) are available for the violation to the same extent as such remedies are available for such a violation in a suit against any public or private entity . . . .

[15] U.S. Const. amend XIV § 1 provides, in relevant part, that "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend XIV § 5 provides that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

question is "yes," this Court need not even address the second. Nevertheless, the answer to the second is "yes" as well.

**(i)** ***The previous City of Boerne/Florida Prepaid "facial" § 5 approach.***

The Board asserts that the CRCA is not "appropriate" § 5 legislation under the "congruence and proportionality" test of *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157 (1997). (Board Brief at 17-18.) Under this test, for Congress to pass valid § 5 legislation it has to: 1) identify conduct transgressing the Fourteenth Amendment's substantive provisions; and then 2) tailor its legislative scheme to remedy or prevent such conduct. *City of Boerne*, 521 U.S. at 519-20, 117 S. Ct. at 2164. Thus, the pertinent analysis under the *Boerne* test is of the statute itself, and of its legislative history. The conduct to which the statute is applied is irrelevant.

Thus, in 1999 the Supreme Court held that the Patent Remedy Act ("PRA") was not appropriate § 5 legislation because: 1) its legislative history did not suggest that the PRA was passed in response to a history of widespread and persisting state deprivations of constitutional rights; and 2) it swept too broadly (given the scant need for it identified in the legislative history) because it ***could hypothetically*** proscribe some patent infringements that would not also rise to the level of a constitutional due process violation. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 642-45, 119 S. Ct. 2199, 2208-10 (1999). In the year following *Florida Prepaid* the Fifth Circuit held that the CRCA was also invalid under the "congruence and proportionality" test, and two district courts later followed suit. *Rodriguez v. Tex. Comm'n on the Arts*, 199 F.3d 279 (5th Cir. 2000); *Chavez v. Arte Publico Press*, 204 F.3d

601 (5th Cir. 2000); *Hairston*, 2005 WL 2136923 at *6-*8; *De Romero v. Inst. of Puerto Rican Culture*, 466 F. Supp.2d 410 (D.P.R. 2006).[16]

The pertinent point about *Florida Prepaid*, *Rodriguez*, *Chavez*, *Hairston*, and *De Romero* is that their analyses of the "appropriateness" of the PRA and the CRCA were "facial." In other words, the courts analyzed the validity of the PRA and CRCA ***on their face***, rather than first considering whether they were constitutional ***insofar as they applied*** to state patent and copyright infringements that also constituted deprivations of property without due process.[17] Because the PRA and the CRCA could, ***hypothetically***, proscribe a significant enough number of infringements that would not also meet the elements of a procedural due process violation, both were held invalid across the board – even in cases where those elements were met.

**(ii)    *The current Georgia "as-applied" § 5 approach.***

The "facial" approach that characterized *Florida Prepaid*'s analysis of the PRA, and those lower court opinions that followed *Florida Prepaid*, has since been modified. In 2006, the Supreme Court in *Georgia **unanimously*** adopted a new three-step approach that analyzes the "appropriateness" of legislation under § 5 by ***first*** examining ***the specific application of the statute before the Court***. Under this approach, if the conduct at issue in the litigation not only

---

[16] The Board in its Brief states that "every court that has examined the CRCA has struck it down as an invalid attempt to abrogate the States' Eleventh Amendment immunity" and then cites not only *Rodriguez*, *Chavez*, *Hairston*, and *De Romero*, but also *Salerno v. City Univ. of N.Y.*, 191 F. Supp.2d 352, 356 (S.D.N.Y. 2001); *Rainey v. Wayne State Univ.*, 26 F. Supp.2d 973, 976 (E.D. Mich. 1998); and *Jehnsen v. N.Y. Martin Luther King Jr. Inst. for Nonviolence*, 13 F. Supp.2d 306, 311 (N.D.N.Y. 1998). (Board Brief at 3 n.2, 18-19.) *Jehnsen* is a unique opinion that is discussed separately below (n. 24 at p. 40.) But *Salerno* and *Rainey* do not analyze the CRCA at all – must less "strike it down." NABP is not sure why the Board cited to these cases as cases that have "struck down" the CRCA, but in any event NABP will confine its analysis herein to those four cases that ***did*** analyze the CRCA – *Rodriguez*, *Chavez*, *Hairston*, and *De Romero*.

[17] In fact, Justice Stevens urged such an approach in his dissent in *Florida Prepaid*. *Florida Prepaid*, 527 U.S. at 653-54, 119 S. Ct. at 2213 ("The question presented by this case, then, is whether the Patent Remedy Act, which clarified Congress' intent to subject state infringers to suit in federal court, may be applied to willful infringement.") (Stevens, J., dissenting).

violates a federal statute, but also the Constitution, then the court will uphold the statutory abrogation of state sovereign immunity as-applied to the case at hand, *without* addressing whether other hypothetical applications of the statute would reach conduct that is not also a violation of the Constitution.   Only if the conduct at issue does not rise to the level of a constitutional violation does "congruence and proportionality" come into play.

*(a)*     ***Background.***

Before turning to *Georgia* and the three-step approach it adopted, it is first necessary to briefly discuss *Tennessee v. Lane*, 541 U.S. 509, 124 S. Ct. 1978 (2004).   In *Lane*, the Supreme Court held that Title II of the ADA, as it applied to cases implicating the fundamental right of access to the courts, constituted a valid exercise of Congress's § 5 power.   *Lane*, 541 U.S. at 533-34, 124 S. Ct. at 1994.   The respondents in *Lane*, both of whom were paraplegics who used wheelchairs for mobility, sued the State of Tennessee and a number of Tennessee counties alleging past and ongoing violations of Title II, claiming that they were denied access to the state court system by reason of their disabilities.   *Id.* at 513, 124 S. Ct. at 1982.   The issue was thus whether Title II constituted "appropriate" § 5 legislation.   *Id.* at 520, 124 S. Ct. at 1986.   The Court first analyzed the history of disability discrimination that Title II sought to address.   *Id.* at 523-29, 124 S. Ct. at 1988-92.   The Court then turned to whether Title II constituted an "appropriate" response to that history.   *Id.* at 530, 124 S. Ct. at 1992.

On this point, just three years earlier, in *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S. Ct. 955 (2001), the Supreme Court had held that Title I (as opposed to Title II) of the ADA was not "appropriate" legislation under § 5 because it (like the PRA) ***could hypothetically*** cover some state conduct that would not also rise to the level of a constitutional violation.   *Garrett*, 531 U.S. at 372-73, 121 S. Ct. at 966-67.   Not surprisingly, the State in *Lane*

23

urged the Court to use this same "facial" approach, arguing that the breadth of Title II's *hypothetical applications* was a mark of its invalidity. *Lane*, 541 U.S. at 530, 124 S. Ct. at 1992. As the Court summarized the State's position:

> According to petitioner, the fact that Title II applies not only to public education and voting-booth access but also to seating at state-owned hockey rinks indicates that Title II is not appropriately tailored to serve its objectives.

*Id.*, 124 S. Ct. at 1992.

The Court in *Lane* declined to use the *Florida Prepaid/Garrett* facial approach.  While the Court did not dispute that Title II might *hypothetically* reach some conduct in other cases that would not rise to the level of a constitutional violation, the Court noted that *as it applied to cases implicating the fundamental right of access to the courts*, Title II did in fact redress a constitutional violation.  As the Court stated:

> [N]othing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole.  Whatever might be said about Title II's other applications, the question presented in this case is not whether Congress can validly subject the states to private suits for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power under § 5 to enforce the constitutional right of access to the courts.  Because we find that Title II unquestionably is valid § 5 legislation *as it applies* to the class of cases implicating the accessibility of judicial services, we need go no further.

*Id.* at 530-31, 124 S. Ct. at 1992-93 (citations omitted) (emphasis added).  Thus, the Court held that Congress's chosen remedy for the pattern of exclusion and discrimination at issue was appropriate under § 5, *at least insofar as it applied* to enforcing the constitutional right of access to the courts.  *Id.* at 531, 124 S. Ct. at 1993.

Justice Scalia dissented in *Lane*, the relevance of which would later come to the fore in *Georgia*.  In short, Justice Scalia dissented to express his disdain for, and disavowal of, the "congruence and proportionality" test that the Court had used to analyze the "appropriateness" of

§ 5 legislation in *Boerne* and its progeny. Instead, Justice Scalia stated that he would henceforth replace (except in cases dealing with racial discrimination, for reasons not relevant here), the "congruence and proportionality" test, which allowed Congress some prophylactic leeway, with a test permitting under § 5 only legislation that ***actually enforces*** some provision of the Fourteenth Amendment. *Lane*, 541 U.S. at 565, 124 S. Ct. at 2013 (Scalia, J., dissenting).

**(b)      Georgia.**

        Justice Stevens' "as-applied" *Lane* majority, and Justice Scalia's "enforcement only" *Lane* dissent, coalesced two years later in *Georgia*. Justice Scalia, writing for a ***unanimous*** Court, wedded the "as-applied" *Lane* majority approach to his "enforcement only" *Lane* dissent, holding that Title II of the ADA validly abrogated state sovereign immunity ***insofar as*** it created a private cause of action for damages against the states for conduct that ***actually violated*** the Fourteenth Amendment. *Id.* at 159, 126 S. Ct. at 882. The petitioner in *Georgia*, a paraplegic prison inmate confined to a wheelchair, had sued the State of Georgia and the Georgia Department of Corrections (along with several individual prison officials), challenging the conditions of his confinement and seeking injunctive relief and monetary damages under, *inter alia*, Title II. *Id.* at 154-55, 126 S. Ct. at 879. Because the petitioner's claims were based, at least in large part, on conduct that independently violated the provisions of § 1 of the Fourteenth Amendment (insofar as that Section incorporated the Eighth Amendment's guarantees against cruel and unusual punishment), the Court eschewed the § 5 "congruence and proportionality" approach that had defined its earlier analyses. As the Court stated:

> While Members of this Court have disagreed regarding the scope of Congress's "prophylactic" enforcement powers under § 5 of the Fourteenth Amendment, no one doubts that § 5 grants Congress the power to enforce the provisions of the Amendment by creating private remedies against States for *actual* violations of those provisions. Section 5 authorizes Congress to create a cause of action through which the citizen may vindicate his Fourteenth Amendment rights. This

> enforcement power includes the power to abrogate state sovereign immunity by
> authorizing private suits for damages against the States.  Thus, insofar as Title II
> creates a private cause of action for damages against the States for conduct that
> *actually* violates the Fourteenth Amendment, Title II validly abrogates state
> sovereign immunity.

*Id.* at 158-59, 126 S. Ct. at 881 (emphasis in original; citations omitted).  Based on this holding,

the Court remanded the case for further proceedings, instructing the petitioner to amend his

Complaint to clarify which of his Title II claims also violated the Fourteenth Amendment.  *Id.* at

159, 126 S. Ct. at 882.  The Court then noted that in future cases:

> [T]he lower courts will be best situated to determine in the first instance, on a
> claim-by-claim basis, (1) which aspects of the State's alleged conduct violated
> Title II; (2) to what extent such misconduct also violated the Fourteenth
> Amendment; and (3) insofar as such misconduct violated Title II but did not
> violate the Fourteenth Amendment, whether Congress's purported abrogation of
> sovereign immunity as to that class of conduct is nevertheless valid.

*Id.*

There are two important facets of *Georgia*, each of which is relevant here.  The first is the

extent to which the Court adopted, with no discussion, an "as-applied" approach, seven years

removed from the "facial" decision of *Florida Prepaid*, in which Justice Stevens had urged in

dissent that the PRA be analyzed ***insofar as it applied*** to a constitutional violation.  But this

transition is not remarkable when viewed in the context of the Supreme Court's "facial" vs. "as-

applied" jurisprudence.  When viewed in this context, it is clear that *Georgia* does not represent a

shift from a general preference for facial challenges, as much as it represents the Court's

rescission of one of the few ***exceptions*** to its general preference for as-applied challenges.

The Supreme Court's default preference is typically for as-applied over facial challenges.

As the Court has explained this preference:

> The very foundation of the power of the federal courts to declare Acts of
> Congress unconstitutional lies in the power and duty of those courts to decide
> cases and controversies properly before them. . . . This Court, as is the case with

all federal courts, has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. . . . [O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. . . . [I]t would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.   The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.

*United States v. Raines*, 362 U.S. 17, 20-22, 80 S. Ct. 519, 522-23 (1960) (citations omitted).

The Court reiterated this basic preference for as-applied challenges in *Sabri v. United States*, in which it added an afterword on the plaintiff's facial attack on the statute in question, stating that "facial challenges are best when infrequent."  *Sabri v. United States*, 541 U.S. 600, 608, 124 S. Ct. 1941, 1948 (2004).  The Court noted that any efficiency gained from facial challenges would be offset by "losing the lessons taught by the particular, to which common law method normally looks."  *Id.* at 608-09, 124 S. Ct. at 1948.  Further, the court noted that overbreadth facial challenges were especially to be discouraged, because they relaxed the normal requirements for standing.  *Id.* at 609, 124 S. Ct. at 1948.  In essence, such challenges allowed a defendant (like the Board) to argue that even if *it* had violated a statute, it could escape the consequences thereof if it could show that the statute could not be enforced against some hypothetical third-party not before the court.[18]  However, the Court in *Sabri* also noted that there were **four** exceptions to the

---

[18] For the same reasons identified by the Court in *Raines* and *Sabri*, scholarly commentary also supports a preference for as-applied over facial challenges, noting that the more narrow "as-applied" approach comports with the judiciary's typical role – to decide the case at hand, not to issue advisory opinions on far-reaching hypothetical matters not at issue.  *See, e.g.*, Gillian E. Metzger, *Facial Challenges and Federalism*, 105 COLUM. L. REV. 873, 932 (2005) ("[O]nce a court determines that the statute is constitutional with respect to enforcing the constitutional right at issue in the case at hand, the proper course is generally for the court to uphold the application of the statute and not proceed to consider other applications."); Edward A. Hartnett, *Modest Hope for a Modest Roberts Court: Deference, Facial Challenges, and the Comparative Competence of Courts*, 59 SMU L. REV. 1735, 1751-52 (2006) ("Courts
(continued...)

general preference for as-applied challenges where facial challenges to statutes had been allowed: 1) free speech cases, *citing Broadrick v. Oklahoma*, 413 U.S. 601, 93 S. Ct. 2908 (1973); 2) right to travel cases, *citing Aptheker v. Sec. of State*, 378 U.S. 500, 84 S. Ct. 1659 (1964); 3) abortion cases, *citing Stenberg v. Carhart*, 530 U.S. 914, 120 S. Ct. 2597 (2000); and 4) Section 5 cases, *citing Boerne. Sabri*, 541 U.S. at 610, 124 S. Ct. at 1948.

Thus, the Court's shift from *Florida Prepaid's* and *Boerne's* facial analyses of § 5 legislation to *Georgia's* three-step as-applied analysis can be viewed not so much as a broad shift from a preference for facial challenges, but simply as the Court's rescission of one of those four exceptions.   The Supreme Court has likewise recently rescinded the abortion exception. *Gonzales v. Carhart*, 127 S. Ct. 1610, 1638 (2007) (stating that the respondents' facial attack on a partial-birth abortion ban because it lacked an exception for the health of the mother "should not have been entertained in the first place" because "the proper means to consider exceptions is by as-applied challenge."); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 126 S. Ct. 961 (2006) (holding that the proper remedy where a New Hampshire abortion law contained several unconstitutional applications was not to invalidate the law wholesale, but to remand to the lower courts to determine whether legislative intent would support a declaratory judgment and an injunction prohibiting the unconstitutional applications).   As the dissent in *Carhart* pointed out, the Court's professed preference for as-applied challenges to abortion statutes in that case was contrary to its earlier acceptance of facial challenges to abortion statutes in *Stenberg* and elsewhere. *Carhart*, 127 S. Ct. at 1650-51 (Ginsburg, J. dissenting).   But the

---

(continued...)

. . . should largely be confined to the as-applied constitutional challenges where their comparative competence lies.  They should concentrate on what they are comparatively good at: determining whether a particular application of a particular statute is constitutional.").

*Carhart* majority, and its preference for as-applied challenges to abortion statutes, is now the law. Thus, just as it would be erroneous for a litigant to today rely on *Stenberg* to mount a facial challenge to an abortion statute in the face of *Carhart's* admonition to the contrary; so too is it equally erroneous for the Board to rely on *Florida Prepaid* to mount a facial challenge to the CRCA in the face of *Georgia*.

The second important facet of *Georgia* is what is missing from the opinion – namely, ***any*** discussion of the legislative history of Title II, or of whether the ultimate scope of Title II was "congruent and proportional" to its objective. The reason for this omission is clear – the "congruence and proportionality" test was designed only for analyzing how far "over the line" Congress could go from the "enforcement" realm (drafting legislation that provides a remedy for actual constitutional violations) into the "prophylactic" realm (drafting legislation that covers some actions that do not rise to the level of a constitutional violation, "just to be safe," to prevent constitutional violations). *See, e.g., Garrett*, 531 U.S. at 365, 121 S. Ct. at 963 ("Accordingly, § 5 legislation ***reaching beyond the scope of § 1's actual guarantees*** must exhibit 'congruence and proportionality' between the injury to be prevented or remedied and the means adopted to that end.") (Emphasis added.). Thus, where an ***actual*** constitutional violation is alleged, the "congruence and proportionality" test is unnecessary, and there is no need to examine the legislative history.

This is not to say that "congruence and proportionality" is no longer *ever* the test under *Georgia*, or that legislation is appropriate under § 5 *only* insofar as it applies to constitutional violations. *Georgia* created a floor, not a ceiling. Recall the three-step test from *Georgia*:

> [T]he lower courts will be best situated to determine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) ***insofar as such misconduct violated Title II but did not***

> *violate the Fourteenth Amendment*, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid [presumably under the "congruence and proportionality" test].

*Georgia*, 546 U.S. at 159, 126 S. Ct. at 882 (emphasis added).    Thus, "congruence and proportionality" will still play a role in those cases that deal with conduct that is not itself a constitutional violation ("Step Three" cases).[19]   But as the highlighted language illustrates, it will *only* apply in Step Three cases, because in those cases where a plaintiff is successful on Step Two ("Step Two" cases), a court doesn't need to address "congruence and proportionality." Hence, because this is a Step Two case, "congruence and proportionality" is moot.

**(iii)     *This is a Step Two case because the Board has deprived NABP of property without due process of law.***

Because this is a Step Two case under *Georgia* – meaning that the conduct at issue, in addition to being copyright infringement, also meets the elements of a Fourteenth Amendment procedural due process claim (*i.e.*, a claim that the Board deprived NABP of property without due process of law) – Congress validly abrogated the Board's sovereign immunity here under the CRCA.  As outlined by the Supreme Court, the three elements of a procedural due process claim are: 1) a deprivation by state action; 2) of a constitutionally protected interest in life, liberty, or property; 3) without due process of law.  *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990).  As shown below, because the infringement here was not only intentional, but was

---

[19] The manner in which *Georgia's* three-step test still uses "congruence and proportionality," but only on the third step, is illustrated in numerous lower court decisions.   *See, e.g., Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 554-55 (3d Cir. 2007) ("Having determined that the alleged misconduct in this case states a claim for violation of Title II but not the Fourteenth Amendment, we arrive at the final step of Georgia's tripartite test. . . .  Therefore, there is only one difficult issue left at this point in the inquiry: the congruence and proportionality of Title II with respect to public education."); *Klingler v. Dir., Dept. of Revenue, Mo.*, 455 F.3d 888, 894 (8th Cir. 2006); *Toledo v. Sanchez*, 454 F.3d 24, 34 (1st Cir. 2006); *Guttman v. Khalsa*, 446 F.3d 1027, 1035-36 (10th Cir. 2006).

also *not* random and *not* unauthorized, those three elements are met.  Hence, under *Georgia* this is a Step Two case, and the CRCA is valid § 5 legislation, at least insofar as it applies here.

**(a)    *Deprivation.***

As the Supreme Court noted in *Florida Prepaid*, a state's infringement of a protected property interest will constitute a "deprivation" **unless** the infringement is *un*intentional. *Florida Prepaid*, 527 U.S. at 645, 119 S. Ct. at 2209.  This "intent" exception is based on the Supreme Court's decision in *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662 (1986), which held that a state actor's negligent act that causes unintended injury to a person's property does not "deprive" that person of property within the meaning of the Due Process Clause.  In the instant case, NABP has clearly averred that Defendants' infringement of NABP's copyrights was direct, willful, and intentional.  (Amended and Restated Verified Complaint ¶ 33.)  Further, NABP has also averred that in 1995 both Warren and the Board entered into a contract with NABP regarding NABP's copyrights in its secure exam questions.  (Amended and Restated Verified Complaint ¶ 18 and Ex. A.)  Warren and the Board's acceptance of the 1995 agreement shows that they both **knew** that copying NABP's exam questions constituted copyright infringement.  Such prior knowledge confirms that Warren and the Board's infringement was willful.  *E.g.*, *Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851 (11th Cir. 1990) ("Willfully, in the context of section 504(c)(2), means that the defendant knows his actions constitute an infringement; the actions need not have been malicious.").

**(b)    *Property.***

As the Supreme Court noted in *Florida Prepaid*, patents "have long been considered a species of property" and thus "are surely included within the 'property' of which no person may be deprived by a State without due process of law." *Florida Prepaid*, 527 U.S. at 642, 119 S. Ct. at 2208.  The same analysis applies in the copyright context.  *See, e.g.*, *Roth v. Pritikin*, 710 F.2d

31

934, 939 (2d Cir. 1983) ("An interest in a copyright is a property right protected by the due process and just compensation clauses of the Constitution.").

*(c)*        ***Without due process of law.***

Generally, where a state intentionally deprives an individual of property, that is a denial of due process.  But the Supreme Court has recognized a narrow exception to this rule where ***both*** of two conditions are met: 1) the state's intentional conduct is random and unauthorized; ***and*** 2) the state provides an adequate post-deprivation state-law remedy.  *See, e.g., Parratt v. Taylor*, 451 U.S. 527, 101 S. Ct. 1908 (1981); *Hudson v. Palmer*, 468 U.S. 517, 104 S. Ct. 3194 (1984) (both cited in *Florida Prepaid*, 527 U.S. at 643, 119 S. Ct. at 2208).  Even assuming, *arguendo*, that the second condition could be satisfied in this case,[20] it is clear that the first is not, because the conduct at issue was not random, and was not unauthorized.

*Parratt* and *Hudson* both stand in relevant part for the same proposition: that ***post-*** deprivation state-law remedies, such as tort claims, will constitute "adequate" process for a state's deprivation of an individual's property ***only*** where that deprivation came about as the result of a ***random and unauthorized*** act by a state employee.  *Parratt*, 451 U.S. at 541, 101 S. Ct. at 1916; *Hudson*, 468 U.S. at 533, 104 S. Ct. at 3203.  The reasoning behind this rule is an obvious one of logistics: because a state will have no way of knowing ahead-of-time when one of its employees will randomly deprive an individual of a property right, ***post-*** (as opposed to ***pre-***) deprivation remedies are the only ones that it can feasibly provide in such situations.  As the Court explained in *Parratt*:

---

[20] This assumption is dubious, given that it is questionable whether, under 17 U.S.C. § 301, any state-law post-deprivation remedy that is not preempted can be an adequate "alternative" for a claim for copyright infringement.  Further, the legislative remedy providing for a discretionary largess from the State under O.C.G.A. § 28-5-80, *et seq.*, which the Board repeatedly points to an as adequate post-deprivation remedy (Board Brief at 23, 39), has been held ***inadequate*** by the Georgia courts.  *Hight v. Burden*, 180 Ga. App. 716, 717, 350 S.E.2d 471, 473 (Ga. Ct. App. 1986).

> The justifications which we have found sufficient to uphold takings of property without any *pre*deprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a ***random and unauthorized*** act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place.

*Parratt*, 451 U.S. at 541, 101 S. Ct. at 1916 (emphasis added).

The flip side of this rule is also true – where the deprivation is done through actions that are ***not*** the random and unauthorized actions of a state employee, then the need for ***post***-deprivation remedies disappears, and thus ***even if*** a ***post***-deprivation state-law remedy is available, it will not provide "adequate" process. *E.g., Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435-36, 102 S. Ct. 1148, 1158 (1982) (finding a post-deprivation tort remedy constitutionally inadequate where it was the state system itself, and not some random and unauthorized act, that destroyed the complainant's property interest). *Zinermon v. Burch*, 494 U.S. 113, 110 S. Ct. 975 (1990), is instructive on this point. In *Zinermon*, the Supreme Court held that the petitioner's allegations that employees at a state mental treatment facility admitted him using the "voluntary" procedure for admission, as opposed to the "involuntary" procedure (even though he was heavily medicated and suffering from psychotic disorder), without taking any steps to ascertain whether he was mentally competent to sign the admission forms, were sufficient to state a procedural due process claim (namely, that his liberty was deprived without due process), ***notwithstanding*** the availability of ***post***-deprivation state-law remedies. *Zinermon*, 494 U.S. at 138-39, 110 S. Ct. at 990. The Court in *Zinermon* held that the deprivation of liberty was not "random and unauthorized" for three reasons:

1. The deprivation was not unpredictable (*i.e.*, "random"). As the Court said: "It is hardly unforeseeable that a person requesting treatment for mental illness might be incapable of informed consent, and that state officials with the power to admit patients might take

their apparent willingness to be admitted at face value and not initiate involuntary placement procedures."

2. Predeprivation process was not impossible, given that the deprivation was not random and could have been averted had the State limited and guided the staff's power to admit patients.

3. The conduct was not "unauthorized," because the State had delegated to the staff the power and authority to effect the very deprivation complained of.

*Zinermon*, 494 U.S. at 136-38, 110 S. Ct. at 989-90.

Because the infringement in this case was not random, and not unauthorized, under the *Logan/Zinermon* rubric, the availability of *post*-deprivation state-law remedies, such as a claim for breach of contract or a legislative remedy under O.C.G.A. § 28-5-80 (Board Brief at 23), is *irrelevant*, and the intentional deprivation therefore violates the Fourteenth Amendment. NABP has averred multiple facts showing that the infringement here was both foreseeable and authorized. For example, when NABP first discovered the infringement scheme in 1995 the Board signed off on the settlement agreement, and thus clearly knew of Warren's proclivity for such conduct. (Amended and Restated Verified Complaint ¶ 18 and Ex. A.) Yet, since January of 1996 Warren has taught more than *forty* Review of Pharmacy Courses through the UGA College of Pharmacy's Office of Postgraduate Continuing Education and Outreach, all of which were within the *authorized* scope of his employment with UGA. (*Id.* at ¶ 28.) UGA copied, reproduced, published, distributed, and sold the course materials for these courses. (*Id.* at ¶¶ 22, 23, and 26.) Further, Warren used equipment, supplies, and email accounts owned and operated by UGA to correspond with students who requested NAPLEX review course materials, and created copies of the electronic and hardcopy NAPLEX review course materials for distribution using UGA supplies and machines. (*Id.* at ¶ 27.) Perhaps most egregiously, in the Spring Semester of 2007, UGA offered and provided academic credit, extra credit, elective course

34

credit, or other benefits to at least three UGA College of Pharmacy students who participated in compiling actual or purported NABP Examination Questions and other study or course materials for NAPLEX review courses taught by Warren. (*Id.* at ¶ 25.)

These averred facts, taken as true for purposes of the Board's Motion, show that Warren's actions were not those of some "rogue" professor, but were instead both accepted and abetted by UGA. This case is thus no different than *Wright v. Newsome*, where the Eleventh Circuit held that ***post***-deprivation remedies were inadequate in a case where an inmate's materials were confiscated pursuant to conduct that was both foreseeable and authorized. As the court stated:

> According to Wright's allegations, confiscations of legal materials at [Georgia State Prison] have taken place in the past and continue despite court orders to the contrary and notice to the warden and other responsible officials. Thus it could be inferred that searches and consequent confiscations unaccompanied by procedural safeguards are the sanctioned standard operating procedure at GSP.

*Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986). The same could be said here. *Zinermon* is likewise analogous. Just as the mental hospital staff in *Zinermon* were delegated the authority concerning which admission procedure (voluntary or involuntary) to use even though it was "hardly unforeseeable" that through such delegation an avoidable erroneous admission (a deprivation of liberty) could result; so too in this case Warren was delegated (it was "within the authorized scope of his employment") the authority to compile the materials for the Pharmacy Review Courses he was teaching, even though it was foreseeable (given his past infringement) that through such delegation another avoidable deprivation of NABP's property could result.

Finally, the acts of Warren (and Cobb) were not only both foreseeable and authorized, they were also perpetrated deliberately over time, and not under exigent circumstances. (Amended and Restated Verified Complaint ¶ 29.) Thus, this is not a case where the exigent

35

circumstances surrounding the deprivation made pre-deprivation process infeasible. *See, e.g.,* *Barcena v. Dep't of Off-Street Parking of Miami*, 492 F. Supp.2d 1343, 1350 (S.D. Fla. 2007) (holding that it would be infeasible for a city to provide the owner of an abandoned car with a pre-deprivation hearing before the car was towed, because to do so would destroy the deterrent effect of the threat of towing). Rather, because the deprivation here was perpetrated deliberately, over time, and under no exigent circumstances, it is clear that notice could have been provided to NABP before the Board deprived it of its property. Because such an opportunity was available, but was ignored, whether or not ***post***-deprivation remedies are available after the fact is ***irrelevant***. *See, e.g., Fetner v. City of Roanoke*, 813 F.2d 1183, 1185 (11th Cir. 1987) (finding that post-deprivation remedies were inadequate where a police chief was fired without notice or opportunity to be heard even though the city council had ample time to provide both to him); *Messick v. Leavins*, 811 F.2d 1439, 42-43 (11th Cir. 1987) (finding that post-deprivation remedies were inadequate where the defendant destroyed the plaintiffs' barge without giving them notice that it was going to do so, even though such notice was feasible); *Tribue v. Hough*, No. 304-CV-286, 2006 WL 42163 *9 (N.D. Fla. Jan. 6, 2006) (finding that post-deprivation remedies were inadequate where a Sheriff's Deputy had demolished the plaintiffs' house as a "public nuisance" without giving them notice that he was going to do so, even though exigent circumstances did not exist requiring an immediate demolition.). Thus, because there were no exigent circumstances here, and because pre-deprivation process was feasible, the conduct at issue deprived NABP of its property without due process, ***regardless of*** the possible existence of state-law post-deprivation remedies.

In sum, taking the averments of NABP's Amended and Restated Verified Complaint as true, it is clear that the copyright infringement in this case was also a deprivation of NABP's

property without due process of law. Hence, under *Georgia*, the CRCA is constitutional, at least insofar as it provides NABP redress for that constitutional violation.

**(iv)    *Each of the Board's counterarguments is flawed.***

To escape the ineluctable conclusion that under *Georgia* the CRCA is valid insofar as it provides a remedy for the deprivation of NABP's property without due process, the Board offers four counterarguments:

1.    The "Recital Argument" – because Congress recited Article I instead of § 5 when passing the CRCA, the CRCA is unconstitutional, without regard for whether it is "appropriate" § 5 legislation.

2.    The "Footnote 18 Argument" – even if the CRCA can be analyzed under § 5, the "as-applied" three-step framework from *Georgia* applies only to Title II cases, not to all § 5 cases.

3.    The "Leapfrog Argument" – even if the "as-applied" approach can be used for the CRCA, "as-applied" does not mean that a court can ignore, or "leapfrog," the legislative history of the CRCA.

4.    The "Silent Overruling Argument" – even if the "as-applied" approach applies, there is no constitutional deprivation here, because *Florida Prepaid* implicitly overruled the twenty-plus years of precedent under *Parratt* and *Hudson* that had held that post-deprivation remedies are inadequate where a state official's conduct is not "random and unauthorized."

The first two of these arguments attempt to show that *Georgia* should not apply in this case; the latter two attempt to show that even if *Georgia* applies, the CRCA is still not "appropriate" § 5 legislation. All are flawed.

**(a)    *The "Recital Argument" ignores extensive precedent to the contrary.***

To avoid the *Georgia* conclusion, the Board first argues that the CRCA ought not be analyzed under § 5 ***at all***, given that Congress did not recite § 5 in the legislative history of the CRCA. (Board Brief at 16-17.) This argument ignores Supreme Court precedent to the contrary. *E.g.*, *EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S. Ct. 1054, 1064 n. 18 (1983) (noting

that Congress need not recite the words "Section 5" or "Fourteenth Amendment" or "equal protection" to enact § 5 legislation); *Fullilove v. Klutznick*, 448 U.S. 448, 476, 100 S. Ct. 2758, 2773 (1980) (upholding legislation under a variety of sources of congressional power, including § 5, despite the fact that the Fourteenth Amendment was not mentioned in the legislation); *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S. Ct. 421, 424 (1948) ("[T]he constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."). The basic rule that the constitutionality of legislation does not depend on its recital has been repeatedly affirmed in the lower courts.[21]

The only authority that the Board relies on to counter the great weight of authority outlined above is a footnote from *Florida Prepaid*, which said that because there was no indication from the legislative history of the PRA that Congress had in mind the Just Compensation Clause of the Fifth Amendment when it passed the PRA, the Court would not consider the appropriateness of the PRA thereunder. *Florida Prepaid*, 527 U.S. at 642 n.7, 119 S. Ct. at 2208 n.7. But it is asking quite a lot for a court to conclude that in a two-sentence footnote the Supreme Court overruled fifty-plus years of precedent (dating back to *Woods*), without saying that it was doing so and without paying any heed to *stare decisis*.[22] Perhaps for this reason, neither *Chavez* nor *De Romero*, both of which considered the Recital Argument,

---

[21] *E.g.*, *United States v. Moghadam*, 175 F.3d 1269, 1275 n.10 (11th Cir. 1999); *Ussery v. La. ex rel. La. Dept. of Health & Hosps.*, 150 F.3d 431, 436 (5th Cir. 1998); *Franks v. Ky. Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998); *Or. Short Line R.R. Co. v. Dept. of Revenue Or.*, 139 F.3d 1259, 1266 (9th Cir. 1998); *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997); *Belch v. Bd. of Regents of Univ. Sys. of Ga.*, 27 F. Supp.2d 1341, 1347-38 (M.D. Ga. 1998).

[22] That is one possible reading of footnote 7. An opposite, but equally plausible, reading of footnote 7 is that its omission of any discussion of *EEOC*/*Woods* means that the footnote was simply surplusage, albeit erroneous, and thus is of dubious authority. A third, middle-ground reading of footnote 7 is that the Court must have decided, without explaining why, that *EEOC* was distinguishable from *Florida Prepaid*, so that for Congress to pass legislation under the Fifth Amendment it needs to cite to the Fifth Amendment, but to pass valid legislation under the Fourteenth Amendment it need not explicitly cite to § 5.

ruled on that ground. *Chavez*, 204 F.3d at 605; *De Romero*, 466 F. Supp.2d at 416.   Likewise, lower courts have continued to rely on the basic rule that the constitutionality of legislation does not turn on its recital, even *after Florida Prepaid* – some while citing *Florida Prepaid* elsewhere. *E.g.*, *Hundertmark v. Fla. Dept. of Transp.*, 205 F.3d 1272, 1275, 1275 n.2 (11th Cir. 2000) ("[W]e conclude that Congress need not explicitly state the basis of its power to legislate in order to validly exercise its § 5 enforcement powers. . . . Every other Circuit to consider this issue has reached the same conclusion.").[23]

Thus, despite *Florida Prepaid's* footnote 7, courts, including the Eleventh Circuit, have continued to hold after *Florida Prepaid* that the test is not whether Congress **subjectively** intended to pass § 5 legislation, but whether the legislation in question **objectively** could be regarded as legislation enacted to enforce some protection of the Fourteenth Amendment. *E.g.*, *Hundertmark*, 205 F.3d at 1274-75.   As shown above, the CRCA clearly can be considered legislation enacted to provide monetary remedies for states' deprivation of property (namely copyrights) without due process.   Further, the legislative history of the CRCA supports this view, as it is replete with statements discussing "copyright as property." *See, e.g., Copyright Remedy Clarification Act: Hearings on H.R. 1131 Before the House Subcomm. on Courts, Intellectual Prop., and the Admin. of Justice of the Comm. on the Judiciary*, 101st Cong. 8, 37, 80, 83, 109, 112, 125, 130, 132 (1989) (hereafter "House Hearings").   The legislative history is also replete with statements that the CRCA was needed to provide aggrieved copyright owners with "redress" or their "day in court."   House Hearings at 126, 139, 188.   As one Congressman succinctly stated: "It gets people upset if they think the State is taking money or property or

---

[23] *See also Union Pac. R.R. Co. v. Utah*, 198 F.3d 1201, 1203-04 (10th Cir. 1999); *Mehus v. Emporia State Univ.*, 295 F. Supp.2d 1258, 1265 (D. Kan. 2004); *Anderson v. State Univ. of N.Y.*, 107 F. Supp.2d 158, 161 (N.D.N.Y. 2000).