**Continuation Of Plaintiff's Memorandum In Response
To Defendants' Motions To Dismiss**

property rights from individuals without compensation." House Hearings at 80 (statement of Representative Moorhead). Thus, because it is clear that the CRCA can be considered § 5 legislation, Congress's failure to recite any "magic words" is not dispositive.[24]

Finally, the Board's Recital Argument ignores historical context. As noted above, the CRCA was passed in 1990, only several months after the Supreme Court had held that Congress could abrogate state sovereign immunity under its Article I Commerce Clause power. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 19-20, 109 S. Ct. 2273, 2284 (1989). Congress would have had no way of knowing in 1990 that only six years later the Supreme Court would, for the time, reverse itself and state that Congress could not abrogate state sovereign immunity under Article I. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66, 116 S. Ct. 1114, 1128 (1996). It would be the height of anachronism to hold that the Supreme Court's rejection of Article I as a basis for abrogation in *Seminole Tribe* somehow *post hoc* invalidated the CRCA, which would otherwise be appropriate and valid legislation under § 5, based solely on its recital to Article I.

**(b)      The "Footnote 18 Argument" focuses on the wrong case, and there is nothing in Georgia to suggest that its three-step framework should be applied only to Title II.**

Second, the Board argues that the Supreme Court in *Lane* established a dichotomy between Title II cases and cases such as this one, wherein the "as-applied" approach is appropriate in the former but not the latter. (Board Brief at 20-21; *citing Lane*, 541 U.S. at 530

---

[24] *Jehnsen v. New York State Martin Luther King Institute for Nonviolence*, 13 F. Supp.2d 306 (N.D.N.Y. 1998) is not to the contrary. *Jehnsen* held that the CRCA was invalid under *Seminole Tribe* because it was passed pursuant to Article I. *Id.* at 311. But in doing so it did not hold that the problem with the CRCA was an improper **recital** to Article I. Rather, it suggested that **any** copyright legislation could **only** be passed pursuant to Congress's power under the Copyright Clause of Article I. *Id.* As NABP has already shown (and as the Supreme Court assumed in *Florida Prepaid*), because copyrights and patents are property that can be protected from state deprivation without due process, the CRCA certainly **could** have been passed under § 5. To the extent that *Jehnsen* suggests otherwise, it is erroneous.

n. 18, 124 S. Ct. at 1992 n. 18.)  This argument focuses on the wrong case.  NABP's argument is based on *Georgia*, not *Lane*.  Insofar as NABP's argument is concerned, *Lane* is significant only for the context that it provides for understanding *Georgia*.  And there is nothing in *Georgia* to suggest that the framework it lays down, under which § 5 legislation will be constitutional ***insofar as*** it provides a remedy for actual constitutional violations, is limited only to Title II.[25]

Nor does the argument for limiting *Georgia* to only Title II cases square with the Court's general preference for as-applied over facial challenges, or with the reasons given in *Raines* and *Sabri* therefor (concerning the common law's typical focus on the lessons of the particular, and on the relaxed standing requirements inherent in facial challenges).  Nor does such a limitation square with the Court's recent trend of rescinding the few exceptions to that general preference, as seen in *Carhart*.  There is no reason to believe that the Court would rescind the entire abortion exception in *Carhart*, but rescind only part of the § 5 exception in *Georgia*.  Nor does the limitation square with Justice Scalia's *Lane* dissent, in which he stated his preference for an "enforcement only" approach in ***all*** § 5 cases, save for a select group of racial discrimination cases (for reasons not relevant here).  *Lane*, 541 U.S. at 564, 124 S. Ct. at 2012 (Scalia, J., dissenting).  In short, there is ***no*** indication in *Georgia*, or in ***any*** other Supreme Court opinion, as to why the three-step as-applied approach outlined in *Georgia* should apply only to Title II cases, and not to other § 5 cases.  Given the Court's general guideline that "facial challenges are

---

[25] This is not to say that the dichotomy from *Lane's* footnote 18 may not still be relevant in ***Step Three*** cases – just not in ***Step Two*** cases such as this one.  Footnote 18 ***could*** be read to suggest that ***if*** a court gets to Step Three, then it should conduct the "congruence and proportionality" inquiry as-applied to a particular constitutional right in some cases (like *Lane*), and facially across the board in others (like *Garrett*).  *See, e.g., Bowers*, 475 F.3d at 555.  This assumes that footnote 18's distinction is persuasive.  *But see, e.g.,* Metzger, 105 COLUM. L. REV. at 897 n. 114 ("Justice Stevens' attempt to distinguish this precedent in Lane is not particularly persuasive.").

best when infrequent," *Sabri*, 541 U.S. at 608, 124 S. Ct. at 1948, such a limitation should not be

read into *Georgia*.[26]

**(c)      The "Leapfrog Argument" misreads Georgia.**

Third, the Board argues that even if the *Georgia* approach controls in this case, such does

not mean that the legislative history of the CRCA can be "leapfrogged" in determining whether

the CRCA is valid § 5 legislation.  (Board Brief at 22.)  Yet that is ***exactly*** what *Georgia* says.

Namely, *Georgia* stands for the proposition that both the legislative history, and the "congruence

and proportionality" test that the legislative history is used for, can be ignored in Step Two cases

of ***actual*** constitutional violations, because if a plaintiff prevails on Step Two the court does not

get to Step Three.  To miss this point is to misread *Georgia*.  It is a mistake to argue, as the

Board does, that: 1) *Georgia* did not discuss the "congruence and proportionality" test because

such had already been discussed in *Lane*, which was also a Title II case; and 2) that even under

*Georgia* a court cannot ignore legislative history.  (Board Brief at 21-22.)

---

[26]  The only two cases that could arguably be cited in support of an argument that *Georgia's* three-step as-applied approach should only be used in Title II cases, and not in all § 5 cases, are *De Romero* and *Grizzle v. Okla. Dept. of Veterans Affairs*, No. CIV-06-210, 2006 WL 3227880 at *4 n.2 (E.D. Okla. Nov. 2, 2006).  Yet neither compels such a holding here.  *De Romero* is notable only because it was decided months after *Georgia*, but still found the CRCA unconstitutional, and did not determine whether the conduct at issue actually violated the Fourteenth Amendment in doing so.  But for such an omission to mean anything here, one would have to surmise that the *De Romero* court both considered and implicitly rejected the applicability of *Georgia* to cases analyzing the "appropriateness" of the CRCA.  Such reads too much into the silence of the *De Romero* opinion.  *De Romero* simply parroted the Fifth Circuit's opinion on the CRCA from *Chavez*.  Nowhere in the *De Romero* briefs is *Georgia* even mentioned, and there is no evidence that the district court considered, much less rejected, the applicability of *Georgia's* three-step approach.

Likewise, while the unpublished opinion in *Grizzle* suggests in a footnote that the *Georgia* three-step approach should be limited to Title II cases, it gives no reason in support of such a limitation.  *Grizzle*, 2006 WL 3227880 at *4 n.2.  And in any event, *Grizzle* is inapposite in this case.  The court in *Grizzle* was asked to determine whether *Georgia's* three-step as-applied approach required a re-examination of the ADEA, which had already been held unconstitutional on its face by the Supreme Court in *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 120 S. Ct. 631 (2000).  Yet, as the Board concedes, the Supreme Court has never ruled on the constitutionality of the CRCA.  (Board Brief at 14.)  Thus, *Grizzle's* concern about having to revisit and overrule binding Supreme Court precedent does not apply here.

The first is the more significant mistake – it is illogical to explain away the lack of any mention of "congruence and proportionality" in *Georgia* by arguing, as the Board does, that the Supreme Court had already discussed "congruence and proportionality" for Title II cases in *Lane*. The Court in *Georgia* **explicitly distinguished** both *Lane* and *Boerne*, noting that those cases did not address **actual** constitutional violations. *Georgia*, 546 U.S. at 157-58, 126 S. Ct. at 881 (finding that because his claims were based on an actual constitutional violation, Goodman differed from the claimants in the Court's other § 5 cases including, among others, both *Boerne* and *Lane*). Thus, the Board's argument misses *Georgia's* critical distinction between Step Three cases such as *Lane* and *Boerne*, where "congruence and proportionality" applies, and Step Two cases such as *Georgia* and the present case, where it does not.

The second mistake follows from the first. The Supreme Court has repeatedly said that a statute's legislative history is not dispositive in and of itself. *See, e.g., Boerne*, 521 U.S. at 531-32, 117 S. Ct. at 2170 ("Judicial deference, in most cases, is based not the state of the legislative record Congress compiles but on due regard for the decision of the body constitutionally appointed to decide.") (citations omitted); *Florida Prepaid*, 527 U.S. at 646, 119 S. Ct. at 2210 ("[T]he lack of support in the legislative record is not determinative."). Rather, the relevance of legislative history is that it helps to determine, under the "congruence and proportionality" test *in Step Three cases*, the extent of Congress' *prophylactic* power. If the need for the prophylaxis is strong because the legislative history shows extensive state violations of the Fourteenth Amendment right at issue, then a statute can go more into the prophylactic realm; if the need is slight, then the prophylactic power is more circumscribed. *See, e.g., Florida Prepaid*, 527 U.S. at 646, 119 S. Ct. at 2210 ("[S]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one."). But the "congruence and proportionality" test is

wholly inapposite in Step Two cases, which deal not with Congress's **prophylactic** power but its **enforcement** power – that is, its power to provide remedies for conduct that **actually violates** the Fourteenth Amendment.   To misunderstand this distinction between Step Two and Step Three cases is to misunderstand *Georgia.*[27]

**(d)     The "Silent Overruling Argument" misreads *Florida Prepaid.***

Finally, the Board argues that even if *Georgia* applies, this is a Step Three case, not a Step Two case, because the Board's intentional copyright infringement did not deprive NABP of property without due process since the State of Georgia provided post-deprivation state-law remedies for the Board's infringement.   (Board Brief at 22-23.)   Of course, the main problem with this argument is that *Parratt, Logan, Hudson, Zinermon,* and others have all held that ***post***-deprivation remedies are immaterial where state conduct was not "random and unauthorized." To get around this problem, the Board attempts to argue that *Florida Prepaid* somehow overruled the twenty-plus years of due-process precedent embodied in *Parratt, Logan, Hudson,* and *Zinermon* regarding the inadequacy of ***post***-deprivation remedies for state conduct that is not "random and unauthorized."   As the Board states:

> While acknowledging *Parratt* and *Hudson, Florida Prepaid* nonetheless held that Florida provided adequate remedies for *willful* patent infringement (and therefore adequate due process) by providing *post*-deprivation remedies (not pre-deprivation remedies, which NABP incorrectly contends are the only type of remedies that could be adequate).

(Board Brief at 24.)

But *Florida Prepaid* held no such thing.   As noted above, *Florida Prepaid's* was a "facial" analysis.   As such, the Court had no occasion to consider – much less rule on – the

---

[27] Further, if the Board's approach were correct, then every Circuit court decision following *Georgia* that used the "congruence and proportionality" test only **after** finding that the case was not a Step Two case would be erroneous. *See, e.g., Bowers,* 475 F.3d at 554-55; *Klingler,* 455 F.3d at 894; *Toledo,* 454 F.3d at 34; *Guttman,* 446 F.3d at 1035-36.

adequacy of the state-law remedies *at issue in that case*, because such was irrelevant to the facial inquiry. While the Court in a footnote in *Florida Prepaid* said that it was "worth mentioning" that the State of Florida provided several state-law remedies, *Florida Prepaid*, 527 U.S. at 644 n. 9, 119 S. Ct. at 2209 n. 9, such was dicta. Further, the Court had no reason under its facial analysis to consider whether those post-deprivation remedies were "adequate" *in the case before it* by determining whether the infringement at issue was indeed "random and unauthorized." And it did not do so. To the extent that the Board suggests otherwise, and states that the Court rejected the PRA for the "independent reason" that those state-law remedies were adequate, the Board simply misreads *Florida Prepaid*. (Board Brief at 22, 24-25.)

Rather, the question the Court *did* examine in *Florida Prepaid* was whether Congress had attempted to limit the PRA to only those patent infringements that deprived property without due process. And one factor relevant to this question was whether Congress *had considered* the availability of adequate state-law remedies in enacting the PRA. The Court struck down the PRA in part because Congress had not done so. But it also implied that *if* Congress had more narrowly tailored the PRA, the result could have been different. One example the Court gave was that the remedy the PRA provided could have been limited to certain types of infringement, such as "nonnegligent infringement *or infringement authorized pursuant to state policy* . . . ." *Id*. at 647, 119 S. Ct. at 2210 (emphasis added). As the highlighted language shows, the Court apparently still believed under *Parratt*, *Logan*, *Hudson*, and *Zinermon* that infringements authorized by state policy could appropriately be proscribed under Congress's § 5 powers, because such would constitute deprivations of property without due process (regardless of the availability of *post*-deprivation remedies). Such clearly would appear to be a *reaffirmation*, not a *rejection*, of *Parratt*, *Logan*, *Hudson*, and *Zinermon*. Thus, it is not that *Florida Prepaid* did

45

not say what the Board says it did; it said the exact opposite. This could perhaps explain why *Zinermon*, for one, has been cited with approval in over one thousand cases *since Florida Prepaid*, with no hint that *Florida Prepaid* overruled it. *E.g.*, *Stotter v. Univ. of Tex. at San Antonio*, -- F.3d --, 2007 WL 4171112 *6 (5th Cir. 2007) ("[B]ecause the alleged deprivation was authorized [and] foreseeable, . . . the district court erred in dismissing [the] procedural due process claim on the basis of the availability of an adequate post-deprivation remedy.").[28]

### (v) *Even if this is a Step Three case, the CRCA is still "appropriate" § 5 legislation under the "congruence and proportionality" test.*

Finally, even if this Court finds that the conduct at issue here does not rise to the level of a constitutional violation – making this a Step Three as opposed to a Step Two case – the CRCA is still "appropriate" § 5 legislation under the "congruence and proportionality" test. *See, e.g.*, *Bowers*, 475 F.3d at 554-55 (conducting "congruence and proportionality" test after determining case was a Step Three case); *Klingler*, 455 F.3d at 894 (same); *Toledo*, 454 F.3d at 34 (same); *Guttman*, 446 F.3d at 1035-36 (same). The Board argues that the CRCA fails the "congruence and proportionality" test for the same reasons outlined by the Fifth Circuit in *Rodriguez* and *Chavez*.[29] (Board Brief at 14-16.) But these two Fifth Circuit opinions – neither of which are binding in this Circuit – are each flawed, and should not be adopted by this Court.

---

[28] While this is the main flaw of Section III of the Board's Brief, there are others. For example, the Board's footnote 7 – which asserts that the CRCA is itself a constitutional due process violation because it does not provide for pre-deprivation remedies – is illogical, not the least because no property is deprived by the CRCA. (Board Brief at 24.) Likewise, the Board's claim that *Zinermon* and *Logan* are somehow inapposite because they are not "abrogation" cases is similarly mistaken. (Board Brief at 25.) NABP's argument is that under *Georgia* the CRCA is constitutional insofar as this is a Step Two case. *Logan* and *Zinermon* clearly provide authority on whether this is a Step Two or a Step Three case, as both discuss what state conduct is and is not a deprivation of property without due process of law.

[29] The district court opinions in *Hairston* and *De Romero* simply cite the § 5 analysis outlined in *Chavez*. *Hairston*, 2005 WL 2136923 at *3- *8; *De Romero*, 466 F. Supp.2d at 416-18. Hence, the analysis herein will focus only on *Rodriguez* and *Chavez*.

46

**(a)**    *Rodriguez.*

Abel Rodriguez sued the Texas Commission on the Arts for copyright infringement under the CRCA for allegedly misappropriating a license plate design he created.  The Fifth Circuit held that the CRCA was invalid and affirmed the district court's dismissal of the action.  The Fifth Circuit's decision did not include any analysis of the validity of the CRCA under *Boerne*.  Rather, the decision simply concluded that because the PRA was held unconstitutional in *Florida Prepaid*, then the CRCA must be unconstitutional as well:

> In *College Savings Bank*, the Supreme Court held that the Patent Remedy Act cannot be sustained as legislation enacted to enforce the guarantees of the Fourteenth Amendment's Due Process Clause.  It is appropriate for us to adopt this analysis in the copyright context.  The interests Congress sought to protect in each statute are substantially the same and the language of the respective abrogation provisions are virtually identical.

*Rodriguez*, 199 F.3d at 281 (citations omitted).

**(b)**    *Chavez.*

Denise Chavez sued the University of Houston and one of its employees for copyright infringement under the CRCA for the university's continuing publication of her book without her consent.  In 2000 the Fifth Circuit held that the CRCA did not validly abrogate state sovereign immunity for copyright infringement under § 5.  In so holding, the Fifth Circuit cited *Florida Prepaid* as providing a three-part "analytical framework" for analyzing § 5 legislation.  That framework examined: 1) the nature of the injury to be remedied; 2) Congress's consideration of the adequacy of state remedies to redress the injury; and 3) the coverage of the legislation.  *Chavez*, 204 F.3d at 605.

On the first prong, concerning the legislative record of state infringements, the Fifth Circuit was forced to concede that "the legislative history of the CRCA documents a few more instances of copyright infringement than the PRCA legislative history did of patent infringement

. . . ." *Id.* at 605.  On this point, the court noted that the Copyright Office Report discussed in the legislative history of the CRCA discussed seven incidents of state copyright infringement enabled by the Eleventh Amendment.  But, without stating why seven was not enough (or what number would be enough), the court then concluded that the legislative history of the CRCA did not show a "pattern" or "epidemic" of state infringements of copyright.  *Id.* at 606.  In so concluding, the court cited the testimony of Ralph Oman, Register of Copyrights, who, the court asserted, had testified in part that: 1) the states were all respectful of the copyright laws, *id.* at 606 n.7; and 2) that the concern was principally about the *potential* for future abuse, as opposed to current abuse, *id.* at 606.

On the second prong, the Fifth Circuit determined that Congress "barely considered" the availability of state-law remedies for copyright infringement.  The court conceded that the legislative history showed that Congress ***did*** hear testimony from a witness who testified that his company's attorneys told him that state and local courts were unavailable because only federal courts could hear copyright infringement cases.  The court also conceded that the legislative history included a survey of state waivers of Eleventh Amendment immunity.  But the court held that such consideration was not enough (without saying what would be enough), in part because Congress had not considered possible state-law remedies for copyright infringement, such as breach of contract claims.  *Id.* at 606.

On the third prong, the court noted that the CRCA, like the PRA, could cover both intentional and unintentional infringements.  Hence, because only intentional infringements would constitute a "deprivation" of property, the court held that the CRCA swept too broadly. Tying the three prongs together, the court concluded:

> Since the record does not indicate that Congress was responding to the kind of massive constitutional violations that have prompted proper remedial legislation,

that it considered the adequacy of state remedies that might have provided the required due process of law, or that it sought to limit the coverage to arguably constitutional violations, we conclude that the CRCA is, like the PRCA, an improper exercise of Congressional legislative power.

*Id.* at 607.

**(c)    *Analyzing Rodriguez and Chavez.***

Looking first at *Rodriguez*, it is illogical to claim, as *Rodriguez* does, and as the Board attempts to do (Board Brief at 14-15), that if the PRA is unconstitutional then the CRCA must be as well, simply because both provide remedies for state infringements of "intellectual property." Such an analysis is superficial, and fails to consider that the Supreme Court analyzed the constitutionality of the PRA and the Trademark Remedy Clarification Act in two *separate* opinions, using two *distinct* analyses, in *Florida Prepaid* and *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 671, 119 S. Ct. 2219, 2223-24 (1999). The Supreme Court has even analyzed the constitutionality of different portions of the *same act* separately, using different § 5 analyses, with divergent results. *Compare Lane*, 541 U.S. 509, 124 S. Ct. 1978 (holding that Title II of the ADA, as applied to cases implicating the fundamental right of access to the courts, *did* constitute a valid exercise of Congress' § 5 power), *with Garrett*, 531 U.S. 356, 121 S. Ct. 955 (holding that Title I of the ADA did *not* constitute a valid exercise of Congress' § 5 power). Thus, the *holding* of *Florida Prepaid* is no more applicable to the constitutionality of the CRCA than: 1) the *holding* of *Boerne* regarding the RFRA; 2) the *holding* of *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 123 S. Ct. 1972 (2003) regarding the Family and Medical Leave Act; 3) the *holding* of *Kimel* regarding the ADEA; and so on.

*Chavez* is also flawed. *Chavez* apparently started from the proposition that if the PRA was unconstitutional then the CRCA must be as well, and then worked *backwards* from there.

There is no other way to explain the slanted way that *Chavez* reads, Rorschach-like, the legislative history of the CRCA.

On the first prong of the three-part "congruence and proportionality" test, *Chavez* concedes that the legislative history of the CRCA showed more instances of copyright infringement by states (at least seven discussed in the Copyright Office Report) than the legislative history of the PRA showed of patent infringement (only two, *see Florida Prepaid*, 527 U.S. at 640, 119 S. Ct. at 2207). This comports with Justice Stevens' observation in *Florida Prepaid*:

> To the extent that a majority of this Court finds this factor dispositive, there is hope that the Copyright Remedy Clarification Act of 1990 may be considered "appropriate" § 5 legislation. The legislative history of that Act includes ***many*** examples of copyright infringements by States – ***especially state universities***.

*Florida Prepaid*, 527 U.S. at 658 n.9, 119 S. Ct. at 2215 n.9 (Stevens, J., dissenting) (emphasis added). Thus, there seems to be a difference of opinion between Justice Stevens, who viewed the examples of state copyright infringement in the legislative history of the CRCA as significant ("many"), and the Fifth Circuit, which did not ("a few"). A closer examination of the legislative history of the CRCA supports Justice Stevens' view.

First, the number of state infringements cited by the *Chavez* court – seven – is mistakenly low. It is true that the Copyright Office did discuss seven documented incidents of state copyright infringement on pages 5-9 of its Report, as noted in *Chavez*.[30]  *Chavez*, 204 F.3d at

---

[30] Those seven were:

1.      A Tennessee attorney noted problems a client had providing training videos to prisons.
2 & 3.  The Motion Picture Association of America noted that two state correctional institutions had publicly performed motion pictures without a license, asserting Eleventh Amendment immunity.
4.      Broadcast Music, Inc. noted that it had dismissed an infringement action in June of 1987 against a college rather than contest the Eleventh Amendment issue.

(continued...)

606. But those seven were not the only incidents of state copyright infringement discussed in the legislative history of the CRCA.  For example, the *Chavez* court omits any discussion of the four pre-*Atascadero*[31] lower-court cases that dealt with various state copyright infringements, all of which were discussed in the legislative history of the CRCA.  *See, e.g.*, House Hearings at 29-31.[32]  Two of those decisions had upheld state sovereign immunity for copyright infringement; two had not.  The *Chavez* court likewise omits any discussion of the four ***post-Atascadero*** lower-court decisions that dealt with various state copyright infringements, all of which were discussed in the legislative history of the CRCA, and ***all*** of which upheld state sovereign immunity for copyright infringement.  *See, e.g.*, House Hearings at 31-34.[33]  The House Subcommittee even invited the President of the losing party from one of the four post-*Atascadero* cases to testify as

_____

(continued...)

    5 & 6.    The American Journal of Nursing Company had been unable to obtain relief when the Minnesota Department of Human Services and a local hospital association in California copied the company's educational materials and offered them for sale.

    7.    A Massachusetts law firm noted that after Atascadero a state defendant had re-submitted a new brief re-arguing the Eleventh Amendment issues.

*Copyright Liability of States and the Eleventh Amendment* 7-9 (1988).

[31] In *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S. Ct. 3142 (1985) the Supreme Court held that for Congress to abrogate state sovereign immunity it must clearly express its intent to do so.  Thus, after *Atascadero*, it was unclear whether the Copyright Act's general provision of remedies against "any" infringer included the States.  This uncertainty was what Congress sought to address with the CRCA.

[32] Those four cases were: *Mills Music, Inc. v. Arizona*, 591 F.2d 1278 (9th Cir. 1979); *Wihtol v. Crow*, 309 F.2d 777 (8th Cir. 1962); *Mihalek Corp. v. Michigan*, 595 F. Supp. 903 (E.D. Mich. 1984), *aff'd on other grounds*, 814 F.2d 290 (6th Cir. 1987), *cert. denied*, 484 U.S. 986, 108 S. Ct. 503 (1987); *Johnson v. Univ. of Va.*, 606 F. Supp. 321 (W.D. Va. 1985).

[33] Those four cases were: *BV Eng'g v. Univ. of Cal., Los Angeles*, 657 F. Supp. 1246 (C.D. Cal. 1987), *aff'd*, 858 F.2d 1394 (9th Cir. 1988), *cert. denied*, 489 U.S. 1090, 109 S. Ct. 1557 (1989); *Cardinal Indus. v. Anderson Parrish Ass'n*, No. 83-1038-Civ-T-13, 1986 WL 32732 (M.D. Fla. May 7, 1986), *aff'd*, 811 F.2d 609 (11th Cir. 1987), *cert. denied*, 484 U.S. 824, 108 S. Ct. 88 (1987); *Richard Anderson Photography v. Radford Univ.*, 633 F. Supp. 1154 (W.D. Va. 1986), *aff'd*, 852 F.2d 114 (4th Cir. 1988), *cert. denied*, 489 U.S. 1033, 109 S. Ct. 1171 (1989); *Woelffer v. Happy States of Am., Inc.*, 626 F. Supp. 499 (N.D. Ill. 1985).

to his company's unsuccessful attempt to regain the damages caused by UCLA's copyright infringement. *See, e.g.*, House Hearings at 142-45 (statement of Bert P. van den Berg, President, BV Engineering Professional Software).

In addition to those eight cases, *Chavez* also omits any discussion of the testimony of numerous witnesses who cited "extensive" use of copyrighted materials by the states, and described the problems with the inability of copyright holders to obtain monetary relief therefor following *Atascadero*. *See, e.g.*, H.R. REP. NO. 101-282(I) at 8 (1989). For example, Eamon Fennessy of Copyright Clearance Center submitted a letter to the House Subcommittee describing the withdrawal of two public universities from discussions about photocopy licenses as a result of the holdings of the four post-*Atascadero* cases. *See, e.g.*, House Hearings at 137. Likewise, Maclean Hunter Reports submitted testimony to the House Subcommittee regarding ongoing state infringement of its car valuation guide book, the *Red Book*. *See, e.g.*, House Hearings at 199-202. As this testimony stated:

> In the past several years commercial services acting under color of state law have been plagiarizing the editorial content of <u>Red Book</u>. . . . <u>Red Book</u> and other used car valuation publishers have suffered <u>actual</u>, not merely speculative, damages as a result of ongoing state-authorized copyright infringement.

*Id.* at 200-01 (emphasis in original). But this testimony is omitted by *Chavez*.[34]

_____

[34] The Senate Report echoes these sentiments from the House:

> State immunity from damages critically impairs creative incentive and business investments in the country's copyright businesses that deal with State entities. These include the creators and producers of computer data bases, software, scholarly books and journals, textbooks, ***educational testing materials***, microfilm, educational video materials, music and motion pictures. All of these businesses, large and small, ***are hurt*** by the ***current*** state of the law. Among those most vulnerable are educational publishers whose principal markets are State universities.

S. REP. NO. 101-305 (1989) (emphasis added).

Thus, the number of reported incidents of state copyright infringement discussed in the legislative history of the CRCA is not merely seven, as *Chavez* claims, but is at least seventeen. But simply looking at the number of reported infringements – whether seven or seventeen – in the abstract does not alone resolve the discrepancy between Justice Stevens' view of the legislative history and that of the *Chavez* court.   Rather, it must be kept in mind that until *Atascadero* was decided in 1985, states would have generally refrained from copyright infringement because it was presumed that the Copyright Act's general authorization of remedies against "any" infringer included the states.   *See generally* 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.01[E][2][b] (hereafter NIMMER); *see also* House Hearings at 102 (Testimony of Barbara Ringer, former Register of Copyrights) ("I believe that the States have assumed they have been liable up until now.  I think it is now only beginning to penetrate and they are suddenly saying to each other, 'Gee, we are not liable.'").   Thus, *fourteen* of the seventeen incidents discussed in the legislative history of the CRCA occurred in a very short four-year span from 1985 to 1989.  This qualitatively alters the significance of these reported incidents – fourteen examples of state copyright infringement over two hundred years is substantively different than fourteen examples of state copyright infringement over four years. Yet *Chavez* omits any discussion of this point.

Finally, *Chavez* misstates the testimony of Ralph Oman.   First, Mr. Oman's statement that "the States are all respectful of the copyright laws," *Chavez*, 204 F.3d at 606 n.7, is taken out of context.  Due to its significance, the portion of Mr. Oman's testimony that *Chavez* truncated for its citation is cited here in full:

> I doubt very much, Mr. Chairman, if you fail to enact this bill, that the States would all launch a massive conspiracy to rip off the publishers across-the-board. They are all respectful of the copyright law, and what State or State official wants to get a reputation as a copyright pirate?

53

No, Mr. Chairman, I think they will continue to respect the law.  If some might argue for immunity – which, I repeat, no one has – they would want it only as a shield for the State treasury from the occasional error or misunderstanding or innocent infringement.  Everybody makes mistakes, they may say, but let's not raid the State coffers because of one human error.  An injunction is all you need.

The answer to that line of reasoning, Mr. Chairman, I think is simple.  Without the threat of a fat fine, the States might become lax in their copyright educational program.  With no exposure, the training will slack off, the copyright awareness will decrease, and the honest mistakes will become more and more frequent.

So your bill will reintroduce some anxiety back into the equation and have an important deterrent effect on the States' copyright practices.  It will guard against sloppiness.  So I urge Congress to pass the Copyright Remedy Clarification Act as quickly as possible.

House Hearings at 8-9 (statement of Ralph Oman).  For the *Chavez* court to selectively quote from the part of Mr. Oman's testimony where Mr. Oman was setting up a straw man that he would later knock down is curious.  Likewise, it is similarly mistaken to claim, as the *Chavez* court asserts, that Mr. Oman testified that the "principal" worry to be addressed by the CRCA was of the *potential* for future abuse.  *Chavez*, 204 F.3d at 606.  The testimony that *Chavez* cites for this proposition in fact dealt with Mr. Oman's characterization of the Copyright Office Report, which he claimed showed "that copyright proprietors demonstrated at least the potential for harm unless states are held accountable in damages for the infringement of copyrighted works."  House Hearings at 7.  But Mr. Oman's characterization of the conclusions of the Copyright Office Report should not be confused with his testimony itself, in which he explicitly addressed the distinction between future harm and current harm thusly:

Mr. SANGMEISTER.  If I may interrupt, what you are saying then is there is nothing *on the scene* where the States *have abused* or *have been taking advantage* of what we ought to be stopping here.  This is all on the theory that the States *may* or *could* do this, is that correct?

Mr. OMAN.  *No.*  There are several suits pending in court that relate to copyright infringement by the States.

54

House Hearings at 52 (emphasis added).  This discrepancy can only be explained if, as noted above, the *Chavez* court started from the supposition that the CRCA was unconstitutional, and then worked its way backwards through the legislative history from there.

On the second prong, *Chavez* is again forced to concede that the legislative history of the CRCA is different from that of the PRA, in that Congress *did* consider the availability of state-law remedies.  There is evidence of such from both the witnesses' testimony and from the Copyright Office Report.  This again comports with Justice Stevens' analysis of the legislative history of the CRCA from *Florida Prepaid*:

> Perhaps most importantly, the House requested that the Register of Copyrights prepare a study, which he described in his transmittal letter as, "a factual inquiry about enforcement of copyright against state governments and about unfair copyright licensing practices, if any, with respect to state government use of copyrighted works.  I have also prepared an in-depth analysis of the current state of Eleventh Amendment law and the decisions relating to copyright liability of states, including an assessment of any constitutional limitations on Congressional action.    Finally, as you requested, the American Law Division of the Congressional Research Service has conducted a 50 state survey of the statutes and case law concerning waiver of state sovereign immunity."  This report contains comments from industry groups, statistics, and legal analysis relating to copyright violations, actual and potential, by States.

*Florida Prepaid*, 527 U.S. at 658 n.9, 119 S. Ct. at 2215 n.9 (Stevens, J., dissenting) (citations omitted).  Again, there seems to be a discrepancy between Justice Stevens' reading of the legislative history of the CRCA and that of the *Chavez* court, which viewed with disfavor Congress's failure to consider the availability of alternative state-law remedies for copyright infringement, such as a breach of contract claim.  *Chavez*, 204 F.3d at 606.

Again, this dispute cannot be analyzed in the abstract.  Rather, it can only be analyzed with respect to 17 U.S.C. § 301 and 28 U.S.C. § 1338.  Section 301, a statutory provision that has no analog in the patent context, explicitly preempts any state-law claim that is "equivalent"

to a federal copyright infringement claim.  Section 1338 provides federal courts with exclusive jurisdiction over copyright claims.  Congress was certainly aware of federal preemption and exclusive federal jurisdiction for copyright infringement claims when it passed the CRCA, if for no other reason than it received extensive testimony on this subject in the Hearings on the CRCA.  For example, Mr. Oman discussed it in his testimony:

> While the Copyright Act grants to copyright owners certain exclusive rights in their work, the law dictates that all copyright suits be litigated exclusively in Federal [*sic*] court.  So application of the eleventh amendment leaves copyright owners *without an effective remedy* against allegedly infringing States.

House Hearings at 7 (Statement of Ralph Oman; emphasis added.)   So did the Copyright Remedies Coalition:

> Federal courts have exclusive jurisdiction over copyright infringement matters.  Thus, if the Eleventh Amendment bars copyright owners from seeking a remedy in federal court, they have no place to turn for adequate relief.  As the Court of Appeals for the Ninth Circuit recognized in <u>BV Engineering</u>, "the choice in copyright cases is not between the federal forum and the state forum – it is between the federal forum and <u>no</u> forum."

House Hearings at 126 (Statement of the Copyright Remedies Coalition; emphasis in original).

The only way a state-law claim could arguably survive § 301 preemption would be if it required an "extra element" than a claim for copyright infringement.[35]  Thus, it makes no sense to consider such a claim as an adequate state-law "alternative" for a federal copyright infringement claim.  A state-law claim that is harder to prove (because the plaintiff has to prove an extra element) is an adequate "alternative" only in the sense that a marathon is an

---

[35] *See* NIMMER § 1.01[B][1]:

> But if qualitatively other elements are required, instead of, or in addition to, the acts of reproduction, performance, distribution, or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright, and there is no preemption.  Thus, the "extra element" test generally furnishes the touchstone here.

"alternative" to a 5K run.   Thus, there *can be no* copyright infringements for which an "alternative" state-law remedy is also available (because if it was really an "alternative," it would be preempted).  That category, at least in the copyright context, is an empty set.

A breach of contract claim – cited by the *Chavez* court as something that Congress should have considered – provides a good example of this point.  For such a claim to survive preemption it must at least have some "extra element."  Whether that extra element can be provided simply by the existence of the contract itself, or whether the breached provision must impose a duty not imposed by copyright law, is irrelevant here.  The pertinent point is that there has to be an extra element somewhere.  But because not all copyright owners are going to be able to prove that extra element (for example, not all copyright owners will have entered into contracts with the state entity that infringes their copyright), logic does not support the statement that a breach of contract claim can provide an adequate "alternative" remedy for a state's copyright infringement.  Congress presumably could have come to that common-sense conclusion rather easily, without much, or any, debate or discussion.  But under the *Chavez* reasoning, Congress should have included in the legislative history of the CRCA extensive analysis considering *every possible* state-law claim that could be brought (from defamation to intentional infliction of emotional distress to a legislative remedy), and then showing why each of those claims would not be an adequate "alternative" to compensate a copyright owner for a state's infringement, because of the extra elements that each requires.

On the third prong, *Chavez* is correct to note that the CRCA by its terms is not limited to only intentional copyright infringements.  Thus, it is true that the CRCA does cover some conduct that does not rise to the level of a constitutional violation.  But it is not disputed that Congress has some prophylactic leeway to pass legislation under § 5 that covers conduct that is

not itself a constitutional violation. *See, e.g., Hibbs*, 538 U.S. at 727, 123 S. Ct. at 1977;

*Katzenbach v. Morgan*, 384 U.S. 641, 658, 86 S. Ct. 1717 (1966). As the Supreme Court

explained in *Hibbs*:

> Congress may, in the exercise of its § 5 power, do more than simply proscribe
> conduct that we have held unconstitutional. Congress' power "to enforce" the
> [Fourteenth] Amendment includes the authority both to remedy and to deter
> violation of rights guaranteed thereunder by prohibiting a somewhat broader
> swath of conduct, including that which is not itself prohibited by the
> Amendment's text. In other words, Congress may enact so-called prophylactic
> legislation that proscribes facially constitutional conduct, in order to prevent and
> deter unconstitutional conduct.

*Hibbs*, 538 U.S. at 727-28, 123 S. Ct. at 1977. Thus, the Supreme Court in *Hibbs* upheld the

FMLA based on the states' record of unconstitutional gender-based discrimination in the

administration of family and medical leave benefits, as identified in the FMLA's legislative

history. *Id.* at 737-38, 123 S. Ct. at 1982-83.

Thus, while *Chavez* is correct to note that the CRCA by its terms is not limited to only

intentional copyright infringements, the pertinent question is whether the set of unintentional

copyright infringements that the CRCA could cover is small enough that the CRCA would still

be valid § 5 legislation (*Hibbs*) or large enough that it is not (*e.g., Florida Prepaid*). On this

point, it is important to note that a claim for copyright infringement requires as one of its

elements that the defendant ***actually copied*** (*i.e.*, did not independently create) the work in

question. Copying is typically proved by showing first that the defendant had access to the

copyrighted work. *See, e.g., Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1169 (7th Cir.

1997) ("The Copyright Act forbids only copying; if independent creation results in an identical

work, the creator of that work is free to sell it."). Because this element is wholly absent in the

patent context, the category of unintentional state infringements of ***copyrights*** (which requires

access and copying) will presumably be ***far smaller*** than the category of unintentional state

infringements of **patents** (which does not).[36]  Yet, as discussed above, the legislative history of the CRCA showed that the need for it was much **larger** than the need for the PRA (given the higher number of state infringements of copyright).  Thus, the CRCA responded to a significant "need" with a response that was "congruent and proportional" thereto (permissible under *Hibbs*); as opposed to the PRA, which responded to a small "need" with an incongruent and disproportionate response.

Thus, the *Chavez* and *Rodriguez* opinions relied on by the Board are significantly flawed. Given that they are not binding precedent on this Court, their authority in this case should be circumscribed accordingly.  Instead, this Court should find that even if this case is a Step Three case, the CRCA is still constitutional, because it provided a congruent and proportional response to a well-established need for redress for state deprivations of property (namely copyrights) without due process.

**2.      The CRCA is a proper exercise of Congress's Article I copyright power under *Katz*.**

Thus, as NABP has shown, the CRCA should be upheld under § 5 as applied to the facts of this case.  But in addition to *Georgia*, there was another change in the Supreme Court's sovereign immunity jurisprudence in 2006, one that Defendants simply ignore.  As a result of *Central Virginia Community College v. Katz*, 546 U.S. 356, 126 S. Ct. 990 (2006), the CRCA may now **also** be upheld as a proper exercise of Congress's Article I copyright power.  To understand the extent to which *Katz* thus affects the analysis of the CRCA, it is first necessary to review the Court's evolving jurisprudence concerning sovereign immunity and Article I.

---

[36] The majority in *Florida Prepaid* seemed to suggest as much when it contrasted the limited scope of the CRCA with the vast scope of the PRA by citing to the legislative history of each: "The comments regarding copyright centered on substantial use of copyrighted textbooks by state universities as well as state use of copyrighted music and computer software. *State use of patented products is more diverse and more substantial*. . . . It[']s difficult for us to identify a patented product or process which might not be used by a state." *Florida Prepaid*, 527 U.S. at 646 n.10, 119 S. Ct. at 2210 n.10 (emphasis added).

As noted above, for Congress to abrogate state sovereign immunity it must unequivocally express its intent to abrogate, and it must act pursuant to a valid exercise of its power in doing so. On the second question it is clear that § 5 can provide such authority. *E.g.*, *Fitzpatrick*, 427 U.S. at 452-56, 96 S. Ct. at 2669-71.  But where the Court has vacillated over the last twenty years is on whether any of Congress's Article I powers can also provide such authority.  First, in 1989, the Supreme Court held that Congress's power to pass legislation under the Interstate Commerce Clause of Article I *did* provide such authority. *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 19-20, 109 S. Ct. 2273, 2284 (1989).  Then, only seven years later, the Supreme Court reversed itself and overruled *Union Gas*, holding that Congress's power under the Indian Commerce Clause of Article I did *not* provide such authority. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66, 116 S. Ct. 1114, 1128 (1996).  The Court also broadly stated that because the Eleventh Amendment restricts the judicial power under Article III, *no* Article I power could provide such authority. *Id.* at 73, 116 S. Ct. at 1132.  Thus, when *Florida Prepaid* was decided in 1999, the law appeared to be that states were immune from suit under federal statutes passed under *any* Article I authority.  And in *Alden v. Maine*, the Supreme Court again spoke broadly, holding that Congress's Article I powers did not include the power to subject non-consenting states to private suits for damages in state courts. *Alden v. Maine*, 527 U.S. 706, 712, 119 S. Ct. 2240, 2246 (1999).

But in 2006 the Supreme Court again shifted course in *Katz*.  The Court in *Katz* implied that not all Article I powers are created equal when it upheld legislation passed under the Bankruptcy Clause of Article I.   In particular, the Court held that under the plan of the Constitutional Convention, in joining the Union, the states surrendered any immunity they might have enjoyed from private damages actions brought under the bankruptcy laws. *Katz*, 126 S. Ct.

at 1002-05.  In so holding, the Court acknowledged that statements in both the majority and the dissenting opinions in *Seminole Tribe* reflected an assumption that the holding in that case would apply to the Bankruptcy Clause.  *Id.* at 996.  But the Court then concluded that "careful study and reflection have convinced us, however, that that assumption was erroneous."  *Id.*

Therefore, as a result of *Katz*, further "careful study and reflection" is needed to determine whether the CRCA is more like a statute enacted under the Bankruptcy Clause of Article I (which, under *Katz*, involves an area in which the states surrendered their immunity as part of the plan of the Convention), or is more like a statute enacted under the Commerce Clause of Article I (which, under *Seminole Tribe* and *Alden*, runs into state sovereign immunity).  *E.g., Toeller v. Wis. Dept. of Corr.*, 461 F.3d 871, 876 (7th Cir. 2006) ("Although at one point it seemed as if constitutional provisions added after the effective date of the Eleventh Amendment, such as the Fourteenth Amendment, were the only possible source of valid constitutional authority for Congress, the Supreme Court corrected that impression in its decision in [*Katz*]. . . . [T]he Court clarified in *Katz* that other provisions of the Constitution might also provide a source of authority for Congress in this area.").

**(i)     *The Katz Decision.***

In *Katz*, the liquidating supervisor of a bankrupt private enterprise commenced proceedings in Bankruptcy Court to avoid and recover preferential transfers made to state institutions of higher learning.  The state defendants moved to dismiss the proceedings, contending that sovereign immunity precluded a suit for monetary relief against a state university.  The Supreme Court upheld the federal court's jurisdiction, reasoning that under the plan of the Constitutional Convention, the Framers would have assumed that a claim in bankruptcy would have been one of the types of claims for which the states surrendered their

immunity when they signed on to the Constitution. To support this conclusion, the Court pointed to two facts: 1) the Bankruptcy Clause was included in the Constitution by the Framers to address an overriding need in the new nation for uniformity in its bankruptcy laws; and 2) the Framers in the early Congress, in order to address that need for uniformity, enacted federal bankruptcy legislation in 1800 that authorized *federal* courts to issue writs of habeas corpus directed at *state* officials ordering the release of debtors from state prisons. *Katz*, 126 S. Ct. at 994-95, 1002.

**(a)    *The need for uniformity.***

The Court highlighted two historical developments in support of its conclusion that the Framers included the Bankruptcy Clause in the Constitution to promote uniformity: 1) earlier divergent state court bankruptcy decisions; and 2) the absence of any debate on the Bankruptcy Clause at the Constitutional Convention. On the first, the Court noted two cases – *James v. Allen*, 1 Dall. 188 (C.P. Phila. Cty. 1786), and *Millar v. Hall*, 1 Dall. 229 (Pa. 1788) – that were decided under state bankruptcy laws in place before the adoption of the Constitution. The two cases highlighted both the potential for divergent bankruptcy opinions among state courts, and the possibility that a debtor, upon being discharged in one state, could then be thrown into jail in another. The Court found that these two cases illustrated "the backdrop" against which the Bankruptcy Clause was adopted. On the second point, the Court discussed the adoption of the Bankruptcy Clause at the Constitutional Convention. The Court noted that the Convention adopted the Committee of Detail's recommendation to adopt the Bankruptcy Clause within two days of the Committee's recommendation "with very little debate." *Id.* at 998-99. As the Court concluded: "The absence of extensive debate over the text of the Bankruptcy Clause or its

insertion indicates that there was general agreement on the importance of authorizing a uniform federal response to the problems presented in cases like *James* and *Millar*." *Id*. at 999-1000.

**(b)    *The Framers' actions.***

The second factor influential in the Court's reasoning in *Katz* was that to address the need for uniformity that inspired the Bankruptcy Clause, Congress in 1800 passed federal bankruptcy legislation that authorized ***federal*** courts to issue writs of habeas corpus directed at ***state*** officials ordering the release of debtors from state prisons. This law was relevant to the Court's reasoning for several reasons. First, the Court considered the statute, passed by the Sixth Congress in 1800, highly relevant for divining the Framer's intent.[37]    Second, the statute's grant of the habeas power to federal courts for state prisoners was remarkable because it would be another 67 years – after the transformation in federal-state relations wrought by the Civil War – before the writ would be made generally available to state prisoners. Third, the statute was passed during a period when state sovereign immunity "could hardly have been more prominent" among the nation's concerns, given the 1793 decision of *Chisolm v. Georgia*, 2 Dall. 419 (1793), which so "shocked" the country in its lack of regard for sovereign immunity that it led to the adoption of the Eleventh Amendment. Fourth, there appears to be no record of any objection to the 1800 bankruptcy statute or to its grant of habeas power to federal courts. *Katz*, 126 S. Ct. at 1002-03. That such an intrusion into the realm of the states' sovereign immunity could pass ***without comment*** in the political milieu of the time must have meant, the *Katz* court concluded, that the

---

[37]    *See, e.g., Eldred v. Ashcroft*, 537 U.S. 186, 213, 123 S. Ct. 769, 785 (2003) ("[T]his Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given [the Constitution's] provisions.") (Internal citations omitted.)

Framers understood that the states had *already waived* their sovereign immunity for bankruptcy

actions under the plan of the Convention.  As the Court summarized:

> This history strongly supports the view that the Bankruptcy Clause of Article I,
> the source of Congress' authority to effect [the instant] intrusion upon state
> sovereignty, simply did not contravene the norms this Court has understood the
> Eleventh Amendment to exemplify.  . . .  [T]he Framers, in adopting the
> Bankruptcy Clause, plainly intended to give Congress the power to redress the
> rampant injustice resulting from States' refusal to respect one another's discharge
> orders.  As demonstrated by the First Congress' immediate consideration and the
> Sixth Congress' enactment of a provision granting federal courts the authority to
> release debtors from state prisons, the power to enact bankruptcy legislation was
> understood to carry with it the power to subordinate state sovereignty, albeit
> within a limited sphere.

*Id.* at 1003-04.

(ii)    ***Applying the reasoning of Katz to the copyright context.***

Both of the points central to the Court's reasoning in *Katz* apply with equal, if not

***stronger***, force in the copyright context as in the bankruptcy context.  First, the Copyright

Clause, like the Bankruptcy Clause, was included in the Constitution by the Framers to address

an overriding need in the new nation for uniformity in copyright laws.  Second, the Framers'

actions confirmed that they understood that the states had surrendered their sovereign immunity

for copyright infringement actions just as they had for bankruptcy actions.

(a)     ***The need for uniformity.***

The Continental Congress of 1783 delegated responsibility for protecting copyright to the

states, and by April of 1786 every state except Delaware had enacted copyright statutes.  *See,*

*e.g.*, L. Ray Patterson & Craig Joyce, *Copyright in 1791: An Essay*, 52 EMORY L.J. 909, 933

(Spring 2003).  Unlike in England, where an author could obtain a single copyright under the

common law, this multitude of laws created an inefficient patchwork of copyright protection that

burdened American authors.  In a famous example, Noah Webster was forced in the early 1780s

to undertake expensive and time-consuming travel to New Jersey, Pennsylvania, Connecticut, New York, Virginia, Maryland, and Delaware to attempt to procure protection for his school textbook under laws that varied in their procedural details.  Irah Donner, *The Copyright Clause of the U.S. Constitution: Why did the Framers Include it with Unanimous Approval*, 36 AM J. LEGAL HIST. 361, 370-72 (July 1992).  Worse still were situations in which an author had to deal with multiple conflicting state laws.  *See Hudson & Goodwin v. Patten*, 1 Root 133 (Conn. 1789) (dealing with a clash of interests between the assignees of a copyright in different states).  As Donner concludes:

> [T]he flaws of this system were apparent.  . . . .  Thus, on the eve of the Constitutional Convention, the states were strongly in favor of securing authors copyright in their works, but at the same time there was dissatisfaction with the system of state copyright laws and the need for a national law was apparent.

Donner, 36 AM J. LEGAL HIST. at 374.

The Framers recognized these problems, and their statements confirm that uniformity concerns were paramount in their adoption of the Copyright Clause.  *See* THE FEDERALIST NO. 43, at 279 (James Madison) (Mod. Lib. ed., 1941) ("The copyright of authors has been solemnly adjudged, in Great Britain, to be a right of common law.  The right to useful inventions seems with equal reason to belong to the inventors.  The public good fully coincides in both cases with the claims of individuals.  ***States cannot separately make effectual provision for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress.***") (Emphasis added.)  Based on this recognized need for uniformity, the Framers passed the Copyright Clause without debate *or* dissent.  *See, e.g.*, Patterson & Joyce, 52 EMORY L.J. at 937 ("There was no debate, and the language was approved unanimously.  Thus was born the Copyright and Patent Clause of the United States Constitution."); *see also* Donner, 36 AM J. LEGAL HIST. at 361 (noting that the proposed copyright clause was one of the few

issues presented at the Constitutional Convention that received unanimous approval). As the Court similarly concluded in *Katz*, such an absence of extensive debate over the text of the Copyright Clause or its insertion can be taken to indicate that there was general agreement among the Framers on the necessity of a uniform federal copyright regime.

**(b)     *The Framers' actions.***

As in the bankruptcy context, the view that the states surrendered their sovereign immunity in the copyright context under the plan of the Convention is further confirmed by the actions taken immediately after the Constitution was adopted to achieve the uniformity that the Copyright Clause was intended to effect. First, even more promptly than with the 1800 bankruptcy legislation, the first several Congresses passed a flurry of copyright and patent statutes, including copyright statutes in 1790 and 1802 and patent statutes in 1790 and 1793. Of particular significance in understanding the Framer's understanding is the patent statute of 1793. In furtherance of the federal concern with uniformity, that act required applicants for federal patents to renounce any exclusive rights granted by a state before adoption of the Constitution, but not after. 1 Stat. 318 § 7 (1793). The obvious reason for that temporal limitation is that Congress understood that *once a state had ratified the Constitution it no longer had authority to issue its own state patents.* Copyrights are similar to patents in this respect. *See* Edward C. Walterscheid, *To Promote the Progress of Science and Useful Arts: The Anatomy of a Congressional Power*, 43 IDEA 1, n. 328 (2002).

**(iii)     *The CRCA is valid under Katz.***

Thus, the same considerations that led the Court in *Katz* to find that the under the plan of the Convention the states surrendered their immunity for suits concerning bankruptcy proceedings also indicate that the states surrendered their immunity for suits concerning

copyrights.  Multiple commentators have reached this conclusion.  *See, e.g.*, James F. Caputo, *Copy-Katz: Sovereign Immunity, The Intellectual Property Clause, and Central Virginia Community College v. Katz*, 95 GEO. L.J. 1911, 1935 (August 2007); 1 ALEXANDER LINDEY & MICHAEL LANDAU, 1 LINDEY ON ENTM'T, PUBL'G & THE ARTS § 1:87 (3d ed.).

Although the only lower court decision that has squarely considered this question took a different view, its cursory reasoning is unpersuasive.  In *Biomedical Patent Management Corp. v. California Department of Health Services,* No. 06-00737, 2006 WL 1530177 (N.D. Cal. June 5, 2006), a patent infringement action, the court, in an unpublished opinion, ruled that the holding of *Katz* should be limited to the bankruptcy context.  That decision rested primarily on two bases: bankruptcy matters are in rem, and the *Katz* majority did not explicitly mention, much less overrule, *Florida Prepaid.  Id.* at *6.[38]  But neither of these points is persuasive.  The in rem nature of bankruptcy proceedings is not independent of the need for uniformity in bankruptcy – rather, among the reasons that uniformity is required in bankruptcy is that having conflicting court decisions over the same property would be intolerable.  That same need for uniformity underlies copyright, and conflicting decisions on who owns and who may exploit copyrighted works would raise the same concerns.  Nor must *Katz* overrule *Florida Prepaid* (patent), which does not control this case (copyright), and did not control in *Katz* (bankruptcy) (though the reasoning of *Katz* does implicitly undermine *Florida Prepaid*).

---

[38]  The Federal Circuit recently affirmed the district court's decision in the *Biomedical Patent* case.  The Federal Circuit opinion, however, does not indicate whether, or to what extent, the *Katz* issue was fully briefed and/or analyzed on appeal.  *See Biomedical Patent Mgmt. Corp. v. California*, -- F.3d -- , No. 2006-1515, 2007 WL 3071687 (Fed. Cir. Oct. 23, 2007) ("BPMC raises this issue on appeal, however, only to preserve it for potential Supreme Court review.").  Thus, the discussion herein will be confined to the district court's analysis.

Given the way in which the history of the Copyright Clause mirrors the history of the Bankruptcy Clause, the states, under the reasoning of *Katz*, surrendered their sovereign immunity from suits for copyright infringement when they joined the Union in 1787.  Thus, Congress was free to treat the states the same as any other copyright infringer pursuant to laws passed under its Article I copyright power when it passed the CRCA.  Thus, this Court has jurisdiction over NABP's claim for damages against the Board for its copyright infringement.

**3.      Under *Baum Research, inter alia,* the Board's immunity was contractually waived in 1995.**

Finally, even if the Board's sovereign immunity was not abrogated by the CRCA, it was certainly waived in 1995 when NABP first discovered UGA's infringement scheme, and the Board settled the matter in part by contractually promising ***not*** to infringe NABP's copyrighted examination questions in the future.  Three recent cases (all of which the Board ignores) – *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 122 S. Ct. 1640 (2002); *Bd. of Trustees SABIS Int'l Sch. v. Montgomery*, 205 F. Supp.2d 835 (S.D. Ohio 2002); and *Baum Research & Dev. Co. v. Univ. of Mass. at Lowell*, No. 1:02-cv-674, 2006 WL 461224 (W.D. Mich. Feb. 24, 2006), *aff'd*, --- F.3d ---, 2007 WL 2937300 (Fed. Cir. Oct. 10, 2007) – have uniformly held that a state entity cannot selectively and strategically hide behind the cloak of sovereign immunity when to do so serves its objectives or achieves some advantage.  Yet, that is exactly what the Board is attempting to do here.  The Board avoided litigation and induced a settlement in 1995 in part by agreeing not to infringe NABP's copyrighted examination questions in the future, and NABP relied to its detriment on that promise.  But the Board now claims that it is immune from suit in federal court for its copyright infringement.  Given that a suit for copyright infringement must be brought in federal court under 17 U.S.C. § 301 and 28 U.S.C. § 1338, if the Board can now assert sovereign immunity in this case its earlier promise

will be rendered meaningless.  Under *SABIS* and *Baum Research*, the Board cannot make a promise and then later claim that "its fingers were crossed" under sovereign immunity.

**(i)      *Board of Trustees SABIS International School v. Montgomery.***

The issue in *SABIS* centered on the SABIS "community school" and its dispute with its state sponsor, Ohio's State Board of Education. *Bd. of Trustees SABIS Int'l Sch. v. Montgomery*, 205 F. Supp.2d 835, 839-41 (S.D. Ohio 2002).  Ohio law allowed for the formation of "community schools" such as the SABIS school under certain parameters.  For example, Ohio law required that a group of individuals wishing to create a new "community school" present a proposal to one of six public entities.  The State Board of Education was one of the six.  If the state entity then accepted the proposal, it would enter into a contract with the community school's governing authority to serve as the community school's "sponsor."  That contract was required to include a provision outlining the procedures for resolving disputes or differences of opinion between the sponsor and the community school.  The SABIS school had complied with these requirements, and had entered into a contract with its "sponsor," the State Board of Education.  That contract had included a standard arbitration provision to satisfy the "dispute resolution" requirement.  A dispute later arose between the State Board of Education and SABIS, and SABIS attempted to enforce the arbitration provision.  But the State Board of Education refused to comply, claiming that to do so would waive its sovereign immunity.  *Id.*

The Southern District of Ohio rejected the State Board's argument, and instead held that the State Board had ***already*** waived its sovereign immunity when it included the binding arbitration clause in its contract with SABIS.  *SABIS*, 205 F. Supp.2d at 846.  The court based its decision on the Supreme Court's decision in *Lapides*, which had held that the Board of Regents of the University System of Georgia had waived its sovereign immunity when it had removed a

case to federal court. *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 620, 122

S. Ct. 1640, 1644 (2002). As the Supreme Court in *Lapides* noted, to have held otherwise would

have allowed states to selectively use their sovereign immunity to achieve unfair tactical

advantages in litigation. *Id.* at 621, 122 S. Ct. at 1645. Applying this reasoning, the court in

*SABIS* held that the State Board's pre-litigation act of inserting a binding arbitration provision

into its contract with SABIS constituted as much of a waiver of its sovereign immunity as did the

state's removal in *Lapides*. The court stated:

> Similar to the act of removal, which is litigation conduct, the insertion of the
> binding arbitration clause into the contract constitutes *pre*-litigation conduct, or
> action undertaken in anticipation of future disputes that might result in litigation.
> As the Supreme Court stated with respect to certain litigation conduct, an
> interpretation of the Eleventh Amendment that would allow the State to engage in
> the *pre*-litigation act of drafting a binding arbitration clause into a contract
> without waiving sovereign immunity would rest upon the State's mere preference
> or desire. Such an interpretation of the Eleventh Amendment would allow the
> State selectively to hide behind the cloak of sovereign immunity when doing so
> would serve its litigation objectives. In other words, [such] an interpretation . . .
> fails to produce consistent and fair results, which is precisely the opposite of what
> the Supreme Court mandated in *Lapides*.

*Id.* at 846 (emphasis in original). Thus, the court held that the State Board waived its sovereign

immunity by agreeing to the arbitration provision.

**(ii)    *Baum Research & Development Company v. University of Massachusetts at Lowell.***

Following *SABIS*, in *Baum Research* the District Court for the Western District of

Michigan held that a state university's inclusion of a clause consenting to jurisdiction in federal

courts in a patent license agreement constituted a waiver of the state university's sovereign

immunity. *Baum Research & Dev. Co. v. Univ. of Mass. at Lowell*, No. 1:02-cv-674, 2006 WL

461224 (W.D. Mich. Feb. 24, 2006), *aff'd*, --- F.3d ---, 2007 WL 2937300 (Fed. Cir. Oct. 10,

2007). The aggrieved party in *Baum Research*, Charles Baum, was the inventor of two United

States patents concerning a device for testing baseball bats. --- F.3d ---, 2007 WL 2937300 at

*1.  In December 1998, the University of Massachusetts at Lowell executed a license agreement

with Mr. Baum and the Baum Research and Development Corporation for the two patents.  The

agreement contained, *inter alia*, a jurisdiction provision that stated, in relevant part, that "all

parties agree to proper venue and hereby submit to jurisdiction in the appropriate State or Federal

Courts of Record sitting in the State of Michigan."  A dispute arose between Baum and the

University in September 2002, and Baum filed suit for breach of contract and patent

infringement in federal district court.  The University asserted immunity from the suit based on

the Eleventh Amendment.  *Id.*

The district court rejected the University's asserted sovereign immunity defense,

reasoning on the basis of *SABIS* and *Lapides* that the University had contractually waived such

immunity when it agreed to the jurisdiction provision in the license agreement.  *Baum Research*,

2006 WL 461224 at *3-*5.  The Court stated:

> Just as the arbitration clause in *Sabis* constituted a "pre-litigation" tactic on the
> state's part, inclusion of the governing law provision in this matter is no different.
> By agreeing to this provision, Defendant affirmatively agreed to resolve in federal
> court any disputes that may arise.  Permitting Defendant to now invoke sovereign
> immunity would permit it to "selectively hide behind the cloak of sovereign
> immunity when doing so would serve its litigation objectives," the very concern
> expressed by the *Lapides* and *Sabis* courts.

*Id.* at *5.  The Federal Circuit recently affirmed this holding, and also included additional

analysis concerning whether the University representative who signed the license agreement that

waived the University's immunity enjoyed the authority to do so.  The University argued on

appeal that Baum had not shown that the University signatory had enjoyed the authority to waive

immunity (which, so the argument went, was only enjoyed by the state legislature of

Massachusetts).  *Baum Research*, --- F.3d ---, 2007 WL 2937300 at *3-*4.  The Federal Circuit

rejected this argument, deeming it flawed for two reasons.  First, the relevant question was not

whether the University signatory possessed the authority to waive the University's sovereign immunity, but was whether she possessed the authority to enter into the license agreement (which she clearly did under Massachusetts law). Second, the burden was not on Baum to prove that the University acted legally in signing the licensing agreement; the burden was on the University to prove that it had not acted legally. *Id.* The Federal Circuit thus concluded that the district court "did not err in its ruling that the contract provision [at issue] was a clear and unambiguous consent to the jurisdiction of a Michigan federal court for disagreements arising from the license agreement." *Id.* at \*4.

**(iii)    *Tying SABIS and Baum Research together.***

The rule that emerges from *SABIS* and *Baum Research* is this: if a state agrees to do something that invokes the jurisdiction of the federal courts, the state will not be allowed to wiggle out of that agreement whenever it so chooses under the cloak of sovereign immunity. Rather, fundamental fairness dictates that the state be held to the consequences of what it agreed to do. The difficulty lies in determining what contractual agreements by a state will constitute the requisite "invocation" of the federal courts. A state's inclusion of an explicit provision agreeing to federal court jurisdiction (*Baum Research*), like its removal of a case to federal court (*Lapides*), unquestionably suffices. A more difficult question is why a state's inclusion of an arbitration provision like the one at issue in *SABIS* – which did not explicitly mention the federal courts – likewise suffices.

According to *Baum Research*'s reading of *SABIS*, the answer to that question lies in the primary role that the federal courts play in arbitration matters. As the district court in *Baum Research* explained:

> Pursuant to the Federal Arbitration Act, the federal district courts have jurisdiction over claims that a party to an agreement refuses to abide by an

agreement to arbitrate a particular dispute.  *See* 9 U.S.C. § 4; *United States Fire Ins. Co. v. National Gypsum Co.*, 101 F.3d 813, 816 (2d Cir. 1996).  To the extent, therefore, that the plaintiffs were seeking to enforce the arbitration clause, jurisdiction rested in the federal court.  Thus, the *Sabis* court seems to have concluded that inherent in the agreement to arbitrate was the notion that any disputes regarding the enforceability thereof fell within the jurisdiction of the federal courts, therefore, by agreeing to the arbitration clause the state was agreeing to litigate in a federal forum (at least with respect to certain issue relating to arbitration).

*Baum Research*, 2006 WL 461224 at *4 (citations omitted).  In other words, by agreeing to the arbitration provision the State Board of Education was ***necessarily*** submitting to federal court jurisdiction, because if the arbitration provision was to have any bite it would have to be through enforcement in federal court.

The court in *Baum Research* thus appears to lay out a basic and incontrovertible proposition – that if a party agrees to do something, and that agreement can only be enforced through suit in federal court, such is tantamount to consenting to suit in federal court in the first place.  As far as that point goes it makes sense.  But on closer examination *Baum Research's* treatment of *SABIS* does not go far enough.  In fact, 9 U.S.C. § 4, the portion of the Federal Arbitration Act cited in *Baum Research*, does ***not*** confer ***exclusive*** jurisdiction in federal court for claims that a party refuses to abide by an arbitration provision.  Rather, it states, in relevant part, that:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration ***may*** petition any United States district court which, save for such agreement, ***would have jurisdiction under Title 28***, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4 (emphasis added).  As the highlighted language shows, and as numerous courts have held, federal courts thus have concurrent, not exclusive, jurisdiction to enforce the FAA.  *E.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25, 103 S. Ct. 927, 942

(1983).  Further, the FAA does not *alone* confer subject matter jurisdiction on the federal courts – a federal court must have some *other*, *independent* jurisdictional basis (such as diversity jurisdiction) to entertain a case arising under the FAA.  *Id*. at 25 n.32, 103 S. Ct. at 942 n.32.  And while the FAA does preempt state law to the extent that a state law actually conflicts with the FAA (*i.e.*, stands as an obstacle to the accomplishment and execution of the FAA's objectives), the FAA contains no express preemption provision, and does not reflect a congressional intent to occupy the *entire* field of arbitration.  *See, e.g.*, *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 477, 109 S. Ct. 1248, 1255 (1989).

Thus, on examining the FAA, while it surely *contemplates* federal suits to enforce arbitration provisions, it does not *mandate* them.  Thus, the rule from *SABIS* would appear to be different than how *Baum Research* characterized it.  *SABIS* does not stand only for the basic, unassailable proposition that agreeing to do something that can *only* (*must*) be enforced through suit in federal court is tantamount to consenting to suit in federal court.  Rather, *SABIS* stands for the proposition that agreeing to do something that *could* (*may*) be enforced through suit in federal court is tantamount to consenting to suit in federal court.  Both are equally valid consents.  But the second is obviously a broader consent.  The point here is that *SABIS* does *not* say that *only* the first, narrow type of consent to suit in federal court is sufficient to waive sovereign immunity.  Rather, *SABIS* says that even the second, more general consent to suit in federal court is sufficient to waive sovereign immunity.  This more general consent obviously *includes* the narrower consent, but it is not *limited* to it.

**(iv)**      ***Applying SABIS and Baum Research to the instant case.***

In the summer of 1994, on the basis of multiple tips to NABP, Warren was identified as an individual possibly gathering NAPLEX items (at the time the exam was referred to as the

NABPLEX) through students and otherwise.  NABP was told that Warren was asking students to remember NABPLEX items and to tell him about them for placement in review course materials. (Amended and Restated Verified Complaint ¶ 18.)  Based on these concerns, NABP undertook an investigation of Warren, which ultimately culminated in the 1995 settlement agreement, in which, *to avoid litigation*, both Warren and the Board agreed in relevant part to "cease and desist for profit or otherwise from all past, present, *and future* copying, transcribing, or other infringing use of NABP copyrighted materials . . . ." (*Id.* at Ex. A. ¶ 1)(emphasis added).  The Board signed the settlement agreement.[39]

Under the reasoning of *SABIS*, when the Board agreed in 1995 to desist from all future copying, transcribing, or other infringing use of NABP copyrighted materials, such necessarily carried with it a consent to be sued in federal court for copyright infringement for the Board's failure to do so.  As noted above, the *SABIS* rule says that agreeing to do something that *could* be enforced through suit in federal court is the same as consenting to suit in federal court.  Thus, because the State Board of Education in *SABIS* could be sued in federal court to enforce the arbitration provision that it had agreed to, it had consented to suit in federal court.  So too the Board could be sued in federal court for copyright infringement to enforce the provision in question here; hence it likewise has consented to suit in federal court.  Further, the reasoning of *SABIS* applies equally here as well.  Just as the court in *SABIS* was troubled by the inconsistency of the State Board of Education agreeing to an arbitration provision but then later turning around and arguing that it did not have to comply with that agreed-upon provision on the basis of its

---

[39] The Board has not raised any argument that its signatory, Charles B. Knapp, acted illegally in signing the Agreement on behalf of the Board, and it is not NABP's burden to show that he acted legally in doing so. *Baum Research*, 2007 WL 2937300 at *3-*4.  Nor is it sufficient for the Board to argue that he did not have the authority to waive the Board's immunity – the only relevant authority is the authority to enter into the settlement agreement itself. *Id.*

sovereign immunity; so too the Board should not be allowed to avoid litigation in 1995 by agreeing to cease all future infringement of NABP's copyrighted materials, but then in 2007 argue that it does not have to comply with that agreed-upon provision on the basis of its sovereign immunity. Such would permit the Board to "selectively to hide behind the cloak of sovereign immunity" – the very conduct that *Lapides*, *SABIS*, and *Baum Research* sought to prevent.

Going even further, it is clear that the Board's agreement not to infringe NABP's copyrighted materials was not merely a *SABIS*-type consent, but actually constituted the more narrow *Baum Research*-type consent. In other words, the Board consented to suit in federal court not by agreeing to a provision that ***could*** (***may***) be enforced through suit in federal court, but by agreeing to a provision that can ***only*** (***must***) be enforced through suit in federal court. Two statutory provisions, 17 U.S.C. § 301 and 28 U.S.C. § 1338, combine to compel this result. First, there is authority that a claim for breach of contract for the Board's breach ***of the provision in question***[40] would be preempted under 17 U.S.C. § 301. That would leave NABP with only a claim for copyright infringement to enforce the provision in question against the Board. And under 28 U.S.C. § 1338(a),[41] jurisdiction over such a claim for copyright infringement lies ***exclusively*** with the federal courts. Thus, this is not a case like *SABIS*, where the Board's agreement ***could*** be enforced in federal court. Rather, the ***only*** way that the Board's agreement

---

[40] Whether breach of contract claims for Warren and the Board's breaches of other provisions of the 1995 Settlement Agreement would similarly be preempted under 17 U.S.C. § 301 is not relevant to this argument and is not addressed here.

[41] 28 U.S.C. § 1338(a) provides that the federal district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

not to infringe NABP's copyrights can be given any teeth is through a federal suit for copyright infringement. Hence if the agreement to arbitrate in *SABIS*, which *could* be enforced through suit in federal court, constituted a waiver of sovereign immunity, then the Board's agreement here, which, if preempted, can *only* be enforced through suit in federal court, must do the same.

As noted above, 17 U.S.C. § 301 preempts state causes of action that are "equivalent" to any of the exclusive rights within the general scope of copyright under 17 U.S.C. § 106.[42] *E.g.*, *Telecomm Tech. Servs., Inc. v. Siemens Rolm Communications, Inc.*, 66 F. Supp.2d 1306, 1326 (N.D. Ga. 1998). A state-law claim is not "equivalent," and hence not preempted, if it requires an "extra element" for recovery that changes the nature of the action so that it is qualitatively different from a copyright infringement claim. *Id*. In addressing whether a claim for breach of contract has such an "extra element," courts have tended to look at the nature of the contractual provision allegedly breached. There are essentially two types of provisions. The first type of provision explicitly proscribes conduct that would itself violate one of the § 106 exclusive rights. A good example would be a provision, like the one here, agreeing not to "copy" or "infringe" copyrighted material. We will put these provisions into "Category A." The second type of provision *relates to* the § 106 rights, but does not *explicitly proscribe* conduct that would itself violate one of the § 106 rights. A good example would be a provision whereby a party agrees not to use copyrighted material for the benefit of certain third parties. Because such conduct, absent the contractual agreement, would not on its own violate any of the § 106 rights, such a

---

[42] 17 U.S.C. § 106 provides, in relevant part, that the owner of copyright has the exclusive rights to: 1) reproduce the copyrighted work; 2) prepare derivative works based on the copyrighted work; 3) distribute copies of the copyrighted work; 4) perform the copyrighted work publicly; 5) display the copyrighted work publicly; and 6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

provision imposes a duty that would not otherwise be imposed by copyright law.  We will put these provisions in "Category B."

Looking at the "extra element" test through the lens of Categories A and B, the decisions in this area break down into essentially four groups.  Group One is comprised of decisions that find that the contractual provision in question ***does fall*** into Category A, and hence find preemption.  *See, e.g., Wolff v. Inst. of Elec. & Elecs. Eng'rs, Inc.*, 768 F. Supp. 66, 69 (S.D.N.Y. 1991) ("In the case at bar, IEEE breached its contract with plaintiffs, embodied in the stock photo invoice, by infringing plaintiffs' copyright.  It is difficult to see how the resulting claims are qualitatively different.  Accordingly the breach of contract claim is preempted.").[43]  Group Two is comprised of decisions that find no preemption because the provision in question falls into Category B, but then ***unequivocally state*** that that ***if*** the provision had instead fallen in Category A, the preemption analysis ***would*** be different.  *See, e.g., Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 457-58 (6th Cir. 2001) ("If the promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work, then the contract claim is preempted.").[44]  Group Three is comprised of decisions that find no preemption because the provision in question falls into Category B, but then state that ***if*** the provision had instead fallen into Category A, the preemption analysis ***could*** be different.  *See, e.g., Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 434 n.6 (8th Cir. 1993) ("Because we decide that the specific contract right [at issue] is not equivalent to any of the copyright rights, we do not need to decide whether a breach of contract claim based on a wrongful exercise of one of the

---

[43] *See also, e.g., Arpaia v. Anheuser-Busch Cos.*, 55 F. Supp.2d 151, 162 (W.D.N.Y. 1999); *Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 931-32 (S.D.N.Y. 1996).

[44] *See also, e.g., Firoozye v. Earthlink Network*, 153 F. Supp.2d 1115, 1126 (N.D. Cal. 2001); *Titan Sports Inc. v. Turner Broad. Sys., Inc.*, 981 F. Supp. 65, 72 n.2 (D. Conn. 1997).

exclusive copyright rights is preempted.").[45]  Finally, Group Four is comprised of decisions that go against the holdings of the decisions in Group One, and against the dicta of the decisions in Groups Two and Three, to hold that *even if* the contractual provision in question falls into Category A, it is still not preempted because the existence of the contractual promise itself provides the "extra element" to avoid preemption – even if the promise was nothing more than a promise not to infringe one of the § 106 rights.  *See, e.g., Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 439 (S.D.N.Y. 1996) ("[T]he extra element that saves a contract claim from preemption is the promise itself.").[46]

The authority in Groups One, Two, and Three would appear to get the better of the argument, for multiple reasons.  First, if Group Four is correct – meaning that even contractual promises not to infringe, like the one at issue here, are not preempted – then logically *any* breach of contract claim is not preempted.  If that were the case then all of the ink spilled in the decisions in Groups Two and Three to determine whether the contractual provision at issue fell into Category A or B would have been superfluous.  Rather, the A vs. B distinction would not matter, because contract claims are not preempted anyway.  Second, the idea that a "promise" not to infringe a copyright can itself somehow provide the requisite "extra element" to avoid preemption appears dubious, given that a "promise" to forbear from committing a tort is unenforceable and void.  RESTATEMENT (SECOND) OF CONTRACTS § 73 cmt. b (1981).  Thus, those decisions in Group Four have basically concocted an "extra element" out of nothing.

---

[45] *See also, e.g., Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988); *Chesler Perlmutter Prods., Inc. v. Fireworks Entm't, Inc.*, 177 F. Supp.2d 1050, 1059 (C.D. Cal. 2001); *Lennon v. Seaman*, 63 F. Supp.2d 428, 438 (S.D.N.Y. 1999); *Howard v. Sterchi*, 725 F. Supp. 1572, 1579 (N.D. Ga. 1989); *Brignoli v. Balch Hardy & Scheinman, Inc.*, 645 F. Supp. 1201, 1205 (S.D.N.Y. 1986).

[46] *See also, e.g., Torah Soft Ltd. v. Drosnin*, 224 F. Supp.2d 704, 717 (S.D.N.Y. 2002); *Asunto v. Shoup*, 132 F. Supp.2d 445, 452 (E.D. La. 2000); *Trenton v. Infinity Broad. Corp.*, 865 F. Supp. 1416, 1429 (C.D. Cal. 1994).

Thus, if the law is as it appears it should be, and those decisions in Groups One, Two, and Three are correct (in other words, if a breach of contract claim predicated on a party's breach of a provision agreeing not to infringe a copyright *is* preempted[47]), then the **only** way that the contractual provision from the 1995 settlement agreement in question can have **any** effect is through a suit by NABP against the Board in federal court for copyright infringement. Hence, when the Board agreed to that contractual provision, under the *Baum Research* notion of consent, it also consented to suit in federal court for copyright infringement. Thus, no matter how broadly (*SABIS*) or narrowly (*Baum Research*) one wants to define the range of contractual provisions that constitute "consent to suit in federal court," the provision at issue here unquestionably suffices. Under *Lapides*, *SABIS*, and *Baum Research*, the Board's acceptance of that provision waived whatever immunity it would have otherwise enjoyed for its infringement of NABP's copyrighted materials.

## E.    Warren, Cobb, and the Board are not entitled to immunity for their misappropriation of trade secrets or breach of contract.

### 1.    Trade Secret Misappropiation.

NABP acknowledges that this Court does not have pendant jurisdiction over the state-law claim against Defendants for misappropriation of trade secrets.    The trade secret misappropriation claim can, however, be pursued in state court against the Board, and is not barred by any failure to provide an *ante litem* notice.[48]

---

[47] The Board has claimed that it does not contend **at this time** that any state-law claim for breach of contract brought by NABP would be preempted under 17 U.S.C. § 301. Board Response to Interrogatory No. 7. But as the highlighted language shows, the Board is clearly holding out the possibility that it could so contend at a later time, so as to whipsaw NABP in multiple proceedings. The Board cannot have it both ways.

[48] State court actions against the state for equitable relief, including an injunction (or temporary restraining order) for misappropriation of trade secrets exist independently of the Georgia Tort Claims
(continued...)

## 2.      Breach of Contract.

The breach of contract claim against Warren is asserted against him in his personal capacity as a signatory to the 1995 settlement agreement, and thus, for the reasons set forth in part III(B) above (pp. 2-8), and pursuant to 28 U.S.C. § 1367, are properly before this Court. Such claim includes the more specific claim that Warren breached his agreement to "cease and desist for profit or otherwise from all past, present and future copying, transcribing, or other infringing use of NABP copyrighted materials . . . ." (Amended and Restated Verified Complaint Ex. A.)   This specific breach of contact claim is impacted by the preemption

---

(continued...)

Act, and are not subject to its *ante litem* notice provisions. *Int'l Bus. Machs. Corp. v. Evans*, 265 Ga. 215, 216-217, 453 S.E.2d 706, 708-709 (1995); O.C.G.A. § 50-21-26.   No **specific** claims for monetary damages for misappropriation of trade secrets were made in NABP's original or amended complaint (only **general** damage claims were made).   Thus, NABP's claims in this regard are not prejudiced.   Further, sending an *ante litem* notice to the State detailing claims for monetary damages for misappropriation of trade secrets after filing suit to obtain injunctive relief would be futile.   The purpose of the *ante litem* provisions of the GTCA is "to ensure that the state receives adequate notice of the claim to facilitate settlement before the filing of a lawsuit." *Williams v. Ga. Dept. of Human Res.*, 272 Ga. 624, 625, 532 S.E.2d 401 (2000).   Although generally notice is required before filing a claim against the state:

> [The Supreme Court of Georgia has] also held that the rule of strict compliance does not demand a hyper-technical construction that would not measurably advance the purpose of the GTCA's notice provisions.... In other words, [the Court has] declined to reach a needlessly harsh result "when that result was not mandated by the GTCA."

*Cummings v. Ga. Dept. of Juvenile Justice*, __ S.E.2d __, 2007 WL 4124884 at *3 (Ga. November 21, 2007).   Unless the State is prejudiced in some way in investigating and attempting to settle the claims, the purpose of the notice provisions is not thwarted by accommodating the subsequent curing of technicalities. *Id.* at *4, *citing Camp v. Coweta County*, 280 Ga. 199, 203-204(3), 625 S.E.2d 759 (2006) (in deciding whether claimant may subsequently correct failure to send copy of complaint to Attorney General as required under GTCA's service of process provisions, "courts should determine on a case by case basis whether the purpose of the statute . . . has been so thoroughly undermined as to cause prejudice to the State and warrant dismissal of the lawsuit").   Because an action for an *ex parte* seizure order and TRO relating to both copyright infringement and misappropriation of trade secrets (for which no notice is required) would have been instituted either prior to or at the same time as any such notice for monetary damages could be sent to the State, there would be no scenario in which the State could have attempted to settle before a complaint alleging the trade secret claim was filed.   Requiring an *ante litem* notice on these specific facts futilely puts form over substance, and does not advance the purposes of the GTCA. Such a "hyper-technical construction" was eschewed by *Cummings*.

provisions of the Copyright Act, 17 U.S.C. § 301, as set forth in detail in Part III(D)(3)(iv) above (pp. 74-80). Because this Court has jurisdiction over the breach of contract claim against Warren, and because this question of preemption is relevant to NABP's waiver argument under the 1995 settlement agreement, this Court should address whether the specific breach of contract claim is preempted.

NABP acknowledges that this Court does not have pendant jurisdiction over the state-law claim against the Board for breach of contract.[49] But to resolve the waiver issue outlined above, to preclude possible future inconsistent decisions by federal and state courts, and for reasons of judicial economy, the contractual preemption issue should be resolved by this Court.

## IV.    CONCLUSION

NABP owns copyrights in its pharmacist licensure exam questions that Defendants infringed when they repeatedly solicited those questions from, and provided those questions to, pharmacy students in advance of the students' licensure exams. Defendants' infringement was recurrent – it began in the early-1990s, was stopped only under the threat of litigation, and was resumed shortly thereafter. Defendants' infringement was defiant – it was undertaken in stark violation of the solemn promise that Warren and the Board made in 1995 to permanently desist from such misconduct. Defendants' infringement was intentional – under the 1995 settlement agreement Defendants *knew* that what they were doing was wrong, and they did it anyway. Defendants' infringement was flagrantly illegal – every court that has addressed copyright infringement of standardized tests has held that the solicitation and copying of secure exam

---

[49] But such has nothing to do with *anti litem* notices. GA. CONST. art. I, § II, par. IX waives the State's sovereign immunity for the breach of any written contract. O.C.G.A. § 50-21-1(a). No *ante litem* notice is required when bringing a contract claim against the State. *See King v. Comfort Living, Inc.*, 287 Ga. App. 337, 651 S.E.2d 484 (2007)(explaining that when a claim arises out of contract, the signing party is already on notice of the contract, and thus the need for an *ante litem* notice does not exist).

questions constitutes copyright infringement and is not fair use.  Defendants' infringement was collective – it was not the random and unauthorized act of some rogue professor, but was done with the knowledge of UGA, for the profit of UGA, through the systematic exploitation of UGA's institutional resources (including its provision of class credit to students).   And Defendants' infringement was reckless – it may have allowed unqualified pharmacy students to procure licensure to dispense prescription medication to an unsuspecting public.

In the face of such misconduct, Defendants' only reply is to attempt to invoke the perceived shield of "sovereign immunity."  Under the U.S. Constitution, sovereign immunity often protects a state from liability for certain violations of federal law.  But Defendants would have the Court think that sovereign immunity shields a state, and *all* of its employees, from *all* liability, *all* of the time, regardless of the nature of the state's misconduct, regardless of the pertinent federal statutory scheme, and regardless of whether the state's misconduct violated the constitutional as well as the statutory rights of a litigant.  That, as NABP has shown, is simply not the law.  Sovereign immunity does not protect Warren and Cobb, both of whom are sued in their personal capacities.  Sovereign immunity does not protect the Official Capacity Defendants insofar as they are sued for prospective injunctive relief.  And sovereign immunity does not protect the Board, both because Congress abrogated it, and because the Board waived it.

To circumvent these legal principles, Defendants attempt to shift the focus of this litigation from the impropriety of *their* misconduct to the propriety of *Congress's* conduct when it passed the CRCA to confirm state liability for copyright infringement.  But as NABP has shown, Congress has ample authority under § 5 of the Fourteenth Amendment to stop state agencies that, like the Board, seek intentionally and systematically to destroy property without due process of law.  Congress also has ample authority, under Article I of the Constitution, to

establish a uniform law of copyright and to enforce that uniform law.  Immunity for flagrant and recurrent institutional violations is hardly the basis for establishing uniformity.

The financial damage to NABP from Defendants' collective misconduct is significant. Six hundred and thirty-three NAPLEX questions have been compromised and must be replaced. Additional questions on the MJPE were also compromised and must be replaced.  The cost of replacement is $3,000.00 per question.  Given the significant amount of such damages, a holding that the Board can escape liability under sovereign immunity will leave NABP holding the financial bag for the consequences of Defendants' concerted infringement.  Such an outcome would have far-reaching consequences.  A state school's administration could place *untold* pressure on its professors to help their students cheat on such exams, and if a similar scandal ever broke, could simply slough off its liability.  These consequences would perhaps have to be grudgingly accepted if the Board had a compelling legal argument for its sovereign immunity position.  But it does not.  This Court has ample authority, as NABP has demonstrated, to assert jurisdiction over the copyright infringement claims against each group of Defendants and ultimately hold all of the Defendants accountable for the multi-million dollar injuries that their collective misconduct has wrought.

This 4th day of January, 2008.

Respectfully submitted,

SMITH, GAMBRELL & RUSSELL, LLP
Suite 3100, Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3592
Phone: (404) 815-3500
Fax: (404) 815-3509

J. Rodgers Lunsford III
Georgia Bar No.: 461200
rlunsford@sgrlaw.com
Kerri A. Hochgesang
Georgia Bar No.: 358448
khochgesang@sgrlaw.com
Devin H. Gordon
Georgia Bar No.: 141256
dgordon@sgrlaw.com
Todd D. Williams
Georgia Bar No.: 142379
twilliams@sgrlaw.com

Attorneys for Plaintiff The National
Association of Boards of Pharmacy

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION**

| | | |
|---|---|---|
| THE NATIONAL ASSOCIATION OF BOARDS OF PHARMACY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO: 3:07-CV-84 (CDL) |
| THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA et al., | ) ) ) | |
| Defendants. | ) ) ) ) | |

## CERTIFICATE OF SERVICE

This is to certify that on this 4th day of January, 2008, the foregoing  was electronically

filed with the Clerk of the Court using the Court's ECF system which automatically generates a

Notice of Electronic Filing of such Pleading to the following attorneys of record.  A copy of the

same has also been electronically transmitted to:

Alan E. Lubel
Kevin A. Maxim
TROUTMAN SANDERS, LLP
600 Peachtree Street, Suite 5200
Atlanta, GA  30308

Mary Josephine Volkert
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA  30334

*Attorneys for Defendant The Board
of Regents of the University System
of Georgia*

Gary L. Seacrest
John G. Haubenreich
Annarita M. Busbee
SEACREST, KARESH, TATE &
BICKNESE, LLP
56 Perimeter Center East
Suite 450
Atlanta, GA  30346

*Attorneys for Defendant Flynn
Warren, Jr.*

J. Rodgers Lunsford III

LIT\1016439.5