IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

NATIONAL ASSOCIATION OF BOARDS   *
OF PHARMACY,
            *
   Plaintiff,
            *
vs.               CASE NO. 3:07-CV-084 (CDL)
            *
BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA,   *
*et al.*,
            *
   Defendants.
            *

O R D E R

   This case arises from alleged copyright infringement by Defendant Flynn Warren, Jr., Defendant Henry H. Cobb, III, and the University of Georgia ("UGA"). Plaintiff claims that Warren and Cobb copied its copyrighted pharmacy board exam questions and used them in materials for their pharmacy board review course, which course was offered through UGA.

   Presently pending before the Court are the Motions to Dismiss of Cobb, Warren, and the Board of Regents of the University System of Georgia (the "Board") and the Official Capacity Defendants.[1] For the

---

   [1]The "Official Capacity Defendants" are: Board Members (collectively "Board Members") Eldridge W. McMillan, Donald M. Leebern, Jr., Hugh A. Carter, Jr., J. Timothy Shelnut, Michael J. Coles, William H. Cleveland, Wanda Yancey Rodwell, James R. Jolly, Patrick S. Pittard, Julie Ewing Hunt, W. Mansfield Jennings, Jr., Allan Vigil, Doreen Stiles Poitevint, Richard L. Tucker, Willis J. Potts, Robert F. Hatcher, A. Felton Jenkins, Benjamin J. Tarbutton, James A. Bishop, and Kenneth R. Bernard, Jr.; and UGA School of Pharmacy administrators (collectively "Administrators") Paul Brooks, Alan Wolfgang, George Francisco, and Svein Oie.

1

reasons set forth below, Defendant Cobb's Special Limited Appearance Motion to Dismiss (Doc. 110) is granted in part and denied in part; Defendant Flynn Warren, Jr.'s Renewed Special Limited Appearance Motion to Dismiss (Doc. 111) is granted in part and denied in part; and the Renewed Special Limited Appearance Motion to Dismiss (Doc. 112) filed by the Board and the Official Capacity Defendants is granted.

## FACTUAL ALLEGATIONS

In reviewing these motions to dismiss, the Court must take the allegations in the complaint as true. *McElmurray v. Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007); *Thaeter v. Palm Beach County Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Plaintiff alleges the following:

Plaintiff owns copyrights in National Board of Pharmacy ("NABP") examination questions, including questions for the North American Pharmacist Licensure Examination ("NAPLEX"). (Am. & Restated Verified Compl. ¶¶ 14, 30 [hereinafter Compl.].) Various state Boards of Pharmacy use the NAPLEX as part of their assessment of competence to practice pharmacy. (*Id.* ¶ 14.) Plaintiff has an extensive process for developing NAPLEX questions. (*Id.* ¶ 15.) All finalized and approved NAPLEX questions are placed in an "item bank," a pool from which questions are drawn for each administration of the NAPLEX. (*Id.*) NAPLEX takers are required to agree and acknowledge that the exam is proprietary and subject to copyright protections and

that activities that compromise the integrity of the NAPLEX will be pursued by Plaintiff. (*Id.* ¶ 17.) If a question is compromised, then it must be discarded from the item bank. (*Id.* ¶ 24.) The cost of replacing a single NAPLEX question is estimated to be in the thousands of dollars. (*Id.*)

In July 2007, Defendants Warren and Cobb made available course materials for their Pharmacy Board Review course ("PBR course"). (*Id.* ¶ 22.) The PBR course materials were available at the UGA College of Pharmacy, at a cost of $100.00 per set. (*Id.*) Plaintiff obtained a copy of the PBR course materials, which included practice exam questions. (*Id.* ¶ 23.) Plaintiff compared the PBR course practice questions to actual NAPLEX questions and found that 633 of the PBR practice questions were "verbatim, nearly verbatim or substantially similar" to NAPLEX questions. (*Id.*) Defendants gained access to the NAPLEX questions through candidates who took the NAPLEX. (*Id.* ¶ 31.) Defendants did not have a license or other authorization from Plaintiff "to copy, sell, distribute, prepare derivative works from, or otherwise offer[] to transfer the ownership of the copyrights" of the NAPLEX questions. (*Id.* ¶ 32.)

At least three UGA College of Pharmacy students received course credit or other compensation from UGA for compiling "actual or purported NABP Examination Questions and other study or course materials for NAPLEX review courses taught by Defendant Warren." (*Id.* ¶ 25.) UGA "copied, reproduced, published, and distributed"

3

materials for PBR courses taught by Warren and Cobb, and the PBR course materials were created using UGA computers and other equipment. (*Id.* ¶¶ 26-27.) Warren has taught more than forty PBR courses through the UGA College of Pharmacy's Office of Postgraduate Continuing Education and Outreach. (*Id.* ¶ 28.)

Plaintiff previously investigated Warren for copying its exam questions and using them in his PBR courses. (*Id.* ¶ 18.) In 1995, Warren and the Board entered into a Settlement Agreement ("Agreement") under which Warren and the Board "agreed to cease and desist all copying, transcribing or other infringing use of NABP copyrighted materials and examination questions." (*Id.*)

Plaintiff asserts claims against all Defendants for copyright infringement, against the Board, Warren and Cobb for misappropriation of trade secrets, and against the Board and Warren for breach of contract. (Compl. ¶¶ 30-39, 40-43, 44.) Plaintiff concedes, however, that this Court does not have subject matter jurisdiction over its trade secret misappropriation claim against the Board. (Pl.'s Mem. of Law in Resp. to Defs.' Mots. to Dismiss 80 [hereinafter Pl.'s Br.]); *see also* O.C.G.A. § 50-21-23(b) ("The state waives its sovereign immunity . . . only with respect to actions brought in the courts of the State of Georgia. The state does not waive any immunity with respect to actions brought in the courts of the United States."); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 120-21 (1984) (finding that *Ex parte Young* does not

4

permit suit for injunctive relief against state officials on the basis of state law and that Eleventh Amendment bar applies to pendent claims). Plaintiff also concedes that this Court does not have subject matter jurisdiction over its breach of contract claim against the Board. (Pl.'s Br. at 82); *see also* Ga. Const. art. I § 2 ¶ IX(c) ("The state's defense of sovereign immunity is hereby waived as to any action *ex contractu* for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies."); Ga. Const. art. I § 2 ¶ IX(f) ("No waiver of sovereign immunity under this Paragraph shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers, or employees by the United States Constitution.").

Accordingly, Plaintiff's claims against the Board for misappropriation of trade secrets and breach of contract are dismissed for lack of subject matter jurisdiction. The only claims remaining to be evaluated are Plaintiff's claims against all Defendants for copyright infringement, against Warren and Cobb for misappropriation of trade secrets, and against Warren for breach of contract. Plaintiff seeks both damages from and a permanent injunction against Defendants. (Compl. ¶¶ (A)-(E).)

DISCUSSION

## I.  Motion to Dismiss Standards

Defendants move to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). In reviewing this "facial attack" motion to dismiss for lack of subject matter jurisdiction, the Court must take the allegations in Plaintiff's Complaint as true and determine whether Plaintiff has sufficiently alleged a basis for subject matter jurisdiction. *McElmurray*, 501 F.3d at 1251.

Defendants also move to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a 12(b)(6) motion to dismiss, the Court must accept as true all facts set forth in Plaintiff's Complaint and limit its consideration to the pleadings and exhibits attached thereto. *Thaeter*, 449 F.3d at 1352; *see also Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (to state a claim, a complaint must contain "enough factual matter (taken as true) to suggest" the required elements). Although "'[f]actual allegations must be enough to raise a right to relief above the speculative level[,]'" "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable[.]'" *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly*, 127 S. Ct. at 1965).

## II.  Damages Claims vs. the Board and Official Capacity Defendants

The Board and the Official Capacity Defendants contend that sovereign immunity bars Plaintiff's damages claims against them in federal court.[2]  Plaintiff responds that sovereign immunity does not apply because Congress validly abrogated sovereign immunity as to copyright claims against the States.  In the alternative, Plaintiff argues that the Board waived its sovereign immunity by entering into the 1995 Agreement with Plaintiff.  The Court rejects each of these arguments as explained below.

### A.   Sovereign Immunity Principles

The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

"The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  Sovereign immunity[3] extends to arms of the

---

[2] Warren and Cobb contend that Plaintiff sued them in their official capacities and that they are therefore entitled to sovereign immunity.  As discussed *infra* Part **IV.**A., the Court finds that Warren and Cobb were sued in their individual capacities.  Therefore, they are not entitled to sovereign immunity.

[3] The courts sometimes refer to the States' immunity from suit as "Eleventh Amendment immunity."  "The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S. 706, 713 (1999).

State.  *See Alden*, 527 U.S. at 756; *see also Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 92 (2000) (finding that an Alabama state university, the Florida Board of Regents, and the Florida Department of Corrections were entitled to sovereign immunity).

Here, the parties do not dispute that the Board is an arm of the State of Georgia.  *See, e.g., Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002) (holding that Board of Regents of the University System of Georgia waived its sovereign immunity when it removed a case from state court to federal court); *see also* O.C.G.A. § 20-3-36 ("The applicability of the doctrine of sovereign immunity to the board of regents is reaffirmed, except to the extent that the General Assembly may expressly provide.").  They do, however, strongly dispute whether the Board is entitled to sovereign immunity in this case.

The States' immunity from suit "is one the States enjoy save where there has been 'a surrender of this immunity in the plan of the convention.'"  *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997) (quoting *Principality of Monaco v. Mississippi*, 292 U.S. 313, 322-23 (1934)).  There are only two circumstances in which an individual may sue a State.  First, Congress may abrogate the States' sovereign immunity under a "valid grant of constitutional authority." *Kimel*, 528 U.S. at 73.  Second, a State may waive its sovereign immunity.  *Lapides*, 535 U.S. at 618.  Here, Plaintiff contends that Congress validly abrogated the States' sovereign immunity when it

enacted the Copyright Remedy Clarification Act ("CRCA"), Pub. L. No. 101-553, 104 Stat. 2749 (1990) (codified in scattered sections of Title 17). Plaintiff also argues that the Board waived its sovereign immunity by entering into the 1995 Agreement with Plaintiff.

B. Abrogation of Sovereign Immunity

To determine whether Congress has abrogated the States' sovereign immunity, the courts ask two questions: (1) "whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,'" and (2) "whether Congress has acted 'pursuant to a valid exercise of power[.]'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)) (first alteration in original).

Here, it is undisputed that Congress met the first requirement by making "its intention to abrogate the States' immunity 'unmistakably clear in the language of the [CRCA].'" *Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 635 [hereinafter *Florida Prepaid*] (quoting *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989)). The CRCA provides, in relevant part:

> Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person[ for copyright infringement].

CRCA § 2 (codified at 17 U.S.C. § 511(a)). Thus, the next question is "[w]hether Congress had the power to compel States to surrender

their sovereign immunity." *Florida Prepaid*, 527 U.S. at 635. Plaintiff argues that both the Copyright Clause, U.S. Const. art. I, § 8, cl. 8, and § 5 of the Fourteenth Amendment give Congress the power to abrogate the States' sovereign immunity.

### 1. Abrogation Under Article I

The Supreme Court in *Seminole Tribe* made it clear that "Congress may not . . . base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I." *Garrett*, 531 U.S. at 364 (citing *Seminole Tribe*, 517 U.S. at 72-3 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction[.]")); *see also Kimel*, 528 U.S. at 80 ("Congress' powers under Article I of the Constitution do not include the power to subject States to suit at the hands of private individuals."); *Florida Prepaid*, 527 U.S. at 636 (finding that Patent Clause and Commerce Clause did not provide authority for Congress to abrogate sovereign immunity). However, in 2006 the Supreme Court held that sovereign immunity does not bar a bankruptcy trustee from bringing proceedings in Bankruptcy Court to avoid and recover alleged preferential transfers to State agencies. *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 360-62 (2006) [hereinafter *Katz*]. Plaintiff argues that the Copyright Clause, like the Bankruptcy Clause of Article I addressed in *Katz*, gives Congress the power to abrogate the States' sovereign immunity. The Court disagrees.

The Supreme Court in *Katz* acknowledged that its statements in *Seminole Tribe* "reflected an assumption that the holding in that case would apply to the Bankruptcy Clause[,]" but "[c]areful study and reflection" led the Court to conclude that "that assumption was erroneous." 546 U.S. at 363. The holding in *Katz* rests upon unique aspects of bankruptcy jurisdiction and the Supreme Court's extensive examination of the history of the Bankruptcy Clause and bankruptcy legislation considered and enacted shortly after ratification of the Constitution: "This history strongly supports the view that the Bankruptcy Clause of Article I, the source of Congress' authority to effect this intrusion upon state sovereignty, simply did not contravene the norms this Court has understood the Eleventh Amendment to exemplify." *Id.* at 375. The Supreme Court found that "States agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to 'Laws on the subject of Bankruptcies.'" *Id.* at 377.

Plaintiff urges the Court to extend *Katz* to the copyright context, arguing that the Copyright Clause was included in the Constitution to address a need for uniformity in copyright laws, just as the Bankruptcy Clause was included to address a need for uniformity in bankruptcy laws. Plaintiff further contends that in submitting the Copyright Clause for ratification the Framers "understood that the [S]tates had surrendered their sovereign immunity for copyright infringement actions just as they had for

11

bankruptcy actions" because, after the Constitution was ratified, states no longer had the authority to issue state copyrights. (Pl.'s Br. at 64, 66.) As superficially appealing as Plaintiff's argument may sound, Plaintiff provides no support (and the Court can find none) for the next step necessary to complete the argument: that the Framers, in drafting the Copyright Clause and enacting legislation shortly after ratification, contemplated "a surrender by the States of their sovereign immunity in certain federal proceedings[,]" such as copyright infringement lawsuits against the States. *Katz*, 546 U.S. at 369 n.9; *cf. Seminole Tribe*, 517 U.S. at 73 n.16 ("Although the copyright . . . laws have existed practically since our Nation's inception, . . . there is no established tradition in the lower federal courts of allowing enforcement of those federal statutes against the States.").

Furthermore, Plaintiff overlooks the careful distinction the *Katz* Court made between Congress's powers under the Bankruptcy Clause and Congress's other enumerated Article I powers. *See Katz,* 546 U.S. at 378; *see also Biomedical Patent Mgmt. Corp. v. Cal. Dep't of Health Servs.*, 505 F.3d 1328, 1343 (Fed. Cir. 2007) ("The holding in *Katz* was so closely tied to the history of the Bankruptcy Clause and the unique aspects of bankruptcy jurisdiction that it cannot be read to extend to actions for patent infringement."). The *Katz* Court repeatedly noted that bankruptcy jurisdiction is "chiefly *in rem*—a narrow jurisdiction that does not implicate state sovereignty to

nearly the same degree as other kinds of jurisdiction." 546 U.S. at 378. The Court found that "[i]n ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts." *Id.*

Based on the *Katz* Court's careful distinction, the Court cannot conclude that *Katz* extends beyond the realm of federal bankruptcy law and into the copyright context. Accordingly, the Court finds that, under the well-established precedent of *Seminole Tribe*, the Copyright Clause is not a valid basis for abrogation of the States' sovereign immunity. *See Seminole Tribe*, 517 U.S. at 73; *Garrett*, 531 U.S. at 364; *Kimel*, 528 U.S. at 80; *Florida Prepaid*, 527 U.S. at 636.

2. *Abrogation under the Fourteenth Amendment*

Plaintiff also contends that in enacting the CRCA Congress abrogated the States' sovereign immunity pursuant to the Fourteenth Amendment. Plaintiff argues that copyright infringement may deprive copyright holders of their property without due process of law. Congress has the power under § 5 of the Fourteenth Amendment "'to enforce' by 'appropriate legislation,' the constitutional guarantee that no State shall deprive any person of 'life, liberty, or property, without due process of law.'" *City of Boerne v. Flores*, 521 U.S. 507, 517 (1997) (quoting U.S. Const. amend XIV §§ 1, 5). Accordingly, Plaintiff asserts that the CRCA is a valid exercise of

Congress's § 5 enforcement power to protect copyright holders from the deprivation of their property without due process.

### i.   CONGRESS'S RECITAL IN THE CRCA

Defendants preliminarily respond that Congress enacted the CRCA solely pursuant to its Article I powers and that the Court need not address Plaintiff's Fourteenth Amendment argument. (The Board of Regents of the University System of Georgia and the Official Capacity Defendants' Br. in Supp. of Their Renewed Special Limited Appearance Mot. to Dismiss 16 [hereinafter Board Br.]; The Board of Regents of the University System of Georgia and the Official Capacity Defendants' Reply Br. in Supp. of Their Renewed Special Limited Appearance Mot. to Dismiss 3 [hereinafter Board Reply].) Defendants point to H.R. Report 101-282, where the House Judiciary Committee noted that the Supreme Court in *Pennsylvania v. Union Gas Co.* held that Congress could abrogate the States' sovereign immunity under the Commerce Clause of Article I and concluded that the same reasoning "applies equally to the Copyright Clause of Article I."[4]  H.R. Rep. 101-282, at 7 (1989); *see also Union Gas*, 491 U.S. 1, 22 (1989).  The Senate Judiciary Committee similarly found that *Union Gas* approved Article I authority for the CRCA.  S. Rep. 101-305, at 8 (1990).[5]

---

[4]The Supreme Court overruled *Union Gas* a few years later, in *Seminole Tribe*, 517 U.S. at 66, thus arguably eliminating Congress's expressed basis for abrogation.

[5]The Senate Committee also noted that some pre-*Union Gas* copyright infringement cases against the States were upheld based upon *Fitzpatrick v. Bitzer*, in which the Supreme Court found that § 5 of the Fourteenth

Plaintiff argues that the House Committee's recital of authority is irrelevant because the constitutionality of Congress's action does not depend on whether Congress recites "section 5" or "Fourteenth Amendment" as the basis for its exercise of power. *EEOC v. Wyoming*, 460 U.S. 226, 244 n.18 (1983), *superseded by statute for reasons not relevant here as stated in McCann v. City of Chicago*, 968 F.2d 635, 636 (7th Cir. 1992).[6] Defendants contend, however, that the Court is precluded from considering § 5 as a basis for the CRCA because in *Florida Prepaid*, the Supreme Court declined to consider whether the Just Compensation Clause of the Fifth Amendment was a valid basis for the Patent and Plant Variety Protection Remedy Clarification Act ("PRA") because Congress was "so explicit about invoking its authority under Article I and its [§ 5] authority." *Florida Prepaid*, 527 U.S. at 642 n.7.

*Florida Prepaid* is distinguishable from the present case on this point. In *Florida Prepaid*, the Court was presented with Congress's explicit statement of its authority for enacting the PRA: "The provisions of [the PRA] are justified under the Patent Clause, the Commerce Clause and the enforcement provision of the fourteenth amendment." S. Rep. 102-280, at 7-8 (1992). Congress did not even

---

Amendment creates an exception to the Eleventh Amendment. S. Rep. 101-305, at 7; *see also* 427 U.S. 445, 456 (1975).

[6]The *Wyoming* Court did recognize that the courts must be able "to discern some legislative purpose or factual predicate that supports the exercise of [§ 5] power." 460 U.S. at 243 n.18.

mention the Just Compensation Clause as a basis for the PRA. *Florida Prepaid*, 527 U.S. at 642 n.7; *see also id.* In this case, the congressional reports on the CRCA are not quite as clear; each report discusses the history of Eleventh Amendment abrogation, including abrogation under the Fourteenth Amendment, then focuses on Article I and concludes, based on *Union Gas*, that the Copyright Clause provides a basis for abrogation of sovereign immunity. S. Rep. 101-305, at 7-8; H.R. Rep. 101-282, at 7. Therefore, out of an abundance of caution and to avoid future remand on this issue, the Court finds it prudent to address whether the CRCA is a valid exercise of Congress's Fourteenth Amendment enforcement power.[7] As explained below, the Court finds that it is not.

### ii. IS THE CRCA VALID § 5 LEGISLATION?

#### a. Impact of *United States v. Georgia*

Congress may enforce the provisions of the Fourteenth Amendment "by creating private remedies against the States for *actual* violations of those provisions." *United States v. Georgia*, 546 U.S. 151, 158 (2006). In *Georgia*, the Supreme Court was presented with

---

[7]Two other courts have been presented with a similar CRCA recital argument. Both declined to decide whether the plaintiff was foreclosed from making a Fourteenth Amendment argument because of Congress's recital of authority in the CRCA; instead, they focused on whether the CRCA was a valid exercise of § 5 authority. *Chavez v. Arte Publico Press*, 204 F.3d 601, 605 (5th Cir. 2000) [hereinafter *Chavez*]; *De Romero v. Inst. of Puerto Rican Culture*, 466 F. Supp. 2d 410, 416 (D.P.R. 2006); *but see Jehnsen v. New York State Martin Luther King, Jr., Inst. for Nonviolence*, 13 F. Supp. 2d 306, 311 (N.D.N.Y. 1998) (finding, without analyzing the implicit authority issue, that because "the copyright legislation was authorized by Article I and not the Fourteenth Amendment, Congress is without authority to abrogate state sovereign immunity for copyright cases").

the question whether Title II of the Americans with Disabilities Act ("ADA") validly abrogated the States' sovereign immunity with respect to the plaintiff's claims regarding access to public services in prison. *Id.* at 157. The Supreme Court found that the plaintiff's Title II ADA claims were arguably based on conduct that independently violated § 1 of the Fourteenth Amendment because the alleged conduct violated the Eighth Amendment's guarantee against cruel and unusual punishment. *Id.* Reasoning that § 5 of the Fourteenth Amendment grants Congress the power to enforce the Fourteenth Amendment "by creating private remedies against the States for *actual* violations" of the Amendment, the Supreme Court held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 158-59.

Because the *Georgia* Court found that the plaintiff had arguably alleged an actual violation of the Fourteenth Amendment, it did not evaluate whether Title II of the ADA was valid prophylactic legislation aimed at preventing an unconstitutional denial of public services in prison. *Id.* at 159; *see also City of Boerne*, 521 U.S. at 520, 532-35 (discussing "congruence and proportionality" test). Thus, if a plaintiff alleges a statutory violation that is also an actual constitutional violation, the court need not examine whether that statute could validly prohibit facially constitutional conduct under the *City of Boerne* test.

17

### b. Did Plaintiff Allege an Actual Violation?

Plaintiff contends that *Georgia* controls here because Plaintiff alleged an actual violation of the Fourteenth Amendment: a deprivation of property without due process of law. *See* U.S. Const. amend XIV § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"). Defendants do not dispute that a copyright is a species of property protected by the Due Process Clause of the Fourteenth Amendment. *See Roth v. Pritikin*, 710 F.2d 934, 939 (2d Cir. 1983). Plaintiff alleged a "deprivation" of property because it alleged that Defendants willfully infringed Plaintiff's copyright and that Defendants' use of Plaintiff's proprietary, copyrighted exam materials destroyed the value of the materials. Thus, the only remaining question is whether this deprivation was done "without due process of law."

The Fourteenth Amendment protects only against deprivations "without due process of law." *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), *overruled for reasons not relevant here in Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Therefore, the Court must ask what process Georgia provided here and whether that process was constitutionally adequate. *Zinermon v. Burch*, 494 U.S. 113, 126 (1990).[8]  In many cases, to be adequate, process must be provided

---

[8]The cases relied upon in this section, such as *Parratt* and *Zinermon*, are largely cases brought under 42 U.S.C. § 1983 to vindicate a right guaranteed by the United States Constitution, such as the Fourteenth Amendment right to due process at issue here.  Defendants appear to contend that § 1983 cases are irrelevant here because Plaintiff cannot bring a §

prior to the deprivation of a constitutionally protected interest. *Parratt*, 451 U.S. at 537-38 (citing, e.g., *Mullane v. Cent. Hanover Trust Co.*, 339 U.S. 306 (1950) (requiring predeprivation hearing because deprivation of property was pursuant to an established state procedure and predeprivation hearing was possible)). Predeprivation process is required if an "established state procedure" effects the deprivation because, in such cases, the State is in a position to provide for predeprivation process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982); *accord Hudson v. Palmer*, 468 U.S. 517, 534 (1984); *Rittenhouse v. DeKalb County*, 764 F.2d 1451, 1454-55 (11th Cir. 1985). However, a deprivation of property does not give rise to a procedural due process claim where (1) predeprivation process was impracticable because the deprivation was the result of "a random and unauthorized act by a state employee" and (2) the State provides adequate postdeprivation process, such as a postdeprivation hearing or a tort remedy that could redress the loss. *Parratt*, 451 U.S. at 541; *see also Zinermon*, 494 U.S. at 128-29.

The Court must first examine whether predeprivation process was feasible in this case. In *Zinermon*, The Supreme Court determiend that predeprivation process was feasible, and therefore required,

---

1983 action against the Board. (*See* Board Reply at 10-13 (arguing that "17 U.S.C. § 1983 cases" are not relevant).) However, a key inquiry in the § 1983 cases is whether there has been a violation of a constitutional right, and the § 1983 cases are therefore relevant here because they examine the very question at issue: the definition of a "deprivation . . . without due process of law."

where the plaintiff claimed that mental hospital personnel deprived him of liberty without due process. 494 U.S. at 135. Florida delegated to hospital personnel broad authority to admit patients to mental hospitals. *Id.* Since the hospital personnel had state authority to deprive persons of liberty, "the Constitution imposed on them the State's concomitant duty to see that no deprivation occur without adequate procedural protections." *Id.* The problem: the hospital personnel failed in their duty to provide constitutionally required procedural safeguards to their patients because they allowed individuals to be admitted as "voluntary" patients (without the process given to "involuntary patients") without evaluating whether the individuals were competent to give informed consent. *Id.* at 137. The plaintiff was one such individual, and the Supreme Court found that the deprivation of his liberty was foreseeable due to the nature of mental illness.[9] *Id.* at 136. Furthermore, predeprivation process was possible because Florida had an established procedure for involuntary placement. *Id.* at 136-37. Accordingly, predeprivation process was required. *Id.*

Likewise, in *Wright v. Newsome*, the Eleventh Circuit found that predeprivation process was required because the plaintiff alleged

---

[9]Although there technically was no "established state procedure" that effected the deprivation, the plaintiff was "not simply attempting to blame the State for misconduct by its employees." *Zinermon*, 494 U.S. at 136. Rather, he sought to "hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue." *Id.*

facts that would support the finding that the deprivation was the result of an "established state procedure." 795 F.2d 964, 967 (11th Cir. 1986) (per curiam). The plaintiff, a state prisoner, alleged that prison guards "tossed" his cell and seized his legal materials, despite two court orders and notice to prison officials prohibiting confiscation of legal materials without procedural safeguards. *Id.* From these allegations, "it could be inferred that searches and consequent confiscations unaccompanied by procedural safeguards are the sanctioned standard operating procedure at [the state prison]." *Id.* The Eleventh Circuit further concluded that predeprivation process would have been feasible. *Id.; see also Rittenhouse*, 764 F.2d at 1456 n.4 (noting that in some cases procedures might be so "egregiously deficient" that deprivations of protected interests are "manifestly predictable" so that the situation resembles an "established state procedure" case and the government unit should have a duty to correct the deficiencies, thus affording "predeprivation process").

In contrast, predeprivation process was not feasible in *Parratt* or *Hudson*, both prison guard/destruction of property cases, because the deprivations were not pursuant to an established state procedure and predeprivation process was impracticable. *Hudson*, 468 U.S. at 533; *Parratt*, 451 U.S. at 541. In both cases, the destruction of property was the result of "a random and unauthorized act by a state employee[,]" so the State could not "predict precisely when the loss

[would] occur" and thus predeprivation process was not feasible. *Parratt*, 451 U.S. at 541; *accord Hudson*, 468 U.S. at 533. Similarly, predeprivation process was not feasible in *Rittenhouse*, where the county's emergency maintenance procedures were at issue. In that case, the county received information after 9 p.m. that its water meter was leaking and that the water would likely freeze on a road. The county did not fix the water meter that night, the water froze, and a car accident occurred early the next morning. *Rittenhouse*, 764 F.2d at 1452. There, however, it was not a state procedure itself that effected the deprivation; the purpose of the challenged emergency maintenance procedures was not to deprive anyone of anything, and the procedures did not contemplate the deprivation of any protected interest. *Id.* at 1455. Furthermore, predeprivation process would not have been feasible. *Id.* Although "better procedures would have prevented the deprivation[,]" the Eleventh Circuit concluded that the Supreme Court did not intend "general allegations of administrative negligence to render the *Parratt* analysis inapplicable." *Id.* at 1456.

Plaintiff tries to fit this case into the "established state procedure" line of cases, likening Warren to the hospital officials in *Zinermon* and the prison guards in *Wright* and contending that Warren's alleged copyright infringement was not "random" or "unauthorized." At its core, however, Plaintiff's complaint seeks to blame the Board for its employee's alleged misconduct, not to hold

22

state officials accountable for an abuse of any power to effect the deprivation. *Cf. Zinermon*, 494 U.S. at 136. Therefore, Plaintiff's allegations fit more closely with *Hudson*, where the employee's actions were random and unauthorized, and predeprivation process was not feasible because the State could not predict when the loss would occur. *See Hudson*, 468 U.S. at 533.

Plaintiff argues that Warren's alleged 2003-2007 copyright infringement was "foreseeable" and not "random" because the Board learned of Warren's "proclivity" for copyright infringement in 1995, when Plaintiff accused Warren of copyright infringement and Warren entered into the Agreement with Plaintiff, promising that he would "cease and desist" from all past, present and future infringement of Plaintiff's copyrights. (Pl.'s Br. at 34; Ex. A to Compl., Settlement Agreement & Release ¶ 1 [hereinafter Settlement Agreement].) Plaintiff further argues that Warren's alleged 2003-2007 copyright infringement was "authorized" by the Board because Warren prepared materials for his PBR courses in the scope of his employment with UGA: he was "delegated . . . the authority to compile" PBR course materials and was authorized to use UGA resources, including office equipment and student research assistants. (Pl.'s Br. at 35.)

According to Plaintiff, the Board should have provided predeprivation process to Plaintiff by denying Warren permission to compile materials for PBR courses. (*Id.*) This argument ignores the

23

fact that the 1995 Agreement explicitly states that its prohibitions "shall not prevent Warren from educational responsibilities associated with his teaching position, nor inhibit discussions related to preparing students for careers in pharmacy related professions." (Settlement Agreement ¶ 2.) More importantly, this argument takes a much broader view of "authorization" than is warranted by the cases. In *Zinermon* and *Wright*, the officials were authorized *to effect the deprivation at issue*: the hospital personnel in *Zinermon* had authority to deprive mental patients of their liberty, and the officers in *Wright* had the authority to deprive prisoners of their property without process, subject to a sanctioned standard operating procedure of the prison. *See Zinermon*, 494 U.S. at 136; *Wright*, 795 F.2d at 967. Here, Warren had nothing more than the authority to teach a review course, just as the prison guard in *Hudson* had only the authority to guard prisoners. The purpose of the Board's grant of Warren's authority was not to deprive anyone of anything, and this authority did not contemplate the deprivation of any protected interest. There are no allegations from which the Court can conclude that the Board's course authorization procedures were so "egregiously deficient" that deprivations of protected interests were "manifestly predictable," *Rittenhouse*, 764 F.2d at 1456 n.4; the foreseeability of the deprivation at issue here is dubious because Warren promised in 1995 that he would not infringe Plaintiff's copyrights.

Plaintiff does not suggest any other possible means of predeprivation process, such as an oversight procedure to be followed by the Board or the Administrators to prevent copyright infringement in Warren's review course materials. Indeed, such a procedure would not have been possible because the only party able to detect infringement of Plaintiff's proprietary materials was Plaintiff, which had the contractual right to obtain Warren's course materials upon written request. (Settlement Agreement ¶ 4.) Furthermore, just as a "rule forbidding a prison guard to maliciously destroy a prisoner's property would not have done any good [and] it would be absurd to suggest that the State hold a hearing to determine whether a guard could engage in such conduct[,]" *Zinermon*, 494 U.S. at 137, a rule forbidding Warren to infringe Plaintiff's copyrights, after he promised not to do so, would not have prevented Plaintiff's alleged deprivation.

For these reasons, the Court concludes that the deprivation at issue here was not pursuant to an established state procedure and that predeprivation process was not feasible. Accordingly, the Court must now determine whether Georgia provides adequate postdeprivation remedies for the deprivation alleged here. The Court finds that it does.

As discussed above, a deprivation of property does not state a procedural due process claim unless the State fails to provide adequate postdeprivation process, such as a postdeprivation hearing

or a tort remedy that could redress the loss. *Parratt*, 451 U.S. at 541; *see also Zinermon*, 494 U.S. at 128-29. The postdeprivation remedy must be capable of providing adequate compensation for the property loss. *Hudson*, 468 U.S. at 518. Defendants contend that Georgia provides adequate postdeprivation process for Plaintiff's copyright claim because Georgia law provides for a claims review procedure, a claim for breach of contract, and tort remedies. Plaintiff argues, on the other hand, that it is questionable whether any state law postdeprivation remedy that is not preempted can adequately compensate for copyright infringement and that Georgia's claims review board procedure is inadequate.

Plaintiff contends that a state law postdeprivation remedy cannot adequately compensate for copyright infringement, presumably because an action for copyright infringement, like an action for patent infringement, is within the exclusive jurisdiction of the federal courts. *See* 28 U.S.C. § 1338(a). However, the Supreme Court in *Florida Prepaid* concluded that it was possible for state law postdeprivation remedies to compensate adequately for patent infringement. *Florida Prepaid*, 527 U.S. at 644 n.9 (noting that Florida provides remedies to patent owners for alleged infringement on the part of the State: a claims bill or a takings or conversion claim); *accord Georgia*, 546 U.S. at 158 (citing *Florida Prepaid* for th proposition that "Florida satisfied due process by providing adequate remedies for patent infringement by state actors"). The

Court finds that this conclusion extends to an action for copyright infringement and determines that it is possible, under the logic of *Florida Prepaid* and *Georgia*, for a state law postdeprivation remedy to compensate adequately for copyright infringement.

Defendants point to several state law remedies under which Plaintiff may be compensated for the alleged deprivation of property. One such remedy is a breach of contract claim, which Plaintiff has asserted in this case. Plaintiff contends, however, that its breach of contract claim is preempted by federal copyright law. As discussed *infra* section **II.C.**, the Court rejects this argument because the Eleventh Circuit has found that federal law does not preempt breach of contract claims based on an agreement not to copy. *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1318-19 (11th Cir. 2001). Georgia has waived its sovereign immunity from suit in state court for breach of contract actions, and Plaintiff may recover damages to compensate for the breach of contract. Ga. Const. art. I § II ¶ IX(c); O.C.G.A. § 13-6-2. Accordingly, the Court concludes that a state law breach of contract claim provides Plaintiff with adequate postdeprivation process for the deprivation of property alleged here, so the deprivation was not "without due process of law."[10] Therefore, Plaintiff has not alleged an "actual violation" of the Fourteenth Amendment, and *Georgia* dictates that the Court must

---

[10]Plaintiff may also have an adequate state law remedy under Georgia's claims bill process, *see* O.C.G.A. §§ 28-5-80 to -86, or under a trade secret misappropriation theory, *see* O.C.G.A. §§ 10-1-760 to -767.

determine whether Congress's purported abrogation of sovereign immunity is nevertheless valid. *Georgia*, 546 U.S. at 159.

### iii. IS THE CRCA "CONGRUENT AND PROPORTIONAL"?

Having found that Plaintiff failed to allege an actual constitutional violation, the Court must now determine whether Congress abrogated the States' sovereign immunity based upon its authority to enact prophylactic legislation that is designed chiefly to prevent unconstitutional conduct but may also prohibit conduct that is constitutional on its face. As discussed above, Congress has the "power 'to enforce' by 'appropriate legislation,' the constitutional guarantee that no State shall deprive any person of 'life, liberty, or property, without due process of law.'" *City of Boerne*, 521 U.S. at 517 (quoting U.S. Const. amend XIV §§ 1, 5). Although Congress's § 5 enforcement powers include the power to enact appropriate prophylactic legislation that proscribes facially constitutional conduct in order to prevent and deter unconstitutional conduct, Congress may not define what constitutes a constitutional violation. *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 (2003); *accord City of Boerne*, 521 U.S. at 519. To distinguish between appropriate prophylactic legislation and a substantive redefinition of Fourteenth Amendment rights, the courts apply the *City of Boerne* test: "Valid § 5 legislation must exhibit 'congruence and proportionality between the injury to be prevented or remedied

and the means adopted to that end[.]'" *Hibbs*, 538 U.S. at 728 (quoting *City of Boerne*, 521 U.S. at 520).

The starting point in determining whether legislation is an "appropriate" exercise of Congress's Fourteenth Amendment enforcement power is "to identify with some precision the scope of the constitutional right at issue." *Garrett*, 531 U.S. at 365; *accord Florida Prepaid*, 527 U.S. at 639. Here, the "wrong" to be remedied by the CRCA is state infringement of copyrights and the use of sovereign immunity to deny copyright holders compensation for the infringement. S. Rep. 101-305, at 4. The constitutional injury at issue here is uncompensated copyright infringement by the States that amounts to a deprivation of property without due process of law.

Once a court identifies the "wrong," it must determine whether there is a "'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Kimel*, 528 U.S. at 81 (quoting *City of Boerne*, 521 U.S. at 520). In performing this analysis, the courts are "guided by the principle that the propriety of any § 5 legislation 'must be judged with reference to the historical experience . . . it reflects.'" *Florida Prepaid*, 527 U.S. at 639-40 (quoting *City of Boerne*, 521 U.S. at 525) (omission in original). The factors to be considered in this analysis include: (1) whether Congress identified a pattern of unconstitutional activity by the States, *see Florida Prepaid*, 527 U.S. at 640; *Kimel*, 528 U.S. at 88; (2) whether Congress considered

29

the adequacy of state law remedies, *see Florida Prepaid*, 527 U.S. at 644; and (3) whether Congress placed sufficient limitations on the remedy, *see Hibbs*, 538 U.S. at 739.[11]

The Supreme Court found a "pattern" of unconstitutional conduct justifying § 5 legislation in cases where Congress documented a "marked pattern of unconstitutional action by the States[.]" *Garrett*, 531 U.S. at 358 (citing *South Carolina v. Katzenbach*, 383 U.S. 310, 312 (1966) (discussing widespread pattern of unconstitutional action by the States justifying the Voting Rights Act)); *see also Tennessee v. Lane*, 541 U.S. 509, 524-28 (2004) (outlining "sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services"); *Hibbs*, 538 U.S. at 735 (finding that in enacting the Family and Medical Leave Act Congress identified a significant pattern of the States' participation in, and fostering of, gender-based discrimination in the administration of leave benefits). In contrast, where Congress documents only a handful of examples—which may or may not rise to the level of constitutional violations—there is no "pattern" justifying

---

[11]Several other courts have considered the question whether the CRCA is valid § 5 legislation. All of these courts have concluded that it is not. *Chavez*, 204 F.3d at 607-08; *Rodriguez v. Texas Comm'n on the Arts*, 199 F.3d 279, 281 (5th Cir. 2000); *Infomath, Inc. v. Univ. of Arkansas*, No. 4:04CV00488-WRW, 2007 WL 4562878, at *4 (E.D. Ark. Dec. 21, 2007); *De Romero*, 466 F. Supp. 2d at 418; *Hairston v. N.C. Agric. & Technical State Univ.*, No. 1:04 CV 1203, 2005 WL 2136923, at *8 (M.D.N.C. Aug. 5, 2005); *Salerno v. City Univ. of New York*, 191 F. Supp. 2d 352, 355-56 (S.D.N.Y. 2001).

§ 5 legislation. *Garrett*, 531 U.S. at 369-70 (finding that "half a dozen" examples of employment discrimination based on disability by the States fell "far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based"); *Florida Prepaid*, 527 U.S. at 640 ("In enacting the [PRA], . . . Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations.").

In *Chavez v. Arte Publico Press*, the Fifth Circuit found that in passing the CRCA, Congress did not identify a pattern of copyright infringement by the States, constitutional or unconstitutional. 204 F.3d at 605-06. Plaintiff argues, however, that the *Chavez* court ignored several key portions of the CRCA's legislative history and therefore that *Chavez* was wrongly decided and should not be considered persuasive authority.

Plaintiff points the Court to several examples of state copyright infringement that Congress considered in enacting the CRCA. First, as discussed in *Chavez*, the Copyright Office provided Congress with a report on the relation between the States' copyright liability and the Eleventh Amendment. *Chavez*, 204 F.3d at 606; *see also* Register of Copyrights, Library of Congress, Copyright Liability of States and the Eleventh Amendment (1988) [hereinafter Copyright Office Report]. The Copyright Office Report summarized seven instances of actual problems faced by copyright holders in attempting

to enforce their claims against government infringers.[12]  Copyright

Office Report at 7-9.  It is not clear whether any of these instances

involved  unconstitutional  conduct—i.e.,  intentional  copyright

infringement without due process of law.  Next, Plaintiff points the

Court to eight copyright infringement actions against states that

were not discussed in *Chavez* but were mentioned in the Register of

Copyrights' statement before the House Subcommittee on Courts,

Intellectual Property, and the Administration of Justice.[13]  *Copyright*

---

[12]The seven actual problems: (1) a Texas *federal* prison copied a training tape demo and returned the original without payment; (2 & 3) North Carolina and Wisconsin asserted immunity when challenged about their correctional institutions' public performance of motion pictures without authority; (4) a county college asserted immunity when a business sued it for infringement of musical composition copyrights; (5) a Minnesota Department of Human Services nursing home asserted immunity when it was claimed to have copied a company's educational materials and offered them for sale; (6) a California local hospital association set up a "lending library" that copied a company's copyrighted material; and (7) Massachusetts asserted immunity in a copyright infringement case. Copyright Office Report at 7-9.

[13]Four of these cases preceded the Supreme Court's ruling in *Atascadero State Hosp. v. Scanlon* that Congress may abrogate sovereign immunity "only by making its intention unmistakably clear in the language of the statute."  473 U.S. 234, 242 (1985).  These four cases were split as to whether the then-existing Copyright Act abrogated the States' sovereign immunity: *Mills Music, Inc. v. Arizona*, 591 F.2d 1278, 1286 (9th Cir. 1979) (finding abrogation); *Wihtol v. Crow*, 309 F.2d 777, 782 (8th Cir. 1962) (finding no abrogation); *Johnson v. Univ. of Va.*, 606 F. Supp. 321, 324 (W.D. Va. 1985) (finding abrogation); *Mihalek Corp. v. Michigan*, 595 F. Supp. 903, 906 (E.D. Mich. 1984) (finding no abrogation).  All four of the post-*Atascadero* cases cited found no abrogation of sovereign immunity because the courts did not find Congress's intention to abrogate sovereign immunity was "unmistakably clear" in the language of the Copyright Act of 1976.  *BV Eng'g v. UCLA*, 657 F. Supp. 1246, 1249-50 (C.D. Cal. 1987), *aff'd*, 858 F.2d 1394, 1400 (9th Cir. 1988); *Richard Anderson Photography v. Radford Univ.*, 633 F. Supp. 1154, 1160 (W.D. Va. 1986), *aff'd in relevant part in Richard Anderson Photography v. Brown*, 852 F.2d 114, 120 (4th Cir. 1988) [hereinafter *Richard Anderson Photography*]; *Cardinal Indus., Inc. v. Anderson Parrish Assoc., Inc.*, No. 83-1038-Civ-T-13, 1986 WL 32732, at *1 (M.D. Fla. May 7, 1986); *Woelffer v. Happy States*

*Remedy Clarification Act and Copyright Office Report on Copyright Liability of States: Hearing on H.R. 1131 Before the H. Subcomm. on Courts, Intellectual Prop., and the Admin. of Justice of the H. Comm. on the Judiciary*, 101st Cong. 29-34 (1989) [hereinafter House Hearings] (statement of Ralph Oman, Register of Copyrights).  It is not clear whether any of these cases involved unconstitutional copyright infringement.  Finally, Plaintiff points the Court to two additional examples of state copyright infringement that were not mentioned in *Chavez* but were considered in the House Hearings: (1) withdrawal of a public university from photocopy license negotiations, *see* House Hearings at 137 (attach. B to statement of Copyright Remedies Coalition); and (2) state infringement of a car valuation guide book, *see id.* at 199-202 (statement of Maclean Hunter Reports, Inc., app'x of material submitted for the Hearings record). It is not clear whether either of these examples involved unconstitutional copyright infringement.

In addition to these examples, Plaintiff points the Court to the House Hearings testimony of Ralph Oman, then the Register of Copyrights, as evidence of a pattern of copyright infringement by the States.  Plaintiff contends that the *Chavez* court misstates Oman's testimony.  But while the *Chavez* court did selectively quote from Oman's extensive testimony, it did not misrepresent it.  Oman did testify, as the *Chavez* court reported, that he believed "[the States]

*of Am., Inc.*, 626 F. Supp. 499, 505 (N.D. Ill. 1985).

are all respectful of the copyright laws" and that he did not think the States would "get involved in wholesale violation of the copyright laws." *Chavez*, 204 F.3d at 606 (citing House Hearings at 8, 53 (statement of Ralph Oman)) (alteration in original). Oman also testified that although he had identified several examples of copyright infringement by the states, "*it is not widespread*." House Hearings at 52-53 (statement of Ralph Oman) (emphasis added). Oman noted that States "recognize that respect for copyright law and the property rights conferred by the law is good public policy. As a practical matter, States continue to buy books, computer programs and other copyrighted works. They acquire licenses for the performance of music at non-exempt school events." *Id.* at 8.

As the *Chavez* court recognized, "[r]ather than expose a current epidemic of unconstitutional deprivations, the testimony before Congress worried principally about the *potential* for future abuse and the concerns of copyright owners about that potential[.]" 204 F.3d at 606 (internal citations omitted). Oman's testimony shows concern about *future* copyright infringement by the States:

> I think [the States] will continue to respect the law[, but] [w]ithout the threat of a fat fine, the States might become lax in their copyright educational program. With no exposure, the training will slack off, the copyright awareness will decrease, and the honest mistakes will become more and more frequent.

House Hearings at 8 (statement of Ralph Oman). Oman urged Congress to "put some anxiety back into the equation" and "guard against sloppiness" in the States' copyright practices. *Id.* at 8-9, 53

34

("[T]he change of the law is important to give a deterrent to the States so that they are more careful about what they do."). Congress agreed, noting that it needed to deter "those State entities which *might* become too casual about copyright owners' property rights or which *might* intentionally disregard the Copyright Act." S. Rep. 101-305, at 12 (emphasis added).

Based on the foregoing, the evidence before Congress in enacting the CRCA is similar to the evidence before Congress when it enacted the PRA, although there were several more examples of copyright infringement than patent infringement. However, there was no evidence of widespread violations of the copyright laws by the States and no evidence that unremedied copyright infringement by States "had become a problem of national import." *Florida Prepaid*, 527 U.S. at 641. In enacting the CRCA, Congress considered evidence that copyright infringement "might increase in the future and acted to head off this speculative harm." *Id.* at 656 (internal quotation marks and citation omitted). Therefore, the Court cannot conclude that Congress documented a "pattern" of unconstitutional conduct in the CRCA's legislative history.

Even if the seventeen examples of government copyright infringement cited by Plaintiff did constitute a "pattern" of conduct as contemplated in *Hibbs*, 538 U.S. at 735, and *Lane*, 541 U.S. at 524-28, there is no indication that these were examples of unconstitutional conduct. Copyright infringement is not

unconstitutional unless it is intentional—negligent conduct does not violate the Due Process Clause. *Daniels*, 474 U.S. at 330-31; *see also Florida Prepaid*, 527 U.S. at 645. Furthermore, as discussed above, willful copyright infringement by a State is not unconstitutional unless there is no adequate state remedy. *See Florida Prepaid*, 527 U.S. at 643 (noting that patent infringement cannot constitute a due process violation unless the State provides no adequate remedy).

The *Chavez* court found that Congress "barely considered" the availability of state remedies for copyright infringement. 204 F.3d at 606; *see also Florida Prepaid*, 527 U.S. at 644, n.9. Congress did hear testimony regarding the exclusive jurisdiction of federal courts in copyright actions. *See, e.g.*, House Hearings at 5, 126 (statement of Ralph Oman & statement of the Copyright Remedies Coalition); *The Copyright Clarification Act: Hearing on S. 497 Before the Subcomm. on Patents, Copyrights and Trademarks of the S. Comm. on the Judiciary*, 101st Cong. 51 (1989) [hereinafter Senate Hearing] (statement of James L. Healy, Jr., Vice President of Enterprise Media). Congress also received a survey of state waivers of Eleventh Amendment immunity as an appendix to the Copyright Office Report. Congressional Research Service, Library of Congress, *Waiver of Eleventh Amendment Immunity from Suit: State Survey Relating to Copyright Infringement Claims* (1988) (app'x C to Copyright Office Report). However, this survey did not include any information on

state remedies for the unlawful taking of private property by state governments. *See Chavez*, 204 F.3d at 606 (citing Senate Hearing at 123 (statement on behalf of the Educators' Ad Hoc Committee on Copyright Law)).[14]

Plaintiff argues that there are no adequate state law remedies for copyright infringement because of federal preemption and exclusive jurisdiction for copyright infringement, so it was unnecessary for Congress to perform an extensive analysis of potential state law remedies. (Pl.'s Br. at 57.) However, the Supreme Court recognized in *Florida Prepaid* that state law remedies can provide adequate compensation for patent infringement, 527 U.S. at 644 n.9, and the Court finds that this conclusion extends to actions for copyright infringement. In enacting the CRCA, Congress did consider granting state courts concurrent jurisdiction over copyright cases—a solution that Congress rejected not as an inadequate remedy but because it created "the potential for differing standards and results" and therefore did not comport with the "essential premise" of the Copyright Act to create uniformity in copyright law. H.R. Report 101-282, at 9. While the need for uniformity in copyright law is "undoubtedly important," it "is a factor which belongs to the Article I [copyright]-power calculus, rather than to any determination of whether a state plea of sovereign

---

[14]In contrast to its sparse consideration of state remedies, Congress did consider the adequacy of injunctive relief and found that it would not be sufficient. H.R. Report 101-282, at 8; S. Rep. 101-305, at 12.

immunity deprives [a copyright holder] of property without due process of law." *Florida Prepaid*, 527 U.S. at 645.

The next question in the congruence and proportionality analysis is the coverage of the statute at issue. *See Florida Prepaid*, 527 U.S. at 647. The CRCA is aimed at stopping all copyright infringement by the States, and it prohibits both constitutional and unconstitutional activity. Its apparent aim is to place States on the same footing as private parties under the Copyright Act. *See* S. Rep. 101-305, at 9 ("[I]t is puzzling that State schools cannot be sued for damages for their systematic unauthorized copying, but private institutions can be.") As with the PRA, Congress did not limit coverage of the CRCA to cases involving arguable constitutional violations, "such as where a State refuses to offer any state-court remedy" for copyright owners whose copyrights it infringed, where a State offers questionable remedies or has a high incidence of infringement, or where infringement is authorized pursuant to state policy. *Florida Prepaid*, 527 U.S. at 646-47. "Instead, Congress made all States immediately amenable to suit in federal court for all kinds of possible [copyright] infringement and for an indefinite duration." *Id.* at 647.

Based on the legislative record and the scope of the CRCA's coverage, the Court finds that the CRCA cannot be sustained under §

5 of the Fourteenth Amendment.[15]  *See Florida Prepaid*, 527 U.S. at 647.   The record does not reveal a "marked pattern of unconstitutional action by the states" to justify proper remedial legislation.  *Garrett*, 531 U.S. at 372.  The record does not show that Congress considered the adequacy of state remedies that could provide the required due process.  And Congress's solution—subjecting the States to "expansive liability"—was not limited to cases involving arguable constitutional violations.  *Florida Prepaid*, 527 U.S. at 647.  Accordingly, the Court finds that the provisions of the CRCA are "'so out of proportion to a supposed remedial or preventive object that [they] cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'"  *Id.* at 646 (quoting *City of Boerne*, 521 U.S. at 532) (alteration in original).   Plaintiff's copyright infringement claims against the Board  and the Official Capacity Defendants cannot proceed based on an abrogation of sovereign immunity theory.

  C.   Waiver of Sovereign Immunity

     Plaintiff contends that, even if the CRCA does not abrogate the Board's sovereign immunity, the Board is still subject to suit in this Court because it waived sovereign immunity when it entered into the 1995 Agreement with Plaintiff.  A State may waive its sovereign

---

[15]The Court recognizes that "lack of support in the legislative record is not determinative," *Florida Prepaid*, 527 U.S. at 646, but it also notes that "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one," *City of Boerne*, 521 U.S. at 530.

immunity. *Lapides*, 535 U.S. at 618. The "'test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.'" *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) [hereinafter *Coll. Sav. Bank*] (quoting *Atascadero*, 473 U.S. at 241). Waiver is generally found if a State voluntarily invokes federal jurisdiction or if the State makes a "clear declaration" that it intends to submit itself to federal jurisdiction. *Coll. Sav. Bank*, 527 U.S. at 675-76. The point of the "clear declaration" rule is "to be certain that the State in fact consents to suit." *Id.* at 680. A waiver of sovereign immunity requires an affirmative act and cannot be implied or construed from the circumstances. *Id.*

Plaintiff contends that "[t]he Board avoided litigation and induced a settlement in 1995 in part by agreeing not to infringe NABP's copyrighted examination questions in the future[.]" (Pl.'s Br. at 68.) Plaintiff argues that because some jurisdictions have concluded that certain breach of contract claims are preempted by federal copyright law, the only way for the 1995 Agreement to have any effect is through a suit by Plaintiff against the Board for copyright infringement. (*Id.* at 80.) And because a copyright infringement action may only be brought in federal court, Plaintiff reasons that the Board's 1995 Agreement to cease and desist from future infringement of Plaintiff's copyright "necessarily carried

with it a consent to be sued in federal court for copyright infringement for the Board's failure to do so." (*Id.* at 75.)

Plaintiff relies on three cases in support of this theory. First, in *Lapides*, the Supreme Court held that Georgia waived its sovereign immunity when it engaged in the "affirmative litigation conduct" of removing a case to federal court. *Lapides*, 535 U.S. at 617. In removing the case, the Georgia Board of Regents "voluntarily invoked the federal court's jurisdiction." *Id.* at 620. Second, in *Board of Trustees SABIS International School v. Montgomery*, the U.S. District Court for the Southern District of Ohio found that the Ohio School Board waived its sovereign immunity by inserting a binding arbitration clause into its contract with the plaintiff.[16] 205 F. Supp. 2d at 846. The *SABIS* court found that the conduct of inserting the binding arbitration clause in anticipation of future disputes that might result in litigation was similar to the litigation conduct of removal at issue in *Lapides*.[17] *Id.* Finally, in *Baum Research*, the U.S. District Court for the Western District of Michigan found that

---

[16]In *SABIS*, the plaintiff brought suit in federal court to enforce the arbitration provision after the Ohio School Board refused to arbitrate the case, citing sovereign immunity. 205 F. Supp. 2d 835, 842 (S.D. Ohio 2002).

[17]Although the *SABIS* court offered little rationale for its conclusion, another court opined that the reasoning was based on the idea "that inherent in the agreement to arbitrate was the notion that any disputes regarding the enforceability thereof fell within the jurisdiction of the federal courts, therefore, by agreeing to the arbitration clause the state was agreeing to litigate in a federal forum (at least with respect to certain issue[s] relating to arbitration)." *Baum Research & Dev. Co. v. Univ. of Mass. at Lowell*, No. 1:02-CV-674, 2006 WL 461224, at *4 (W.D. Mich. Feb. 24, 2006), *aff'd* 503 F.3d 1367, 1371 (Fed. Cir. 2007).

the University of Massachusetts at Lowell waived its sovereign immunity by entering into a contract with the plaintiffs which stated that "all parties agree to proper venue and hereby submit to jurisdiction in the appropriate State or Federal Courts Record sitting in the State of Michigan." 2006 WL 461224, at *4-5. By agreeing to this provision, the University "affirmatively agreed to resolve in federal court any disputes that may arise." *Id.* at *5.

Here, unlike in *SABIS* and *Baum Research*, the 1995 Agreement is silent as to potential litigation between the parties. There is no arbitration clause and no forum selection clause. Rather, Plaintiff asks the Court to imply a federal-forum selection clause based on the Board's agreement to "cease and desist . . . from all past, present and future copying, transcribing, or other infringing use of NABP copyrighted materials[.]" (Settlement Agreement ¶ 1.) Plaintiff's argument is based on its view that simply entering into a contract is "pre-litigation conduct" sufficient to constitute a clear indication of a State's waiver of sovereign immunity. Even if that were so, Plaintiff's theory also requires a finding that federal law preempts a state breach of contract claim based on an agreement not to copy and that such an agreement amounts to consent to be sued in federal court.

Federal law preempts state law to the extent it creates "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by [17

42

U.S.C. §] 106." 17 U.S.C. § 301(a). However, "'if an extra element is required instead of or in addition to the acts [specified by § 106] in order to constitute a state-created case of action, then the right does not lie within the general scope of copyright and there is no preemption.'" *Lipscher*, 266 F.3d at 1311-12 (quoting *Foley v. Luster*, 249 F.3d 1281, 1285 (11th Cir. 2001)). As Plaintiff acknowledges in its brief, the law is unsettled as to whether a contract constitutes an "extra element" that would permit a finding that federal copyright law does not preempt a state law breach of contract claim based on a promise not to copy. (Pl.'s Br. at 78-9 (citing four groups of cases with differing outcomes on this issue)); *also compare Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 438-41 (S.D.N.Y. 1996) (finding that breach of contract claim was not preempted because "[p]rotection from breach of contract . . . is not equivalent to copyright protection because a contract claim requires an 'extra element,' that renders the claim qualitatively different from a claim for copyright infringement: a promise by the defendant" (citation omitted)), *with Wolff v. Inst. of Elec. & Elec. Eng'rs, Inc.*, 768 F. Supp. 66, 69 (S.D.N.Y. 1991) (finding that state law breach of contract claim was equivalent of copyright claim and therefore preempted). Furthermore, the Eleventh Circuit has found that a breach of contract claim based on an agreement not to copy materials was *not* preempted because the

43

plaintiff "needed to show an extra element[:] the existence of a valid contract between the parties." *Lipscher*, 266 F.3d at 1318-19.

Plaintiff argues, however, that the better principle is that a state law contract claim based on a promise not to infringe *is* preempted, so "if the law is as it appears it should be," the only way for the 1995 Agreement to have any effect is through a suit by Plaintiff against the Board for copyright infringement. (Pl.'s Br. at 79-80.) The States should not be required to speculate about what the law on preemption of state claims "should be" when deciding whether to enter a contract. For there to be a "clear declaration" that a State intends to submit itself to federal jurisdiction, the State must be able to make a reasonable determination that its action constitutes a waiver of sovereign immunity. Here, the Board had no reason to believe that if disputes arose out of its contract with Plaintiff, Plaintiff's breach of contract claim based upon the copyright provision would be preempted by federal law. Thus, even if the Court could construe waiver from the circumstances—which it cannot—the circumstances here would not permit such a finding. *See Coll. Sav. Bank*, 527 U.S. at 680. Moreover, the Board did not engage in any affirmative act constituting a clear declaration of intent to submit to federal jurisdiction. Accordingly, the Court finds that the Board did not waive its sovereign immunity when it entered the 1995 Agreement with Plaintiff.

For all of these reasons, the Board and the Official Capacity Defendants are entitled to sovereign immunity as to Plaintiff's copyright infringement claims for damages.

## III. Injunctive Relief Claims Against Official Capacity Defendants

Even though Plaintiff may not bring a damages claim for copyright infringement against the Board and the Official Capacity Defendants, Plaintiff contends the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), permits it to bring a claim for prospective relief against the Official Capacity Defendants. The *Ex Parte Young* doctrine creates a narrow exception to Eleventh Amendment immunity and allows federal courts to "grant[] prospective injunctive relief to prevent a continuing violation of federal law."[18] *Green*, 474 U.S. at 68 (citing *Young*, 209 U.S. at 155-56).

Plaintiff acknowledges that it may not bring a claim for injunctive relief directly against the Board. (Pl.'s Br. at 9); *see also Pennhurst*, 465 U.S. at 100-02. Plaintiff also acknowledges that *Young* does not apply in a suit against state officials on the basis of state law. (Pl.'s Br. at 9); *see also Pennhurst*, 465 U.S. at 106. Accordingly, the only claim left to analyze is Plaintiff's claim for

---

[18]The *Young* Court found that "a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Green*, 474 U.S. at 68 (citing *Young*, 209 U.S. at 159-60). "The theory of *Young* was that an unconstitutional statute is void and therefore does not 'impart to [the official] any immunity from responsibility to the supreme authority of the United States.'" *Id.* (quoting *Young*, 209 U.S. at 160) (internal citations omitted) (alteration in original).

injunctive relief against the Official Capacity Defendants based upon the Defendants' alleged copyright infringement.

To determine whether the *Young* doctrine applies, the courts "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene Tribe*, 521 U.S. at 296 (O'Connor, J., concurring in part and concurring in judgment)) (alteration in original). This inquiry "does not include an analysis of the merits of the claim." *Id.* at 646. Here, there is no question that the relief sought—an injunction against future copyright infringement by the Official Capacity Defendants—is properly characterized as prospective. Furthermore, there are no "particular and special circumstances" in this case under which *Young* is inapplicable. *See Coeur d'Alene Tribe*, 521 U.S. at 281-87 (finding that *Young* did not apply because injunctive relief was "far-reaching and invasive" and would have resulted in a shift of ownership and control of state land to plaintiff and the state's loss of regulatory jurisdiction over the land). Therefore, the Court must focus on whether Plaintiff has alleged an "ongoing violation."

To state a claim under *Ex parte Young*, Plaintiff's Complaint must contain "enough factual matter (taken as true) to suggest" an ongoing violation. *Twombly*, 127 S. Ct. at 1965. Conclusory allegations are not sufficient. *Id.* at 1968. Here, Plaintiff simply

alleges that "Defendants are continuing to infringe" its copyrights and that Defendants' wrongful conduct is "continuing." (Compl. ¶¶ 33, 35.) However, Plaintiff does not allege any facts to support these conclusory allegations. Indeed, Plaintiff could not. While it is true that the alleged activities were appropriately characterized as "continuing" when the Court granted Plaintiff's *ex parte* temporary restraining order in August 2007, Plaintiff's original Complaint only named the Board and Warren as defendants. The Board agreed to maintain the status quo during the pendency of the lawsuit. However, by the time Plaintiff amended its Complaint in October 2007 to add the *Ex parte Young* claims against the Official Capacity Defendants, Plaintiff could not allege facts to support its continuing infringement theory because the Official Capacity Defendants were not committing (or permitting) any ongoing violation: UGA had stopped offering the PBR course and Warren had retired from teaching. By October 2007, there was no reasonable expectation that Plaintiff would be subject to the same injury again or that Plaintiff would be unable to seek review in the unlikely event that the injury recurred. Accordingly, the Court finds that Plaintiff has failed to state a claim against the Official Capacity Defendants under *Ex parte Young*. Plaintiff's claims for injunctive relief against the Official Capacity Defendants are dismissed.

## IV.  Claims Against Warren and Cobb

Warren and Cobb rely upon three grounds for their motions to dismiss: sovereign immunity, qualified immunity and official immunity.

### A.  Warren and Cobb's Sovereign Immunity Defense

Warren and Cobb contend that although Plaintiff brought suit against them "individually," Plaintiff's claims against them are actually official capacity claims and that they are entitled to sovereign immunity.  Since the State is the real party in interest in a suit against its employees in their official capacities, state employees sued in their official capacities are entitled to sovereign immunity.  *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575, 1577 (11th Cir. 1994).  However, sovereign immunity "does not protect state employees sued in their individual capacity for employment-related acts."  *Id.* at 1575 (citing *Hafer v. Melo*, 502 U.S. 21, 25-27 (1991)).

As Warren and Cobb acknowledge, "[t]he general test for determining whether the state is the real party in interest, even though it is not a named defendant, is whether the relief sought against the nominal defendant would in fact operate against the state, especially by imposing liability damages that must be paid out of the public fisc."  *Id.* at 1577 (citing *Pennhurst*, 465 U.S. at 101, n.11; *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)).  Furthermore, sovereign immunity only applies "if the judgment *must*, under all

circumstances, be paid out of state funds." *Id.* In contrast, the "essence of an individual capacity suit is that the plaintiff is seeking to recover from the individual defendant, who is personally liable for the judgment." *Id.* Thus, in *Jackson*, the Eleventh Circuit found that because the district court's judgment against state employees neither compelled the state to act nor imposed liability upon the state, the employees were not entitled to sovereign immunity. *Id.; see also Hafer*, 502 U.S. at 30-31 (Eleventh Amendment did not bar suit against state official in her individual capacity for acts done in the course of her official duties); *Richard Anderson Photography*, 852 F.2d at 122 (claim against state employee was individual capacity because employee "could obviously pay a judgment for money damages independently of her status as a state official, and without any consequences to the state's fisc").

Here, Warren and Cobb focus on the fact that their allegedly infringing activities were done in the scope of their employment. As discussed above, however, the test is not whether the acts were done in the course of an employee's official duties but whether a judgment against the employee would in fact operate against the state. *Jackson*, 16 F.3d at 1577. Warren and Cobb baldly assert that relief sought against them would come directly from the State of Georgia, but they do not explain how. Warren and Cobb are both subject to the federal copyright laws. *See* 17 U.S.C. § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner . . . is an

49

infringer of the copyright."). A judgment against them may be paid out of their personal funds—not necessarily State funds—because Plaintiff's claims against Warren and Cobb seek to hold Warren and Cobb individually liable for their conduct in violation of federal copyright law. And, to the extent that Georgia has voluntarily agreed to protect Warren and Cobb from liability here, such an agreement would *not* make Georgia a real party in interest in this action. *Jackson*, 16 F.3d at 1578.

The Court concludes that Plaintiff sued Warren and Cobb in their individual capacities and that they are not entitled to sovereign immunity.

### B. Warren and Cobb's Qualified Immunity Defense

Warren and Cobb also argue that they are entitled to qualified immunity. In deciding this question, the Court must focus on the factual allegations in Plaintiff's Complaint; unless Plaintiff alleged a violation of clearly established law, Warren and Cobb are entitled to dismissal under Rule 12(b)(6). *Epps v. Watson*, 492 F.3d 1240, 1244 (11th Cir. 2007).

Qualified immunity shields government officers acting within the scope of their discretionary authority from liability so long as their conduct does not violate clearly established law. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of

personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)) (internal citation omitted). The rule exists to prevent government officials from being unduly inhibited in the discharge of their duties. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

Here, Plaintiff does not dispute that Warren and Cobb are "government officials" who would be entitled to qualified immunity if they could establish that their conduct did not violate clearly established law.[19] Plaintiff also does not dispute that Warren and Cobb were acting in the scope of their discretionary authority when they allegedly infringed Plaintiff's copyright. *See Lee*, 284 F.3d at 1194. Plaintiff does, however, contend that qualified immunity is not appropriate because (1) taken in the light most favorable to Plaintiff, the facts alleged show that Warren and Cobb violated federal copyright law, *see id.*, and (2) the law was clearly established at the time of the alleged infringement, *see Saucier v. Katz*, 533 U.S. 194, 201 (2001).

---

[19]The parties have not briefed whether Warren and Cobb are properly considered "government officials" entitled to qualified immunity. The Court declines to reach this issue because even if Warren and Cobb are "government officials," they are not entitled to qualified immunity. The Court notes that the Fifth Circuit granted qualified immunity to a university employee who allegedly infringed a copyright because the employee's conduct did not violate clearly established law. *Chavez v. Arte Publico Press*, 59 F.3d 539, 548 (1995), *vacated on other grounds in Univ. of Houston v. Chavez*, 517 U.S. 1184 (1996).

Taken in the light most favorable to Plaintiff, the facts alleged show that Warren and Cobb infringed Plaintiff's copyrighted materials. Plaintiff alleges that Warren and Cobb prepared materials for the PBR course, that the course materials contained 633 sample questions that were "verbatim, nearly verbatim, or substantially similar" to actual NAPLEX questions, which were proprietary and copyrighted, and that the materials were made available for purchase at a cost of $100.00 per set. (Compl. ¶¶ 8, 19, 22, 23, 30); *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247-48 (11th Cir. 1999) (per curiam) (elements of a copyright infringement claim are (1) ownership of a valid copyright and (2) copying of the copyrighted work, which may be proved by showing "substantial similarity" between the alleged copy and the copyrighted work).

The next question is whether Warren and Cobb's alleged conduct violated clearly established law. "'Clearly established law' is law that is sufficiently defined so as to provide public officials with 'fair notice' that the conduct alleged is prohibited." *Epps*, 492 F.3d at 1245 (quoting *Hope*, 536 U.S. at 739). The unlawfulness of the conduct must be apparent in light of preexisting law, but the precise action in question need not have been previously held unlawful. *Hope*, 536 U.S. at 739. "Fair notice" of prohibited conduct may be provided in the words of a federal statute or in case law. *Vinyard v. Wilson*, 311 F.3d 1340, 1350-52 (11th Cir. 2002).

Warren and Cobb argue that their alleged conduct did not violate clearly established law because the line between copyright infringement and fair use of copyrighted material is not clear, so they could reasonably believe that the fair use affirmative defense applied to their alleged use of the NAPLEX questions. While the fair use doctrine may not be clear in all circumstances, it is clear—and was clear at the time of the conduct alleged here—that copying, distributing and selling large numbers of secure test questions, such as Plaintiff's NAPLEX questions, is not fair use.

Secure tests, such as Plaintiff's NAPLEX questions, are entitled to copyright protection because they are "expressive works that are not costlessly created, and the costs are greater and so the incentive to create the tests is diminished if the tests cannot be used." *Chicago Bd. of Ed. v. Substance, Inc.*, 354 F.3d 624, 627 (7th Cir. 2003) ("There is no analytical difference between destroying the market for a copyrighted work by producing and selling cheap copies and destroying the subsequent years' market for a standardized test by blowing its cover."); *accord Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 539 (3d Cir. 1986) [hereinafter *Katzman*]; *cf.* 37 C.F.R. § 202.20(b)(4) (defining "secure test"); 37 C.F.R. § 202.20(c)(2)(vi) (providing special procedures for registering copyrights in test questions to preserve their confidentiality). While teaching the principles tested on the NAPLEX is permissible, doing so using the same fact patterns and answer choices found in NAPLEX questions is

not. *See Katzman*, 793 F.2d at 540; *Nat'l Conference of Bar Exam'rs v. Multistate Legal Studies, Inc.*, 458 F. Supp.2d 252, 259 (E.D. Pa. 2006).

The fair use exception to copyright protection, codified at 17 U.S.C. § 107, provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.[20]

---

[20]Congress added the last sentence to the fair use provision in 1992 to clarify the application of fair use doctrine to unpublished works. Fair Use of Unpublished Works, Pub. L. No. 102-492, 106 Stat. 3145 (1992); H.R. Rep. 102-836, at 1 (1992). In its report on the issue, the Senate Judiciary Committee noted that the bill was "not intended to reduce the protection of secure tests, the utility of which is especially vulnerable to unauthorized disclosure[.]" S. Rep. 102-141, at 6 (1991). In addition, in its report on the Technology, Education, and Copyright Harmonization Act of 2001 ("TEACH Act"), the House Judiciary Committee noted that the law did not apply to secure tests:

> The Committee is aware and deeply concerned about the phenomenon of school officials who are entrusted with copies of secure test forms solely for use in actual test administrations and using those forms for a completely unauthorized purpose, namely helping students to study the very questions they will be asked

Here, based on Plaintiff's allegations, Warren and Cobb copied a large number of NAPLEX questions, and the purpose of Warren and Cobb's use of the exam questions was not to serve the public interest in the free dissemination of information—they sold the questions for $100.00 per set. *See Assoc. of Am. Med. Colls. v. Mikaelian*, 571 F. Supp. 144, 152 (E.D. Pa. 1983). The nature of the copyrighted work is a secure test, which was developed and administered under strict security; the purpose of this security is to prevent NAPLEX candidates from gaining an unfair advantage on the exam that might result in the certification of pharmacists who are not actually qualified. Plaintiff alleges that 633 of Warren and Cobb's practice questions were "verbatim, nearly verbatim, or substantially similar" to actual NAPLEX questions.[21] Finally, Plaintiff contends that Warren and Cobb's use of the NAPLEX questions destroyed the value of the questions because they had to be discarded. Thus, even if Warren and Cobb's alleged activities could properly be considered the fair use

_____

on the real test. The Committee does not in any way intend to change current law with respect to application of the Copyright Act or to undermine or lessen in any way the protection afforded to secure tests under the Copyright Act. Specifically, this section would not authorize a secure test acquired solely for use in an actual test administration to be used for any other purpose.

H.R. Rep. 107-687, at 16 (2002).

[21]Each actual NAPLEX contains 185 exam questions. (Compl. ¶ 15.) It is unclear how many questions are in Plaintiff's item bank.

activity of "teaching,"[22] their alleged copying, sale and distribution of the NAPLEX questions can hardly be considered fair use. *See Mikaelian*, 571 F. Supp. at 151-53 (finding no fair use where defendants copied and sold "vast numbers" of plaintiff's secure MCAT test questions because (1) defendants made extensive, commercial use of copyrighted materials, (2) the materials were developed under strict security, (3) 90% of the defendant's materials were copied verbatim from plaintiff's test, and (4) defendant's use destroyed the value of plaintiff's test questions); *see also Chicago Bd. of Ed.*, 354 F.3d at 630-31 (publication of entire secure tests as "criticism" was not fair use because it destroyed the value of the tests); *Katzman*, 793 F.2d at 543 (finding no fair use where Princeton Review copied SAT questions for its SAT prep course); *Nat'l Conference of Bar Exam'rs v. Saccuzzo*, No. 03CV0737BTM(NLS), 2003 WL 21467772, at *8 (S.D. Cal. June 10, 2003) (finding no fair use where law school professors copied Multistate Bar Exam questions and disclosed them to students); *Educ. Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1090 (C.D. Cal. 1999) (finding no fair use where defendants copied secure test questions and sold them as exam preparation materials).

Because it was clear at the time of Warren and Cobb's alleged activities that their use of the NAPLEX questions constituted

---

[22]It is unclear whether the PBR course qualifies as "teaching" because the PBR course students do not receive a degree and do not become qualified or certified in anything after taking the course, and the course is not a prerequisite for further education. Rather, it is simply a cram course for a board certification exam. *See Mikaelian*, 571 F. Supp. at 152.

copyright infringement and was not fair use, the Court denies their motions to dismiss based on qualified immunity. Accordingly, Warren and Cobb's motions to dismiss Plaintiff's copyright infringement claims are denied.

C.    Warren and Cobb's Official Immunity Defense

Warren and Cobb contend that they are entitled to official immunity on Plaintiff's state law claims against them. As Plaintiff concedes, Plaintiff may not bring its trade secret misappropriation claims against Warren and Cobb in this Court because those claims are barred by Georgia law. (Pl.'s Br. at 80); *see also* O.C.G.A. § 50-21-23 (waiving sovereign immunity for torts of state employees acting in the scope of their employment only to the extent provided in GTCA and only with respect to actions brought in Georgia courts); O.C.G.A. § 50-21-25 (GTCA "constitutes the exclusive remedy for any tort committed by a state officer or employee. A state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor." "A person bringing an action against the state under the provisions of this article must name as a party defendant only the state government entity for which the state officer or employee was acting and shall not name the state officer or employee individually."); *see also Hardin v. Phillips*, 249 Ga. App. 541, 544, 547 S.E.2d 565, 568 (2001) (finding GTCA barred suit against university professors because (1) GTCA applied to the case, (2)

professors were state employees, and (3) actions were committed within scope of professors' employment).  For these reasons, the Court dismisses Plaintiff's trade secret misappropriation claims against Warren and Cobb.

Turning to Plaintiff's breach of contract claim against Warren, the Court notes that it has original jurisdiction over Plaintiff's copyright infringement claims against Warren, so the Court likely has supplemental jurisdiction over Plaintiff's breach of contract claim against Warren.[23]  *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

However, because the Court has dismissed Plaintiff's breach of contract and trade secret misappropriation claims against the Board and the trade secret misappropriation claims against Warren and Cobb, the Court finds that it is appropriate to decline to exercise supplemental jurisdiction over the breach of contract claim against Warren.  *See* 28 U.S.C. § 1367(c)(4) (permitting district courts to decline to exercise supplemental jurisdiction if there are "compelling reasons for declining jurisdiction"); *see also Parker v.*

---

[23]The Court observes that the only jurisdictional basis Plaintiff alleged for its state law claims against Warren is supplemental jurisdiction, 28 U.S.C. § 1367.  (Compl. ¶ 9.)

58

*Scrap Metal Processors, Inc.*, 468 F.3d 733, 745 (11th Cir. 2006) (listing factors to evaluate in determining whether to decline supplemental jurisdiction: judicial economy, convenience, fairness to the parties, and whether all claims would be expected to be tried together). First, it is not altogether clear whether Warren is entitled to immunity on Plaintiff's breach of contract claim against him. *See Feist v. Dirr*, 271 Ga. App. 169, 172, 609 S.E.2d 111, 114 (2004) (affirming summary judgment on immunity grounds in favor of university professor on breach of contract, fraud, conversion, negligent bailment, and deceptive trade practices claims—where all of the claims arose out of the same conduct). Second, Plaintiff may bring its state law breach of contract claim against the Board in state court. Therefore, if the Court retained jurisdiction over the breach of contract claim against Warren, there would be two different lawsuits on the exact same claims arising out of the exact same set of facts pending in two different courts. For these reasons, the breach of contract claim against Warren is dismissed.

CONCLUSION

As discussed above, the Renewed Special Limited Appearance Motion to Dismiss (Doc. 112) of the Board and the Official Capacity Defendants is granted. Defendant Cobb's Special Limited Appearance Motion to Dismiss (Doc. 110) is granted as to Plaintiff's claim against Cobb for trade secret misappropriation and denied as to Plaintiff's claim against Cobb for copyright infringement. Defendant

Flynn Warren, Jr.'s Renewed Special Limited Appearance Motion to Dismiss (Doc. 111) is granted as to Plaintiff's claims against Warren for trade secret misappropriation and breach of contract and denied as to Plaintiff's claim against Warren for copyright infringement.


IT IS SO ORDERED, this 18th day of April, 2008.


                                        S/Clay D. Land
                                          CLAY D. LAND
                                   UNITED STATES DISTRICT JUDGE

60